## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IDEAVILLAGE PRODUCTS CORP., a New Jersey Corporation,<br><br>           Plaintiff,<br><br>v.<br><br>BRETT SAEVITZON; ALL THE J'S, LLC, SPOT ON DIRECT RESPONSE, LLC; D R PRODUCT GROUP; PAUL VON MOHR; INTERACTIVE GROUP LLC; PREXIO TOYS LTD.; and INFOMERCIALS, INC.,<br><br>           Defendants. | Civil Action No: 11-7548(WJM)(MF)<br><br><br>**(ORAL ARGUMENT REQUESTED)**<br><br><br>*(Document Electronically Filed)* |

---

**BRIEF IN SUPPORT OF DEFENDANTS BRETT SAEVITZON AND
SPOT ON DIRECT RESPONSE, LLC'S MOTION TO DISMISS PLAINTIFF'S
VERIFIED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

---

**GENOVA, BURNS & GIANTOMASI**
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777

*Attorneys for Defendants,
Brett Saevitzon and Spot On Direct Response, LLC*

*Of Counsel and on the Brief:*
    Kathleen Barnett Einhorn, Esq.
    Rajiv D. Parikh, Esq.

*On the Brief:*
    Robert W. Ferguson, III, Esq.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY...................................... 1

   A.  The All the J's Consulting Agreement............................................................ 2

   B.  Negotiations with Spot On to Distribute Stompeez.................................... 4

   C.  IdeaVillage's "Verified" Complaint .............................................................. 5

LEGAL ARGUMENT................................................................................................. 7

POINT I ....................................................................................................................... 7

   PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM AGAINST
   SAEVITZON OR SPOT ON............................................................................... 7

   A.  IDEAVILLAGE'S BREACH OF CONTRACT CLAIM AGAINST
     SAEVITZON FAILS AS A MATTER OF LAW. ......................................... 8

      i.  Plaintiff's Complaint Lacks Factual Allegations Sufficient to
        Impose Alter Ego Liability on Saevitzon............................................. 10

      ii.  The Consulting Agreement Expired On October 31, 2010.................. 12

      iii.  The Plain Language of the Consulting Agreement Reveals that All
         the J's Had no Obligation to Present Every Product to IdeaVillage..................... 14

   B.  BECAUSE PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT
     FAILS AS A MATTER OF LAW, PLAINTIFF LIKEWISE HAS NO
     CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD
     FAITH AND FAIR DEALING ..................................................................... 19

   C.  PLAINTIFF FAILS TO STATE A CLAIM AGAINST EITHER
     SAEVITZON OR SPOT ON FOR PROMISSORY ESTOPPEL. ................. 20

      i.  Plaintiff Does Not Allege that Defendants Made a "Clear and
        Definite" Promise.............................................................................. 21

      ii.  Plaintiff's Reliance on Defendants' "Promises", if Any, Was
        Unreasonable as a Matter of Law. ..................................................... 23

   D.  PLAINTIFF FAILS TO STATE A CLAIM FOR TORTIOUS
     INTERFERENCE. ......................................................................................... 24

      i.  Plaintiff Never Had Any Contractual Right to Stompeez...................... 25

      ii.  No Prospective Economic Advantage ................................................. 26

   E.  PLAINTIFF FAILS TO STATE A CLAIM FOR UNFAIR
     COMPETITION UNDER THE LANHAM ACT. ........................................ 27

      A.  Unfair Competition: Trademark Infringement...................................... 27

       B.  Unfair Competition: False Advertising................................................................. 28

CONCLUSION............................................................................................................... 29

## TABLE OF AUTHORITIES

### CASES

*Aircraft Inventory Corp. v. Falcon Jet Corp.*,
   18 F. Supp. 2d 409 (D.N.J. 1998) ........................................................ 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................ passim

*Bauman v. Royal Indemnity Company*,
   36 N.J. 22 (1961)
   (citing 3 Williston, Contracts s 619 at p. 1784 (Rev ed. 1936) ................................. 15

*Buck v. Hampton Township School District*,
   452 F.3d 256 (3d Cir. 2006) ........................................................ 8

*Carthan v. Alliance, Div. of Rock-Tenn Co.*,
   2007 U.S. Dist. LEXIS 6465 (D.N.J., Jan. 29, 2007) ................................. 25

*Commerce Bancorp, Inc. v. BankAtlantic*,
   285 F. Supp. 2d 475 (D.N.J. 2003) ........................................................ 30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................ passim

*Deborah Heart & Lung Ctr. v. Children of the World Foundation., Ltd.*,
   99 F. Supp. 2d 481 (D.N.J. 2000) ........................................................ 30

*Ditri v. Coldwell Banker Residential Affairs, Inc.*, 954 F.2d 869 (3d Cir. 1992) ................ 31

*Florian Greenhouse, Inc. v. Cardinal IG Corp.*,
   11 F.Supp. 2d 521 (D.N.J. 1998) ........................................................ 27

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ........................................................ 8

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
   432 F.3d 463 (3d Cir. 2005) ........................................................ 30

*Gantes v. Kason Corp.*,
   145 N.J. 478 (1996) ........................................................ 12

*Grygorcewicz v. Schweitzer-Mauduit Int'l, Inc.*,
  2009 U.S. Dist. LEXIS 6756 (D.N.J. Jan. 30, 2009) ...................................... 20

*Harris v. Perl*,
  41 N.J. 455 (1964) ......................................................................... 27, 28

*J.E. Faltin Motor Transp., Inc. v. Eazor Exp., Inc.*,
  273 F.2d 444 (3d. Cir. 1959) .................................................................. 15

*J.M. ex rel. A.M. v. East Greenwich Tp. Bd. of Educ.*,
  No. 07-2861, 2008 U.S. Dist. LEXIS 23463, 2008 WL 819968, at *9 (D.N.J.
  March 25, 2008) .............................................................................. 21

*Karl's Sales & Serv. v. Gimbel Bros.*,
  249 N.J. Super. 487 (App. Div. 1991) ........................................................ 10

*Kempf v. Target Corp.*,
  2008 U.S. Dist. LEXIS 7326 at *12 (D.N.J. Jan. 31, 2008) .................................... 10

*Klaxon Co. v. Stentor Electric Mfg. Co.*,
  313 U.S. 487 (1941) ......................................................................... 12

*Korb v. Spray Beach Hotel Co.*,
  24 N.J. Super. 151 (App. Div. 1952) ................................................ 10, 14, 16

*Kruzits v. Okuma Mach. Tool*,
  40 F.3d 52 (3d Cir. 1994) ................................................................... 12

*Lum v. Bank of America*,
  361 F.3d 217 n. 3 (3d Cir. 2004) ............................................................. 8

*Malaker Corp. Stockholders Protective Committee v. First Jersey Nat'l Bank*,
  163 N.J. Super. 463 (App. Div. 1978), *certif. denied*, 79 N.J. 488 (1979) ................. 22

*N.J. Dep't of Envtl. Prot. v. Ventron Corp.*,
  94 N.J. 473 (1983) .......................................................................... 11

*Palisades Properties, Inc. v. Brunetti*,
  44 N.J. 117 (1965) .......................................................................... 20

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ................................................................. 22

*Pittsburgh v. West Penn Power,*
  147 F.3d 256 (3d Cir. 1998) ................................................................ 8

*Pop's Cones, Inc. v. Resorts International Hotel, Inc*
  *307 N.J. Super. 461 (App. Div. 1978)* ................................................ 26

*Printing Mart-Morristown v. Sharp Electronics Corp.,*
  116 N.J. 739 (1989) ..................................................................... 27, 28

*Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co.,*
  722 F. Supp. 184 (D.N.J. 1989) ..................................................... 9, 10

*Sonora Diamond Corp. v. Superior Court,*
  83 Cal. App. 4th 523 (Cal. App. 5th Dist. 2000) ............................... 12

*Sons of Thunder v. Borden,*
  148 N.J. 396 (1997) ........................................................................ 20

*State Capital Title & Abstract Co. v. Pappas Bus Serv., LLC,*
  646 F. Supp. 2d 668 (D.N.J. 2009) .......................................... 12, 13, 21

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,*
  210 F. Supp. 2d 552 (D.N.J. 2002) .................................................... 9

## STATUTES

15 U.S.C. § 1114(1) ............................................................................ 31

15 U.S.C. § 1125 .......................................................................... 31, 32

## OTHER AUTHORITIES

Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d
  ed. 2004) ...................................................................................... 12

## RULES

FED. R. CIV. P. 12(b)(6) ............................................................. passim

## PRELIMINARY STATEMENT

This Court should dismiss plaintiff Idea Village Products Corp.'s Verified Complaint because it fails to state a claim upon which relief can be granted.   Through this action, IdeaVillage, a sophisticated and well financed corporation, seeks to intimidate and bully Brett Saevitzon, a small business owner, and Spot On Direct Response, LLC ("Spot On") into signing a business deal regarding the newest hit product in the "As Seen On TV" market – Stompeez! – animated slippers with personality.   Rather than recognize Spot On's federally conferred intellectual property rights in Stompeez, IdeaVillage attempts, albeit unsuccessfully, to assert the existence of a grand conspiracy by Saevitzon, which 'tricked' IdeaVillage – a self described leader in the market – out of the rights to Stompeez.  Nothing can be further from the truth.  As set forth below, and notwithstanding the unsupported factual allegations and exaggerated legal conclusions in the Verified Complaint, IdeaVillage has failed to state any cognizable claim and this matter should be dismissed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff IdeaVillage Products Corp. ("IdeaVillage", "Plaintiff" or "IV") is "one of the largest 'As Seen on TV' marketing companies" and "one of the leading consumer product companies" in the United States.   It filed a Verified Complaint (the "Complaint") and an Order to Show Cause with a supporting brief and certification in the Superior Court of New Jersey, Chancery Division, Passaic County on December 7, 2011.  (*See* Docket Entry Nos. 1-1, 1-2.)  On December 28, 2011, co-defendant Paul von Mohr ("von Mohr") removed this action to this Court on the basis of federal question jurisdiction, as well as complete diversity of the parties pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1446.  (*See* Docket Entry No. 1.)  Despite the imaginative legal theories and aggrandized 'verified' factual conclusions included in the Complaint,

1

IdeaVillage has failed to state any claim against Mr. Saevitzon or Spot On upon which relief can be granted.

IdeaVillage alleges that its action involves the defendants' "theft and misuse of the exclusive rights to valuable intellectual property of a plush, "As Seen on TV" children's toy called "Stompeez". (*See* Compl. ¶1.) Stompeez are animated children's slippers – "slippers with personality" – that are available in seven (7) different styles. (*Id.* at Exh. C; *see also* www.stompeez.com (last accessed on December 28, 2011.)) IdeaVillage concedes that Spot On holds the intellectual property rights to Stompeez, including a trademark, the registration of which was filed on or about June 22, 2011. (*Id.* at ¶ 39(a).) However, IdeaVillage also contradictorily claims that **it** "holds all rights to the Stompeez product" – which it does not – by virtue of an expired consulting agreement with defendant All the J's, LLC ("All the J's" or "AJ").

## A.   The All the J's Consulting Agreement

In or around November 2009, IdeaVillage entered into a consulting agreement with All the J's, wherein All the J's would assist IdeaVillage in locating end-stage "As Seen on TV" products that could be taken to market. (*See* Compl. ¶ 19; *see also* Compl. at Exh. A (the "Consulting Agreement").) All the J's employees consisted of Mr. Saevitzon and his colleague Jodi Price ("Price"). (*See* Consulting Agreement.) All the J's and IdeaVillage's arrangement was memorialized in the Consulting Agreement, which was executed on or about February 5, 2010, but made effective as of November 1, 2009. (*Id.*) The Consulting Agreement required IdeaVillage to pay a monthly advance against future royalties to All the J's. (*Id.*) There was no other compensation to All the J's under the Consulting Agreement. (*Id.*) Despite IdeaVillage's

allegations, and even though the Consulting Agreement is poorly drafted,[1] it is clear that All the J's had the **option** of whether to bring products to IdeaVillage. (*See* Consulting Agreement at ¶1.3 ("[All the J's] **may** provide Product to [IdeaVillage] for a DRTV spot or retail distribution" (emphasis added).) Only if All the J's chose to bring a "product" to IdeaVillage, and IdeaVillage thereafter "accepted" the product did either of them incur additional contractual obligations to the other. (*Id.*) The term of the Consulting Agreement was for one year from November 1, 2009 through October 31, 2010. (*Id.* at ¶ 2 ("The term of this Agreement is one (1) year from the Effective Date through _____, 2010")(omission in original).) The Consulting Agreement also contained a confidentiality clause titled "Proprietary Information", an "Entire Understanding" clause, and a forum selection of New Jersey. (*See* Consulting Agreement at ¶¶ 5, 12, 13.) In addition, the Consulting Agreement specifically set forth that the parties were "independent, contracting entities" and not partners or agents of each other. (*See* Consulting Agreement at ¶ 6.) Following the expiration of the Consulting Agreement, Saevitzon brought some products to Plaintiff. On August 29, 2011, however, Saevitzon advised IdeaVillage that he would no longer be bringing it any additional products. (*See* Compl. at Exh. D).

From the expiration of the Consulting Agreement through approximately August 2011, Plaintiff continued to make monthly payments to All the J's. These payments represented a portion of the substantial accumulating royalties Plaintiff owes All the J's. (*See* Compl. at ¶ 28.)

IdeaVillage disputes the terms of the Consulting Agreement it drafted, claims that **Saevitzon** had contracted to work for IdeaVillage "on an exclusive basis", and that IdeaVillage was to receive "exclusive rights to any product found or developed by **Saevitzon**" during the purported "20-month" term of the agreement. (*See* Compl. at ¶¶ 20(a), 23(emphasis added).)

---

[1] The Consulting Agreement was drafted by IdeaVillage or an attorney on its behalf.

3

Plaintiff also alleges that it was "compensating" **Saevitzon**, even though the Consulting Agreement specifically outlines that payments to All the J's were simply advances on royalties that would be owed to All the J's in the future.  (*See* Compl. at ¶ 40; *compare* Consulting Agreement at ¶ 3.2.) Plaintiff also concludes, without any factual support, that All the J's was merely an *alter ego* of Saevitzon. (*See* Compl. at ¶ 10.)

**B.     Negotiations with Spot On to Distribute Stompeez**

In mid-September 2011, almost one year after the expiration of the Consulting Agreement, Saevitzon contacted IdeaVillage and advised that Spot On – an LLC of which he is the managing member – had two great products that they should discuss. (*See* Compl. at ¶ 29.) The products were Stompeez and TurboPak (a backpack that converts into a scooter). (*Id.* at ¶ 30.)  In advance of presenting the products to IdeaVillage, Spot On insisted that the parties execute a non-disclosure agreement. (*Id.* at ¶ 31.)  IdeaVillage agreed, and a "Confidentiality Agreement" was executed shortly thereafter.  (*See* Certification of Anand Khubani, submitted with IdeaVillage's Order to Show Cause, at Exh. C (the "Confidentiality Agreement") [Docket Entry No. 1-4].)  In the Confidentiality Agreement, IdeaVillage acknowledged that Stompeez and Turbopak, and all rights and information related thereto, were the property of Spot On. (*See* Confidentiality Agreement at ¶ 4.)  Plaintiff further acknowledged that it had no rights to any information transmitted by Spot On, and that it was to maintain all information received from Spot On as confidential. (*Id.* at ¶¶ 1, 4.) The purpose of the Confidentiality Agreement was to facilitate the exchange of confidential information regarding Stompeez from Spot On to IdeaVillage to aid their discussions regarding a potential distribution deal for Stompeez and/or Turbopak. (*Id.* at ¶5; *cf.* Compl. at ¶¶ 31, 32.) As such, Spot On and IdeaVillage engaged in discussions wherein IdeaVillage would assist Spot On in distributing Stompeez to certain

4

retailers.  (*See* Compl. at ¶¶ 32, 33.)  After significant negotiations over the period of a few months, the parties were unable to reach an agreement on the written terms of a deal. (*See generally* Compl.)

As a result of the parties' failure to reach a deal, IdeaVillage filed the instant litigation. IdeaVillage's allegations against Spot On are sparse, except it claims – again without any factual basis – that Spot On is an *alter ego* of Saevitzon.[2]  (*See* Compl. at ¶ 11.)  While conceding that a written agreement regarding Stompeez had not been finalized or executed, IdeaVillage claims that during the second week of October 2011 IdeaVillage and Spot On reached "an interim agreement" regarding distribution of Stompeez.  (See Compl. ¶ 33.)  Based on this unidentified 'interim agreement' IdeaVillage claims it met with Walmart and 'struck a deal' regarding the sale of Stompeez in Walmart stores.  (Compl. at ¶ 35.)  IdeaVillage asserts that after advising Saevitzon about the Walmart meeting, Saevitzon "held up" IdeaVillage and made additional demands regarding a potential distribution deal.  (Compl. at ¶ 36.)  IdeaVillage concedes it nonetheless continued to negotiate the terms of an agreement to distribute Stompeez with Spot On, but no terms were ever agreed to. (Compl. at ¶ 37.)  As a result, IdeaVillage alleges it was injured and that it uncovered a scheme – that it does not factually set forth – where Saevitzon and/or Spot On sought to steal or misappropriate IdeaVillage's rights, including the intellectual property rights to Stompeez.

## C.   IdeaVillage's "Verified" Complaint

IdeaVillage's Complaint alleges seven (7) causes of action against Saevitzon and/or Spot On and seeks injunctive relief and transfer of all intellectual property rights in Stompeez to Plaintiff: (1) Breach of Contract (Saevitzon); (2) Breach of Implied Covenant of Good Faith and

---

[2]  IdeaVillage similarly claims – without any factual basis – that defendant D R Products Group, LLC ("DRP") is also an *alter ego* of Saevitzon.

Fair Dealing (Saevitzon); (3) Promissory Estoppel (Saeviton and Spot On); (4) Tortious Interference with Contract (Spot On); (5) Unfair Competition (Saevitzon and Spot On); (6) Tortious Interference with Prospective Economic Advantage (Saevitzon and Spot On); and (7) Declaratory Judgment (Saevitzon and Spot On). As set forth below, even assuming all of the properly pleaded factual allegations as true, IdeaVillage fails to state any claim against Saevitzon or Spot On (or the other defendants) upon which relief can be granted. As a result, the Complaint should be dismissed pursuant to FED. R. CIV. P. 12(b)(6).

## LEGAL ARGUMENT

## POINT I

## PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM AGAINST SAEVITZON OR SPOT ON.

As demonstrated below, none of Plaintiff's claims raises a cognizable cause of action under either federal or state law against Saevitzon or Spot On. Accordingly, these claims should be dismissed pursuant to Rule 12(b)(6), which permits a party to seek dismissal of a pleading "for failure to state a claim upon which relief can be granted." *See* FED. R. CIV. P. 12(b)(6).

In deciding a Rule 12(b)(6) motion, the court tests the legal sufficiency of the facts alleged in the complaint and, while "detailed factual allegations" are not required, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). The Supreme Court's decision in *Twombly* heightened the initial pleading standard, which was further refined in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In *Iqbal*, the Supreme Court highlighted the distinction between factual contentions and legal conclusions, and cautioned against accepting as sufficient "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 883. Interpreting *Iqbal*, the Third Circuit has instructed that district courts apply a two prong test when analyzing a plaintiff's complaint:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's **well-pleaded facts as true**, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." **In other words, a complaint must do more**

7

> than allege the plaintiff's entitlement to relief.  A complaint has
> to "show" such an entitlement with its facts.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted) (emphases

added).

In ruling on a motion to dismiss, the court may consider the complaint, exhibits attached

to the complaint, "matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders [and] items appearing in the record of the case."

*Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B

Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)); *see*

*also Lum v. Bank of America*, 361 F.3d 217, 222 n. 3 (3d Cir. 2004), abrogated in part on other

grounds by *Twombly*, 550 U.S. 544; *Pittsburgh v. West Penn Power*, 147 F.3d 256, 259 (3d Cir.

1998).  Here, each of Plaintiff's seven (7) causes of action implicates Saevitzon, Spot On, or

both.  After reviewing IdeaVillage's factual allegations and bare legal conclusions, each of its

claims fails as a matter of law, and should therefore be dismissed pursuant to Rule 12(b)(6).

## A.   IDEAVILLAGE'S BREACH OF CONTRACT CLAIM AGAINST SAEVITZON FAILS AS A MATTER OF LAW.

Count One of the Complaint alleges that Saevitzon breached the Consulting Agreement

between All the J's and IdeaVillage. *See* Compl. at ¶¶ 51-59.  Without supporting factual

allegations, Plaintiff seeks to hold Saevitzon to the terms of the Consulting Agreement, to which

he was never a party (as an individual) and which, by its plain and unequivocal terms, terminated

before the purportedly wrongful acts alleged in the Complaint.  *See* Compl. at ¶¶ 2, 7, 19-20, 29,

31, 33-34, 38, 40-41, 45, 47-48); *compare* Consulting Agreement at p. 1 (agreement "by and

between All the J's, LLC . . . and IdeaVillage Products Corp., LLC").  More important,

Plaintiff's claim rests on a tortured interpretation of the Consulting Agreement that defies both

common sense and the agreement's explicit language. This plain language reveals that All the J's was under no exclusive duty to deliver each and every product it identified, found or developed to IdeaVillage. For these reasons, Plaintiff's breach of contract claim against Saevitzon fails as a matter of law and, should be dismissed.

To state a claim for breach of contract under New Jersey law, a plaintiff must allege: "(1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (citing *Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co.*, 722 F. Supp. 184, 219 (D.N.J. 1989)). Further, "where no ambiguity exists in a contract it is the duty of the court, as a matter of law, to interpret the same." *Korb v. Spray Beach Hotel Co.*, 24 N.J. Super. 151, 155 (App. Div. 1952) (internal citations omitted); *accord Kempf v. Target Corp.*, 2008 U.S. Dist. LEXIS 7326 at *12 (D.N.J. Jan. 31, 2008). (attached to the Certification of Rajiv D. Parikh, Esq. submitted herewith ("Parikh Cert.") at Exh. A)   And, "where an ambiguity appears in a written agreement, the writing is to be strictly construed against the party preparing it." *Karl's Sales & Serv. v. Gimbel Bros.*, 249 N.J. Super. 487, 493 (App. Div. 1991).

IdeaVillage's allegations in this matter fail to state a claim that Saevitzon breached the Consulting Agreement. These allegations instead reveal: (1) no contract ever existed between IdeaVillage and Saevitzon; (2) the Consulting Agreement terminated on or about October 31, 2010; and (3) the plain, unambiguous language of the Consulting Agreement imposed no exclusive duty on All the J's to offer any product it discovered or developed to IdeaVillage. As to Brett Saevitzon, then, Count One of the Complaint should be dismissed.[3]

---

[3] For the reasons set forth herein, as well as in Point I.E., *infra*, IdeaVillage's claim for a declaratory judgment should likewise be dismissed.

### i.   Plaintiff's Complaint Lacks Factual Allegations Sufficient to Impose Alter Ego Liability on Saevitzon.

Plaintiff attempts to impose contract liability on Saevitzon, who is not a party to the Consulting Agreement or any other agreement with IdeaVillage, by flatly asserting that Spot On, All the J's, and defendant D R Product Group, LLC ("DRP") collectively constitute Brett Saevitzon's *alter ego*. *See* Complaint at ¶¶ 9-12. As Saevitzon's *alter-ego*, Plaintiff claims, All the J's bound both itself and Saevitzon when it entered the Consulting Agreement with IdeaVillage. *Id*. at ¶ 19. This conclusory assertion forms the entire basis of Plaintiff's effort to hold Saevitzon to the terms of the Consulting Agreement. Despite Plaintiff's imaginative theory, however, its claim rests entirely on a legal conclusion couched as a factual allegation, and contains no real allegations that, even if true, could give rise to a conclusion that Spot On, All the J's, or DRP are Brett Saevitzon's *alter ego*. *Accord Iqbal*, 556 U.S. at 883. A review of applicable New Jersey law demonstrates this deficiency.

To impose liability on a shareholder of a corporation, or a member of a limited liability company, as the case may be, for the contractual obligations of the business entity, New Jersey law requires a plaintiff to establish facts necessary to "pierce the corporate veil." *N.J. Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500 (1983). In some instances, a claimant may justify

10

its claim for imposing personal liability on the grounds that the entity acts merely as the shareholder or member's *alter ego*.[4]

Determining whether one entity constitutes an *alter ego* of another necessarily involves a fact-sensitive inquiry, but a claimant will not escape a motion to dismiss by merely stating the conclusion, as Plaintiff does here, that one party is the *alter ego* of the other. *State Capital Title & Abstract Co. v. Pappas Bus Serv., LLC*, 646 F. Supp. 2d 668, 680 (D.N.J. 2009) (dismissing complaint for failure to plead any facts supporting the remedy of piercing the corporate veil).

In support of its claim that All the J's constitutes Brett Saevitzon's *alter ego*, Plaintiff offers only that "[All the J's] registered address is Saevitzon's home" that "Saevitzon is the sole member of [All the J's]", and finally that "[All the J's] is the *alter ego* of Saevitzon." Complaint at ¶10. A thorough search of the Complaint reveals no other relevant allegations. Notably, Saevitzon's name appears in the Consulting Agreement only in passing – as the signatory and managing member for All the J's, and with reference to the services All the J's agreed to provide IdeaVillage. On the other hand, and as explicitly stated in the Consulting Agreement, IdeaVillage was hiring All the J's and advancing future royalties to both Saevitzon and Price for

---

[4] Because All the J's is registered in California, the Court faces a question of whether to apply California law or New Jersey law to Plaintiff's claim for *alter ego* liability. In determining what law to apply, this Court must use New Jersey's choice of law rules. *Kruzits v. Okuma Mach. Tool*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941)). New Jersey's choice of law rules require the Court to first determine if a true conflict exists by ascertaining whether California law prescribes a different result than does the law of New Jersey. *Gantes v. Kason Corp.*, 145 N.J. 478, 485 (1996). If not, New Jersey law applies. *Id.* For claims of *alter ego* liability, both New Jersey and California place the burden of proof on the plaintiff. *See Ventron Corp.*, 94 N.J. at 500 (noting that under New Jersey law, courts will not "pierce the corporate veil" absent a showing of fraud, injustice, or illegality); *see also Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (Cal. App. 5th Dist. 2000) (observing the rule in California that "without [the necessary] evidence, the alter ego doctrine cannot be invoked"). Because IdeaVillage articulates no facts to support its conclusion that the "BS Defendants" constitute alter egos of Saevitzon, this claim fails under the law of either State.

**All the J's services**.  Plaintiff merely incants the label "*alter ego*" against Saevitzon without alleging the facts necessary to reach this conclusion. This insufficient pleading does not meet the standards of *Twombly, Iqbal* or *State Capital Title & Abstract Co.*, and it is apparent that Plaintiff has not articulated facts sufficient to impose *alter ego* liability on Saevitzon for any supposed breach of the Consulting Agreement between IdeaVillage and All the J's. Accordingly, IdeaVillage's claim for breach of contract against Saevitzon fails as a matter of law, and should be dismissed.

### ii.  The Consulting Agreement Expired On October 31, 2010.

Even if All the J's is an *alter ego* of Saevitzon – which it is not – Plaintiff's breach of contract claim must nonetheless be dismissed for the additional reason that the Consulting Agreement expired on October 31, 2010, one year (1) from its "Effective Date" of November 1, 2009.  *See* Compl. at Exh. A., p.1, ¶ 2.0.  Even with the benefit of every favorable factual inference, the allegations in the Complaint make clear that the *earliest* possible date that Defendants[5] could have committed a "breach" is November 2010, after the Consulting Agreement expired. *Id.* at ¶40.  Juxtaposed against the clear language of the Consulting Agreement, Plaintiff's allegations thus make clear that any alleged "breach" would have occurred after the Consulting Agreement concluded. Plaintiff has therefore alleged that Defendants breached a contract that no longer existed. This assertion calls for the Court to recognize a legal impossibility and, as such, this Court should dismiss the First Count of the Complaint.

---

[5]  Contrary to IdeaVillage's conclusory statements, assuming that Saevitzon is an *alter ego* of All the J's, does not establish that Spot On or DRP were also *alter egos* of Saevitzon. Notwithstanding this fact, and under the explicit terms of the Consulting Agreement, IdeaVillage fails to state a claim upon which relief can be granted against any defendant named in this action. As such, and for purposes of this alternative argument, we refer to all "Defendants".

As noted above, the Court must interpret and apply the terms of an unambiguous contract as a matter of law. *Korb*, 24 N.J. Super. at 155 (internal citations omitted). Here, the Consulting Agreement unequivocally states "[t]he term of this Agreement is one (1) year from the Effective Date until _____, 2010." *See* Consulting Agreement at ¶ 2.0 (omission in original). The Consulting Agreement defines the "Effective Date" as November 1, 2009, and although the blank end date was never written in, it is indisputable that the term of the engagement concluded in "2010". *Id.* Because Plaintiff alleges no facts sufficient to discard this provision, the Court must enforce the Consulting Agreement as written, including its expiration date of October 31, 2010.

While IdeaVillage contends that the All the J's "compensation continued through the end of August, 2011 . . .", Compl. at ¶ 28, this fact alone provides insufficient justification, to ignore the plain and unambiguous 1-year term in the Consulting Agreement.[6]   Any argument by IdeaVillage that All the J's conduct extended the terms of the Consulting Agreement is undermined by its own allegations.   Tellingly, Plaintiff's Complaint contains not a single reference to the 1-year term of the Consulting Agreement.   To the contrary, Plaintiff attempts to downplay this explicit provision by referring instead to "a 20-month period covered by the [Consulting] Agreement . . ." Compl. at ¶ 23. By ignoring the Consulting Agreement's unambiguous 1-year term, and instead stating a conclusion that the Consulting Agreement actually lasted for 20 months, without alleging any facts to illustrate how an Agreement that lasted for one year – and which contained integration clause – was extended, Plaintiff again exposes its claim to dismissal. *See* Consulting Agreement at ¶ 12.

---

[6] It should be noted that the alleged "compensation" was actually royalty payments due to All the J's under the terms of the Consulting Agreement.

Thus, even if the Consulting Agreement imposed on All the J's an obligation to present each and every product it developed or discovered to IdeaVillage, which it did not, this duty would have expired on October 31, 2010. Plaintiff nevertheless expects the Court to disregard this plain, unambiguous provision of the Consulting Agreement without any factual or legal justification. Plaintiff alleges Defendants wrongfully developed Stompeez beginning in November 2010, in violation of an agreement that expired on October 31, 2010. For this additional reason, the First Count of the Complaint should be dismissed.

### iii. The Plain Language of the Consulting Agreement Reveals that All the J's Had no Obligation to Present Every Product to IdeaVillage.

Even if the Consulting Agreement extended beyond October 31, 2010, which it clearly did not, the plain language of the Consulting Agreement never required All the J's, let alone any other defendant, to present each and every product to IdeaVillage.[7] *See generally* Consulting Agreement. To the contrary, the Consulting Agreement only placed an affirmative obligation on All the J's – and All the J's alone – in two possible situations: (1) ***after*** All the J's, in its discretion, brought a "Product" to IdeaVillage ***and*** IdeaVillage accepted the Product for development; or (2) ***after*** IdeaVillage otherwise requested specific services regarding one of its Products from All the J's. Consulting Agreement at ¶¶ 1-2. No part of the Consulting Agreement ever required All the J's to bring every product to IdeaVillage. This conclusion

---

[7] Any argument that Paragraph 1 of the Consulting Agreement required All the J's provide its "**services**" (as distinguished from "**Products**") exclusively to IdeaVillage is undercut by additional provisions in the agreement that more specifically define the 'exclusivity' and the 'services.' *See J.E. Faltin Motor Transp., Inc. v. Eazor Exp., Inc.*, 273 F.2d 444 (3d. Cir. 1959); *see also Bauman v. Royal Indemnity Company*, 36 N.J. 12, 22 (1961)(citing 3 Williston, Contracts § 619 at p. 1784 (Rev ed. 1936)) ("[i]n interpretation of a contractual instrument, the specific is customarily permitted to control the general and this ordinarily serves as a sensible aid in carrying out its intendment"); *accord Fletcher-Harley Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 249 (3d Cir. 2007).

obtains from a natural reading of the Consulting Agreement's plain language, and is beyond any reasonable dispute. As such, this interpretation must control the Court's analysis. When viewed against IdeaVillage's allegations, then, the Consulting Agreement's plain terms demonstrate that the Complaint fails to allege a breach of any obligation imposed on All the J's.

Where a contractual provision contains no ambiguity, the role of the court is limited to enforcing the term as written. *See, e.g., Korb, supra,* at 155. The Consulting Agreement, which IdeaVillage drafted, provides a clear explanation of the parties' obligations to one another. This Court should accordingly enforce the Consulting Agreement as written. These terms contain no requirement that All the J's submit every product it develops to IdeaVillage. Indeed, the Consulting Agreement sets forth three (3) scenarios in which All the J's **might** incur obligations to IdeaVillage. None of those three (3) scenario's would have applied to Spot On's discovery of Stompeez.

Under Scenario I, "**[a]t IV's request**, AJ shall assist IV in the production of a DRTV spot for a AJ products (sic) by providing certain services to IV . . ." *See* Consulting Agreement at ¶ 1.2 (emphasis added). Scenario II, quoted at length below, begins with the sentence "AJ **may** provide Product to IV for a DRTV spot or retail distribution." *Id.* at ¶ 1.3 (emphasis added). Scenario II then explains that upon All the J's submission of a product, and its acceptance by IdeaVillage, All the J's agreed to assist and cooperate with IdeaVillage in developing that product. Finally, Scenario III refers to "[o]ther such projects or products for which **IV requests** AJ involvement and declares it is a ALL the J's project (sic) which shall be compensated as if it were a AJ Product. *Id.* at ¶ 1.4 (emphasis added).

Under each Scenario, All the J's only assumed obligations with respect to the "Product," a term defined to mean ". . . any product or item that **[All the J's] provides services to**

**[IdeaVillage]** for under this Agreement." *Id.* at ¶ 1.2 (emphasis added).   Similarly, ¶ 2 of the Consulting Agreement required All the J's to refrain from certain activities with respect to the "Product," to wit:

> (i) directly or indirectly, either by itself or in participation with any other person or entity, engage or otherwise assist in the marketing, advertising, distribution and or sale of the **Product**, or any Competing Product, via any means or media within the Territory, (ii) sub-licensee the patent or trademark or otherwise grant the right to any other person or entity to engage in the marketing, advertising, distribution or sale of the **Product** or any Competing Product in any consumer channel of distribution via any means or media within the Territory, and/or (iii) sell the **Product** or any Competing Product to any other person or entity for distribution sale or resale (sic) in any consumer channel of distribution via any means or media, within the Territory. The term "Competing Product", for the purposes of this Agreement, shall mean a product that is similar or identical to the **Product**.

> *Id.* at ¶ 2 (emphasis added).

Thus, All the J's only incurred concrete obligations to IdeaVillage with respect to those projects falling within the definition of "Product."  And, for a project or product to qualify as a "Product," All the J's must have provided one the services outlined in Scenarios I-III to IdeaVillage. All the J's had no obligations to IdeaVillage with respect to other products.

By the plain terms of the Consulting Agreement, the rights and responsibilities contained in each Scenario depended on the occurrence of some affirmative and discretionary act by one or both parties: IdeaVillage's "request" for All the J's services (Scenarios I & III); or All the J's decision to present a product to IdeaVillage *and* IdeaVillage's acceptance of that product for development and distribution (Scenario II). Only when one or both parties triggered these obligations did a product become the "Product." Because IdeaVillage makes no allegation that it "requested" All the J's services in connection with Stompeez prior to termination of the Agreement, its claim must rely on the language in Scenario II, which is unavailing. According to Scenario II:

16

[All the J's] **may** provide Product to IdeaVillage for a DRTV spot or retail distribution. IdeaVillage represents that upon its evaluation of the Product and at its sole discretion decides if it will do the creative marketing, finance the TV production for a DRTV Spot and the Media Test for certain Product. If IdeaVillage wishes to pursue the production and testing of a DRTV Spot for Product, All the J's shall assist with all aspects of the production of a DRTV spot as well as the front-end marketing. All the J's **if possible** shall grant to IdeaVillage or assist in IdeaVillage obtaining an exclusive license to market and distribute the Product. All the J's, **if possible**, shall grant to IdeaVillage an exclusive license for all intellectual property around the United States and Worldwide, including but not limited to, all patents, copyrights and trademarks associated with any t [sic] All the J's product presented to IdeaVillage under this Agreement.

Complaint, Ex. A. at ¶ 1.3 (emphasis added).

IdeaVillage's deliberate use of "**may**" to describe the process by which All the J's could present a product to IV for development makes clear that All the J's, at its election, could choose not to bring a product to IdeaVillage. For its part, IdeaVillage always retained the right to reject any product that All the J's presented. Only after IdeaVillage accepted a product, or otherwise requested All the J's services, did any obligations under Scenario II begin. The Complaint's reliance on these post presentation and acceptance obligations glosses over this particular prerequisite of the Consulting Agreement. Indeed, such clear, unequivocal language, coupled with the Consulting Agreement's conspicuous lack of any other provision that could be possibly construed as specifically imposing this type of obligation on All the J's, requires the conclusion that the Consulting Agreement means what it says: All the J's was free to develop products on its own or in connection with other entities.[8] Plaintiff's claim for breach of contract thus relies on

---

[8] This interpretation is also borne out by the fact that all amounts paid to All the J's reflected an "advance against all future royalty or compensation payments that IV may owe AJ under this agreements." Compl., Ex. A., at ¶ 3.2. As such, All the J's compensation derived wholly from the royalties generated by the products for which All the J's provided assistance.

the demonstrably false assertion that the Consulting Agreement required All the J's to present every product to IdeaVillage.

IdeaVillage's misinterpretation of the Consulting Agreement is apparent in other sections of its "Verified" Complaint.  For example, it alleges that Saevitzon, through All the J's, "was precluded from becoming a member of Spot On and/or DRP (or any other LLC that performed similar services as Saevitzon and/or AJ), *without the written consent* of IdeaVillage." Compl. at ¶ 53 (emphasis added).  When viewed against the plain language of the Consulting Agreement, however, such a contention is palpably wrong as a matter of law.  Similarly, Plaintiff's allegation that the Consulting Agreement "required Saevitzon and All the J's to license the rights to Stompeez to IdeaVillage" lacks all merit.  Compl. at ¶ 52.  Indeed, the Complaint tellingly lacks any direct quotation of the Consulting Agreement's actual language, and instead relies on lengthy "blocks" of Plaintiff's underhanded attempt to recast and rewrite the Consulting Agreement in its favor. *See, e.g., id.* at ¶ 20. Such chicanery is easily spotted and should not be countenanced. The Agreement is plain and simple: If IdeaVillage accepted a product that All the J's chose to present, All the J's was obligated to cooperate with IdeaVillage in developing the Product. All the J's never agreed to forego other opportunities prior to presenting a Product to IdeaVillage that was accepted.  As such, Plaintiff has no valid claim against All the J's for breach of contract. By extension, then, Plaintiff has no breach of contract claim against Saevitzon. The First Count of the Complaint should accordingly be dismissed.

**B.    BECAUSE PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT FAILS AS A MATTER OF LAW, PLAINTIFF LIKEWISE HAS NO CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

The Second Count of the Complaint alleges breach of the implied covenant of good faith and fair dealing against Saevitzon and All the J's.  As set forth above, because Plaintiff fails to allege any facts that would permit the Court to impose contractual liability upon Saevitzon, its claim against Saevitzon for breach of the implied covenant of good faith and fair dealing likewise fails as a matter of law. The Court should therefore dismiss the Second Count of the Complaint as to Saevitzon.

In New Jersey, "every contract . . . contains an implied covenant of good faith and fair dealing." *Sons of Thunder v. Borden*, 148 N.J. 396, 420 (1997) (internal citations omitted). This covenant generally prohibits contracting parties from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). Nevertheless, "it is axiomatic that a contract must exist between two parties before a court will infer this covenant." *Grygorcewicz v. Schweitzer-Mauduit Int'l, Inc.*, 2009 U.S. Dist. LEXIS 6756 (D.N.J. Jan. 30, 2009) (citing *J.M. ex rel. A.M. v. East Greenwich Tp. Bd. of Educ.*, No. 07-2861, 2008 U.S. Dist. LEXIS 23463, 2008 WL 819968, at *9 (D.N.J. March 25, 2008) (*See* Parikh Cert. at Exs. B and C).

As demonstrated in Point I A., *supra*, Plaintiff provides no factual or legal justification for imposing upon Saevitzon the terms of the Consulting Agreement, to which it ascribes an unreasonable and legally unsupportable meaning.  *Accord State Capital Title & Abstract Co.*, 646 F. Supp. 2d 668.  Because Plaintiff had no contract with Saevitzon, it likewise has no claim

against Saevitzon for breach of the implied covenant of good faith and fair dealing. The Third Count of the Complaint must accordingly be dismissed as to Saevitzon.

## C.     PLAINTIFF FAILS TO STATE A CLAIM AGAINST EITHER SAEVITZON OR SPOT ON FOR PROMISSORY ESTOPPEL.

Plaintiff's claim for promissory estoppel should be dismissed for the simple reason that Plaintiff, again, fails to plead the elements necessary to make out this cause of action. *Accord Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 883. Instead of articulating facts sufficient to draw an inference – however generous – that it may recover under this theory, IdeaVillage merely recites the legal requisites of a promissory estoppel claim under New Jersey law. As a result, the Third Count of the Complaint should be dismissed.

To state a claim for promissory estoppel under New Jersey law, a plaintiff must plead the following four (4) elements: "(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise." *Malaker Corp. Stockholders Protective Committee v. First Jersey Nat'l Bank*, 163 N.J. Super. 463, 479 (App. Div. 1978), *certif. denied*, 79 N.J. 488 (1979). *See also Aircraft Inventory Corp. v. Falcon Jet Corp.*, 18 F. Supp. 2d 409, 416 (D.N.J. 1998) (observing the requirements of a promissory estoppel claim under New Jersey law to be the same). Plaintiff's allegations fall short of each element.

In order to withstand the within motion to dismiss, Plaintiff's claim for promissory estoppel must plead each of the above four (4) elements with enough particularity to satisfy the pleading requirements set forth by the Supreme Court in *Twombly* and *Iqbal*. In *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008), the Third Circuit, addressing the

appropriate standard to be employed on a 12(b)(6) motion in the wake of *Twombly*, observed that a complaint must include "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." (quoting *Twombly, supra*, 550 U.S. at 555, n. 3). According to *Twombly*, "stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest" the cause of action. 550 U.S. at 556. Stated differently, the allegations must raise a "reasonable expectation that discovery will reveal evidence of" the required elements. *Id.* The Third Count of the Complaint fails this test.

Plaintiff bases its promissory estoppel claim on discussions that occurred at an alleged meeting between Spot On and IdeaVillage, after which IdeaVillage supposedly made several nebulous and undisclosed "promises" to Walmart. Complaint at ¶¶ 33-37. Aside from mere recitations of the elements of promissory estoppel, however, this claim presents no allegations satisfying the first and fourth elements of this claim under New Jersey law, and should therefore be dismissed. *Accord Iqbal*, 556 U.S. at 883.

### i. Plaintiff Does Not Allege that Defendants Made a "Clear and Definite" Promise.

First, the Complaint contains no real allegation that Saevitzon, Spot On (or any other Defendants) made a "clear and definite promise" to IdeaVillage. New Jersey's courts have consistently held that a claim for promissory estoppel may only proceed where the claimant specifically identifies the "clear and definite" promise to be enforced. *Malaker, supra*, 163 N.J. Super. at 479. This element is undoubtedly "the *sine qua non* for applicability of this theory of recovery." *Id.* Traditionally, courts interpreted this requirement strictly, requiring an "express promise of a clear and definite nature." *Id.* at 484. Although later cases have seemed to relax this requirement, a plaintiff must still include the essential terms of the promise in order to state a *prima facie* case for promissory estoppel.

21

Even under a more flexible approach than the test in *Malaker*, IdeaVillage's allegations here hardly suggest that any defendants made any clear and definite promise. In "alleging" Defendants made a "clear and definite promise" to Plaintiff, the Complaint states:

> Saevitzon, Spot On, DRP and von Mohr made a clear and definite promise that they would agree to license the Stompeez Rights to IdeaVillage. Saevitzon, Spot On and von Mohr made that promise with the intent that IdeaVillage rely on it, in order to induce IdeaVillage to Walmart, as more fully set forth above.

Complaint at ¶ 67. IdeaVillage's only other attempt to describe the parties' conduct relative to the Walmart meeting falls short as well. Plaintiff states:

> [i]n advance of that [Walmart] meeting, Saevitzon (i) confirmed that IdeaVillage would distribute Stompeez in Walmart, (ii) provided IdeaVillage with samples of Stompeez to provide to Walmart, and (iii) wished IdeaVillage "luck" in making the presentation.

*Id.* at ¶ 34.

When viewed in connection with the pleading requirements articulated in *Twombly* and *Iqbal*, Plaintiff's allegations lack any suggestion of a "clear and definite" promise of the kind required by New Jersey law and outlined in *Malaker* and later cases. To the contrary, Plaintiff's bare bones allegations merely recite the elements of this cause of action. *Cf. Iqbal*, 556 U.S. at 883. Indeed, the Complaint raises no expectation that pretrial discovery will reveal any evidence of a clear and definite promise. Plaintiff claims that it relied on such a "clear and definite" promise by Defendants, yet cannot articulate any of the essential terms of that promise. As the party claiming to have detrimentally relied on this supposed promise, however, Plaintiff is best situated to articulate the essential terms of this promise with a reasonable degree of specificity. Because it has not, the Complaint lacks allegations sufficient to establish the first element required for a claim of promissory estoppel claim in New Jersey.

### ii.   Plaintiff's Reliance on Defendants' "Promises", if Any, Was Unreasonable as a Matter of Law.

Even if "confirm[ing] that IdeaVillage would distribute Stompeez", without settling on quantity, purchase price or delivery amounted to a clear and definite promise, any reliance thereon is inherently unreasonable as a matter of law. This is so especially with regard to IdeaVillage, which claims it "is one of the largest 'As Seen on TV' marketing companies in the United States." Compl. at ¶ 16.  Surely a business venture of such magnitude, with significant market experience or at least a reasonable actor in its position, would hardly rely on such a "promise" without "clear and definite" terms regarding the fundamental terms of a distribution agreement such as price, quantity and delivery.

While reasonableness is normally a question reserved for the trier of fact, a court may sometimes resolve the issue as a matter of law. For example, in *Carthan v. Alliance, Div. of Rock-Tenn Co.*, 2007 U.S. Dist. LEXIS 6465 (D.N.J., Jan. 29, 2007), the plaintiff brought a claim for promissory estoppel against his former employer, alleging that the defendant "promised him that he could serve as its in-house common carrier and then breached that promise when it denied him that position."  In response, the defendant highlighted the undisputed fact that it "did not promise [plaintiff] a specific amount of work, did not tell him that he would begin on any particular date, and did not discuss providing for load deliveries with him."  *Id.* at *17; Parikh Cert. at Ex. D.  Therefore, the defendant argued, the plaintiff's reliance on any discussions with the defendant's representatives was unreasonable as a matter of law.  The Court agreed.  *Id.*  Thus, the reasonableness of a party's reliance can only be determined by reference to the specificity of the purported "promise."

In addition, courts have long reviewed "reasonable reliance" in connection with the degree of injustice a party would suffer absent the requested remedy. In *Pop's Cones, Inc. v. Resorts International Hotel, Inc.*, the court recognized this principle, stating:

> [t]he promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, *on its definite and substantial character in relation to the remedy sought*, on the formality with which the promise is made . . . and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant. . . .

307 N.J. Super. 461, 475 (App. Div. 1978) (quoting the Restatement (Second) of Contracts § 90 cmt. b (1979)).

Here, the Third Count of the Complaint seeks a permanent injunction on the basis of a vague "promise" which Plaintiff describes as "confirm[ation] that IdeaVillage would distribute Stompeez in Walmart." Without specifying any terms of the promise to be enforced, Plaintiff would enjoin Defendants from "continuing to refuse to abide from its (sic) promise to and agreement with IdeaVillage related to Walmart . . ." *See* Complaint at ¶ 72. For a self-described commercially sophisticated entity like IdeaVillage to seek refuge in its "reliance" on a promise whose terms it has not, and cannot, articulate with any degree of specificity is simply not reasonable, and the Court should recognize as much as a matter of law. For these reasons, and those outlined in subsection i. above, the Third Count of the Complaint should be dismissed pursuant to Rule 12(b)(6).

**D.    PLAINTIFF FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE.**

In the Fourth and Sixth Counts of the Complaint, Plaintiff respectively brings claims for tortious interference with contract and tortious interference with prospective economic

advantage.  Plaintiff asserts the Fourth Count against Defendants Spot On, DRP, von Mohr, IG and Prexio, while the Sixth Count raises a claim for tortious interference with prospective economic advantage against all Defendants. For the reasons discussed below, neither of Plaintiff's tortious interference claims articulates a valid cause of action, and must therefore be dismissed.

To state a claim for interference, a plaintiff must establish the following elements: (1) an existing contract or "reasonable expectation of economic advantage"; (2) the defendant's knowledge of the contract; (3) the defendant's wrongful interference with that contract; (4) a reasonably probability that the loss of the contract was a result of the interference; and (5) resulting damages. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751-52 (1989); *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998). Under New Jersey law, "interference" is actionable only "if the act complained of does not rest upon some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of [fair] people . . ." *Harris v. Perl*, 41 N.J. 455, 561 (1964). Here, and as set forth above, Plaintiff never enjoyed a contractual right to Stompeez; thus, it has no "contract" regarding the "Stompeez Rights" and, by extension, had no reasonable expectation that it would ever acquire such rights. Plaintiff's claim therefore fails the first and third elements required under New Jersey law, and must be dismissed.

### i.    Plaintiff Never Had Any Contractual Right to Stompeez

As discussed at length in Point I.A., *supra*, and even with all favorable inferences, Plaintiff never had a reasonable expectation to the rights to Stompeez because the Consulting Agreement never granted it such rights. Thus, while Plaintiff may have indeed had a "contract"

with All the J's, that agreement never entitled it to distribute Stompeez (or any other product that was not presented to it)[9]. Plaintiff therefore has no claim for tortious interference with contract.

### ii.   No Prospective Economic Advantage

In order to recover for tortious interference with a prospective economic advantage, a claimant must show that he held a protectable "right" or "interest" in the unconsummated relationship. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 751 (1989). That is, a claimant may not recover unless he had a "reasonable expectation of economic advantage." *Id.* (quoting *Harris v. Perl*, 41 N.J. 455, 561 (1964)). Courts have interpreted this requirement to mean that the "complaint must demonstrate that a plaintiff was in "pursuit" of [the] business [lost]. *Id.* Plaintiff fails to allege a single relationship in which Defendants have interfered.

The Complaint alleges that "Defendants have intentionally and maliciously interfered with . . . IdeaVillage's prospective economic advantage, including, but not limited to, IdeaVillage's retail distribution rights with Walmart and other major retailers." *Id.* at ¶ 88. Conspicuously absent from Plaintiff's allegations, however, is a description of its arrangement, if any, with Walmart. Clearly, a claim for tortious interference with a prospective economic relationship must include a description of that underlying relationship; Plaintiff offers none, leaving Defendants and the Court to guess. Plaintiff similarly fails to include any allegations that it has lost any arrangement with Walmart. Moreover, Plaintiff offers no allegations that Defendants reached out to Walmart to interfere with its relationship with Plaintiff. Plaintiff's

---

[9] More important, Spot On, which controls the rights to Stompeez, never consummated a deal with IdeaVillage.

Complaint thus fails to state a claim for tortious interference. The Fourth and Sixth Counts of the Complaint should therefore be dismissed.

## E. PLAINTIFF FAILS TO STATE A CLAIM FOR UNFAIR COMPETITION UNDER THE LANHAM ACT.

Finally, IdeaVillage claims that Saevitzon, Spot On, All the J's, DRP, IG and Prexio are liable for unfair competition for "usurp[ing] and misappropriat[ing] the rights and interests of IdeaVillage . . . including the Stompeez Rights." Compl. at ¶ 82. Plaintiff further complains of Defendants' alleged "theft and misuse of the exclusive rights to valuable intellectual property (including a trademark) of . . . Stompeez." *Id.* at ¶ 1. And it further notes that it never "consented to Saevitzon's advertising, marketing or selling Stompeez." *Id.* at ¶ 43. Assuming these allegations are true, IdeaVillage's claim is properly characterized as a claim for trademark infringement and/or false advertising under Section 43(a) of the Lanham Act. Based on the allegations in the Complaint, however, such allegations fail to state a claim upon which relief can be granted and should be dismissed pursuant to Rule 12(b)(6).

### A. Unfair Competition: Trademark Infringement

In order to state a claim for infringement of a trademark, service mark, collective mark or certification mark, a plaintiff must establish that (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) the defendant(s)' use of the mark is likely to create confusion. 15 U.S.C. § 1114(1), 1125(a); *see also Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). In addition, these "standards apply to [both] claims brought under 15 U.S.C. § 1125 for unfair competition, as well as to claims for . . . unfair competition under New Jersey common law. *Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp. 2d 475, 483 (D.N.J. 2003) (citing *Deborah Heart & Lung Ctr. v. Children of the World Foundation., Ltd.*, 99 F. Supp. 2d 481, 488 (D.N.J. 2000)).

Here, Plaintiff's claim for unfair competition fails because Plaintiff does not own the trademark or other intellectual property rights to Stompeez. Indeed, Plaintiff does not allege that it has attempted to register a trademark for Stompeez, but nevertheless asks the court to enjoin Defendants from "licensing, transferring, selling . . . or otherwise encumbering, in any way, any intellectual property rights of or to Stompeez, including the trademark thereof." Compl. at ¶ 31. Perhaps most importantly, Plaintiff acknowledges that Spot On has filed a trademark registration for Stompeez. Compl. at ¶ 39. Spot On's ownership of the Stompeez trademark is therefore dispositive of this claim. Plaintiff cannot seek relief in this Court related to a trademark which it admits it does not own. As such, it has not pled the second element of an unfair competition claim under the Lanham Act, and the Fifth Count of the Verified Complaint should be dismissed.

## B.  Unfair Competition: False Advertising

Plaintiff's assertions of false advertising by Saevitzon under Section 43(a) of the Lanham Act similarly lack merit. In the Third Circuit, a false advertising claim under 15 U.S.C. § 1125 requires: (a) a false or misleading statement about plaintiff's or another's product; (b) actual deception or a tendency to deceive a substantial portion of the intended audience; (c) the deception is material in that it is likely to influence purchasing decisions; (d) that the advertised goods traveled in interstate commerce; and (e) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *See Ditri v. Coldwell Banker Residential Affairs, Inc.*, 954 F.2d 869, 872 (3d Cir. 1992). IdeaVillage has failed to allege any facts supporting any of the elements of this claim, rather relying upon a single statement that it did not consent to Saevitzon advertising Stompeez. *See* Compl. at ¶ 43. Its failure to plead any other facts regarding unfair competition is fatal to this claim. For this reason, the Fifth Count of the Complaint should be dismissed.

28

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant defendants, Brett Saevitzon and Spot

On Direct Response, LLC's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).

Respectfully submitted,

**GENOVA, BURNS & GIANTOMASI**
Attorneys for Defendants,
Brett Saevitzon and Spot On Direct Response, LLC

By: _/s/Rajiv D. Parikh_____
RAJIV D. PARIKH

478076v4

29