**GENOVA, BURNS & GIANTOMASI**
494 Broad Street
Newark, New Jersey 07102
(973) 533-0777
Attorneys for Defendants,
Brett Saevitzon and
Spot On Direct Response, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IDEAVILLAGE PRODUCTS CORP., a New Jersey Corporation,<br><br>Plaintiff,<br><br>v.<br><br>BRETT SAEVITZON; ALL THE J'S, LLC, SPOT ON DIRECT RESPONSE, LLC; D R PRODUCT GROUP; PAUL VON MOHR; INTERACTIVE GROUP LLC; PREXIO TOYS LTD.; and INFOMERCIALS, INC.,<br><br>Defendants. | Civil Action No: 11-7548(WJM)(MF)<br><br>**CERTIFICATION OF RAJIV D. PARIKH, ESQ.**<br><br>*(Document Electronically Filed)* |

I, Rajiv D. Parikh, of full age, hereby certify as follows:

1.      I am an attorney at law licensed to practice in the State of New Jersey and the United States District Court for the District of New Jersey. I have full personal knowledge of the matters stated herein. I make this Certification in support of Defendant, Brett Saevitzon and Spot On Direct Response, LLC's Motion to Dismiss pursuant to FED R. CIV. P. 12(b)(6).

2.      Attached hereto as **Exhibit A** is a true and correct copy of the decision of the United States District Court of the District of New Jersey in *Kempf v. Target Corp.*, 2008 U.S. Dist. LEXIS 7326 (D.N.J. Jan. 31, 2008).

477015-1

3.     Attached hereto as **Exhibit B** is a true and correct copy of the decision of the United States District Court of the District of New Jersey in *Grygorcewicz v. Schweitzer-Mauduit Int'l, Inc.*, 2009 U.S. Dist. LEXIS 6756 (D.N.J. Jan. 30, 2009).

4.     Attached hereto as **Exhibit C** is a true and correct copy of the decision of the United States District Court for the District of New Jersey in *J.M. ex rel. A.M. v. East Greenwich Tp. Bd. of Educ.*, No. 07-2861, 2008 U.S. Dist. LEXIS 23463, 2008 WL 819968 (D.N.J. March 25, 2008)

5.     Attached hereto as **Exhibit D** is a true and correct copy of the decision of the United States District Court for the District of New Jersey in *Carthan v. Alliance, Div. of Rock-Tenn Co.*, 2007 U.S. Dist. LEXIS 6465 (D.N.J., Jan. 29, 2007).

I certify under penalty of perjury that the foregoing is true and correct.

s/ Rajiv D. Parikh
RAJIV D. PARIKH

Executed on December 30, 2011

# Exhibit A



PAUL KEMPF, Plaintiff, v. TARGET CORPORATION, NC HOLDINGS and/or NORMARK CORPORATION, "ABC COMPANY 1-5" and "DEF COMPANY 1-5", (both being fictitious designations), Defendants. TARGET STORES, A DIVISION OF TARGET CORPORATION, Third Party Plaintiff, v. NORMARK CORPORATION, Third Party Defendant.

Civil Action No. 06-CV-1935 (DMC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2008 U.S. Dist. LEXIS 7326*

January 31, 2008, Decided
January 31, 2008, Filed

**NOTICE:** NOT FOR PUBLICATION

**COUNSEL:** [*1] For **JUDGE ALVIN WEISS**, Arbitrator: ALVIN WEISS, *LEAD ATTORNEY*, PORZIO, BROMBERG & NEWMAN, PC, MORRISTOWN, NJ.

For **PAUL KEMPF**, Plaintiff: EVAN D. BAKER, *LEAD ATTORNEY*, LAW OFFICES OF ROSEMARIE ARNOLD, ESQ., FORT LEE, NJ; **ROSEMARIE ARNOLD**, *LEAD ATTORNEY*, FORT LEE, NJ.

For **TARGET CORPORATION**, Defendant: JEFFREY L. O'HARA, MATTHEW S. SCHULTZ, *LEAD ATTORNEYS*, CONNELL FOLEY LLP, ROSELAND, NJ.

For **Normark Corporation**, ThirdParty Defendant: **ROSEANN PRIMERANO**, *LEAD ATTORNEY*, LAW OFFICE OF JOSEPH CAROLAN, PARSIPPANY, NJ.

For **TARGET CORPORATION**, ThirdParty Plaintiff: **JEFFREY L. O'HARA, MATTHEW S. SCHULTZ**, *LEAD ATTORNEYS*, CONNELL FOLEY LLP, ROSELAND, NJ.

For **TARGET CORPORATION**, Cross Claimant: **JEFFREY L. O'HARA, MATTHEW S. SCHULTZ**, *LEAD ATTORNEYS*, CONNELL FOLEY LLP, ROSELAND, NJ.

For **TARGET CORPORATION**, Cross Defendant: **JEFFREY L. O'HARA, MATTHEW S. SCHULTZ**, *LEAD ATTORNEYS*, CONNELL FOLEY LLP, ROSELAND, NJ.

For **Normark Corporation**, Cross Claimant: **ROSEANN PRIMERANO**, *LEAD ATTORNEY*, LAW OFFICE OF JOSEPH CAROLAN, PARSIPPANY, NJ.

For **TARGET CORPORATION**, Cross Defendant: **MATTHEW S. SCHULTZ**, *LEAD ATTORNEY*, CONNELL FOLEY LLP, ROSELAND, NJ.

For **Normark Corporation**, Cross Defendant: **ROSEANN PRIMERANO**, *LEAD ATTORNEY*, [*2] LAW OFFICE OF JOSEPH CAROLAN, PARSIPPANY, NJ.

**JUDGES:** Dennis M. Cavanaugh, U.S.D.J.

**OPINION BY:** Dennis M. Cavanaugh

**OPINION**

**OPINION**

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motions for summary judgment pursuant to *FED. R. CIV. P. 56* by Defendants Target Corporation ("Target") and NC Holdings, Inc. and Normark Corporation (collectively, with NC Holdings, Inc., "Normark"). Pursuant to *FED. R. CIV. P. 78*, no oral argument was heard. After carefully considering the submissions of the Parties, and

based upon the following, it is the finding of this Court that Target's motion for summary judgment is **denied in part** and **granted in part**; and Normark's motion for summary judgment is **denied.**

### I. BACKGROUND [1]

1    The facts set forth in this Opinion are taken from the undisputed facts set forth in the parties' *FED. R. CIV. P. 56* statements in their respective moving papers.

Plaintiff Paul Kempf alleges that, on July 6, 2004, while looking through a fishing display in a Target store located in Edgewater, New Jersey, Plaintiff's right palm became hooked by a fishing lure which was removed from its box. The lure was eventually identified as a Rapala "LC Long-Casting Minnow" lure, which is designed, manufactured, [*3] packaged and distributed by Normark. According to Plaintiff, there was no packaging anywhere in the vicinity. Plaintiff reported the incident to Target personnel, who, at Plaintiff's request, called an ambulance. Plaintiff was taken to the Emergency Room at Palisades Medical Center in North Bergen, New Jersey. The lure was removed and Plaintiff was discharged.

On or about March 3, 2006, Plaintiff filed a Complaint against Target, alleging that on July 6, 2004, Plaintiff was injured on Target's premises. Target subsequently filed a third-party Complaint against Normark. On April 27, 2006, Plaintiff filed an amended Complaint against Target and Normark. Plaintiff alleged that Normark negligently designed, manufactured, assembled and otherwise placed a hazardous product into the stream of commerce.

Target now moves for summary judgment against Plaintiff on the grounds that it did not have actual or constructive notice of the alleged dangerous condition and that Plaintiff's product liability should be dismissed because Target is an "innocent product seller" pursuant to *N.J.S.A. 2A:58C-9.* Additionally, Normark moves for summary judgment against Plaintiff on the grounds that Plaintiff failed [*4] to establish a *prima facie* case against Normark. Finally, Target seeks summary judgment against Normark because Target is indemnified by Normark pursuant to an agreement between Normark and Target, entered into on August 13, 2003, and referred to as the Partners Online Agreement ("POL Agreement"). Target argues that the indemnification clause contained in the POL Agreement demonstrates Normark's intention to indemnify Target for its own negligence.

### II. STANDARD OF REVIEW

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See *FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* The moving party bears the burden of showing that there is no genuine issue of fact. See *id.* "The burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.* The non-moving party "may not rest upon the mere allegations or denials   [*5] of his pleading" to satisfy this burden, but must produce sufficient evidence to support a jury verdict in his favor. See *FED. R. CIV. P. 56(e)*; see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).* However, "[i]n determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences - including issues of credibility - in favor of the nonmoving party." *Newsome v. Admin. Office of the Courts of the State of N.J., 103 F. Supp.2d 807, 815 (D.N.J. 2000),* aff'd, *2002 U.S. App. LEXIS 23350, 51 Fed. Appx. 76 (3d Cir. 2002)* (citing *Watts v. Univ. of Del., 622 F.2d 47, 50 (D.N.J. 1980)).*

### III. DISCUSSION

### A. BOTH MOTIONS FOR SUMMARY JUDGMENT AGAINST PLAINTIFF BY CO-DEFENDANTS TARGET AND NORMARK, RESPECTIVELY, MUST BE DENIED

After carefully reviewing the submissions by all of the Parties, this Court finds that there are significant issues of material fact, which preclude the grant of summary judgment against   [*6] Plaintiff.

### 1.   DEFENDANT TARGET'S MOTION FOR SUMMARY JUDGMENT

Target's motion for summary judgment is denied because there are disputed issues of material fact, thereby precluding the grant of summary judgment. A question of fact exists regarding whether Target had constructive knowledge of the alleged dangerous condition. Business owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation. See *Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 433, 625 A.2d 1110 (1993).* The duty of due care requires a business owner to discover and eliminate dangerous conditions, to maintain

the premises in safe condition and to avoid creating conditions that would render the premises unsafe. See *O'Shea v. K. Mart Corp., 304 N.J. Super. 489, 492-93, 701 A.2d 475 (App. Div. 1997)*. "Ordinarily an injured plaintiff asserting a breach of that duty must prove, as an element of the cause of action, that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident." *Nisivoccia v. Glass Gardens, 175 N.J. 559, 563, 818 A.2d 314 (2003)*. Constructive knowledge refers to notice that a particular condition existed for such a length of [*7] time as reasonably to have resulted in knowledge of the condition, had the owner/occupier been reasonably diligent. See *Parmenter v. Jarvis Drug Store, Inc., 48 N.J Super. 507, 510, 138 A.2d 548 (App. Div. 1957)*. Here, the alleged defect in the lure's packaging or design existed for such a period of time that Target had constructive knowledge or the alleged defect.

Target argues that there is no evidence to indicate that Target had constructive knowledge of the alleged defective condition. Target provides that Plaintiff has not deposed any Target personnel. Furthermore, Target alleges that photographs of the display where the lure was allegedly located, which were taken immediately after Plaintiff reported the incident, did not reveal anything out of place. Although this argument may act to strengthen Target's position that they lacked constructive notice of the defect, it only goes to the weight of the evidence. Even if accepted as true, this argument does not dispose of the issue whether Target had constructive notice of the alleged defective condition. That remains a question of fact to be determined by a jury.

Target's second basis for summary judgment, that it is a "product seller" and, therefore, [*8] not liable because it has identified the product manufacturer, is equally unavailing. In New Jersey:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

*N.J.S.A. §§ 2A:58C-2 (2007)*. Not only are manufacturers strictly liable for product defects, but "all subsequent parties in the chain of distribution, are strictly liable for damages caused by defectively designed products." *Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 394, 451 A.2d 179 (1982)*. A product seller, however, can be relieved of all strict liability claims upon the filing of an affidavit identifying the manufacturer of the product which allegedly caused the injury. See *N.J.S.A. §§ 2A:58C-9(b)*. A product seller can still be held liable [*9] under *N.J.S.A. §§ 2A:58C-9(d)*, which provides:

> A product seller shall be liable if: (2) The product seller knew or should have known of the defect in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage.

*N.J.S.A. § 2A:58C-9(d)*. Essentially, if Target had actual or constructive notice of a defect in the product, it can no longer claim to be merely an innocent product seller. There exists a genuine issue of material fact whether Target had constructive notice of the alleged defect, which precludes the grant of summary judgment.

## 2. NORMARK'S MOTION FOR SUMMARY JUDGMENT

Normark's motion for summary judgment is denied because there are disputed issues of material fact, thereby precluding the grant of summary judgment. Normark's first basis why summary judgment should be granted is that Plaintiff failed to establish a *prima facie* case for strict liability. Under the doctrine of strict liability, manufacturers --like Normark-- [*10] are liable for damages if the product left their hands in such a defective condition that it rendered the product dangerous for its intended use and it proximately caused Plaintiff's injury. See *Corbin v. Camden Coca-Cola Bottling Co., 60 N.J. 425, 431, 290 A.2d 441 (1972)*. "[A] plaintiff in a strict liability case must establish that the product was defective, that the defect arose while in the control of the defendant, and that the plaintiff suffered injury thereby." *Scanlon v. Gen. Motors Corp., Chevrolet Motor Div., 65 N.J. 582, 590, 326 A.2d 673 (1974)*. There exists sufficient evidence to establish that the lure or the lure's package was defective and that defect may have occurred while it was in Normark's control. Therefore, because there are issues of material fact which create a question for a jury, summary judgment must be denied.

Normark's second basis for summary judgment is that Plaintiff failed to establish the elements of a negligence claim. "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to other." *Rappaport v. Nichols, 31 N.J. 188, 201, 156 A.2d 1 (1959).* There exists a dispute in material [*11] fact whether Normark acted reasonably in packaging and shipping the lure. Therefore, Normark's motion for summary judgment is denied.

Normark's third basis for summary judgment that, no evidence exists to demonstrate a design defect because there was no expert testimony that the packaging was defective, is equally unavailing. One of the basic requirements for the admission of expert witness testimony is that the intended testimony must concern a subject matter that is beyond the understanding of the jury. See *State of N.J. v. Walter Townsend, 186 N.J. 473, 491, 897 A.2d 316 (2006).* Plaintiff correctly argues that, while under many circumstances, an expert is needed to testify to demonstrate the existence of a design defect, it is not always necessary. Because the facts at issue and the theory of liability are arguably not beyond the understanding of a jury, expert testimony may not be necessary.

## B. TARGET'S MOTION FOR SUMMARY JUDGMENT AGAINST NORMARK

Target's motion for summary judgment against Normark is granted with respect to the indemnification contract because the clear and unequivocal language of the indemnification clause provided in the POL Agreement between Normark and Target demonstrates [*12] that it was the intent of the parties that such indemnification would occur without regard as to the negligence of any party or parties, even if that negligence was solely that of Targets. A contract of indemnity is construed by applying the customary rules governing the interpretation of contracts. See *Univ. of Mass. Mem'l Med. Ctr., Inc. v. Christodoulou, 360 N.J. Super. 313, 321, 823 A.2d 51 (App. Div. 2003).* "Where no ambiguity exists in a contract it is the duty of the court, as a matter of law, to interpret the same." *Korb v. Spray Beach Hotel Co., 24 N.J. Super. 151, 155, 93 A.2d 578 (App. Div. 1955)* (citations omitted). "[W]here the parties have said, by very plain words, what they meant, the court has no duty to perform other than to carry their meaning into effect." Id. "A contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms." *Ramos v. Browning Ferris Indus., Inc., 103 N.J. 177, 191-92, 510 A.2d 1152 (1986)* (citing *Longi v. Raymond-Commerce Corp., 34 N.J. Super. 593, 603, 113 A.2d 69 (App. Div. 1955)).* The POL agreement provides, in pertinent part, that:

> Vendor [Normark] shall defend, indemnify and hold harmless Purchaser [*13] [Target], its parent, affiliates, agents and employees, from and against any and all liability, claims, suits, actions, losses and expenses, including costs and attorney fees, relating to or arising out of any claim or demand of any kind or nature, which any buyer or user of the Goods, or any other person (including employees or agents of Vendor), whether in privity to Purchaser or not, may make against Purchaser, based upon or arising out of the manufacture, delivery, ticketing, labeling, packaging, placement, promotion, sale or use of the goods.

(O'Hara Cert., P11, Exhibit I) (emphasis added). Here, Plaintiff alleged that the packaging, which contained the Rapala lure at issue, was defective. Plaintiff further alleged that the packaging was not sufficient to contain the lure, rendering the package not reasonably fit for its intended or reasonably foreseeable purpose. It is clear that the indemnification clause was designed to hold Target harmless for any claim or demand of any kind or nature which arises from, *inter alia,* the lure's packaging. Additionally, the indemnification clause goes on to provide that:

> It is the intent of the parties hereto that all indemnity obligations be without [*14] limit, without regard as to whether or not Purchaser furnishes specifications or inspects the Goods, and without regard as to the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive.

Id. (emphasis added). The plain language of this clause demonstrates clearly and unequivocally that it was the parties' intent that Normark would indemnify Target even if the negligence was solely that of Target's.

Normark, in its opposition brief, provided that the indemnification clause, which it claims was drafted by Target, was ambiguous and, therefore, should be strictly construed against Target. In support of this claim, Normark argues that, had the parties intended Normark to indemnify Target for its sole negligence, it would have phrased the clause to state: "Normark shall indemnify Target for its own negligence." While Normark's phrasing of the clause would achieve a clearer understanding of the intent of the parties, the clause as it was provided in the POL Agreement is sufficient to establish the nec-

2008 U.S. Dist. LEXIS 7326, *

essary standard of clearly and unequivocally expressing Normark's intent to indemnify Target, even for Target's own negligence.

## IV. CONCLUSION

For [*15] the reasons stated, it is the finding of this Court that Target's motion for summary judgment be **denied in part** and **granted in part;** and Normark's mo-

tion for summary judgment is **denied.** An appropriate Order accompanies this Opinion.

S/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.

Date: January 31, 2008

# Exhibit B



ANNA GRYGORCEWICZ, Plaintiff, v. SCHWEITZER-MAUDUIT INTERNA-
TIONAL, INC., Defendant.

Civil Action No. 08-cv-4370(FLW)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2009 U.S. Dist. LEXIS 6756*

January 30, 2009, Decided
January 30, 2009, Filed

**COUNSEL:** [*1] For **ANNA GRYGORCEWICZ, Plaintiff:** ANTONIO J. TOTO, *LEAD ATTORNEY,* SOUTH RIVER, NJ.

For **SCHWEITZER-MAUDIT, Defendant:** BRIAN D. LEE, *LEAD ATTORNEY,* OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., MORRISTOWN, NJ; **JENNIFER A. RYGIEL-BOYD,** OGLETREE DEAKINS NASH SMOAK & STEWART, MORRIS-TOWN, NJ.

**JUDGES:** Freda L. Wolfson, U.S.D.J.

**OPINION BY:** Freda L. Wolfson

**OPINION**

**WOLFSON, United States District Judge:**

Presently before the Court is a Motion brought by Defendant Schweitzer-Maudit International, Inc. ("Defendant") to dismiss Plaintiff Anna Grygorcewicz's ("Plaintiff") Complaint pursuant to *Fed. R. Civ. P. 12(b)(6).* In her Complaint, Plaintiff alleges that Defendant, her employer, terminated her employment after twenty-three years, and in doing so, breached the covenant of good faith and fair dealing. For the following reasons, Defendant's Motion to Dismiss is granted.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Defendant is a Delaware corporation maintaining its principal place of business in Alpharetta, Georgia. Def.'s Notice of Removal P 7. Plaintiff is a New Jersey resident and had been employed by Defendant for twenty-three years. Id. P 6; Pl.'s Compl. P 1. Plaintiff claims she "al-ways performed her job in a professional [*2] and workmanlike manner." Pl.'s Compl. P 2. Defendant terminated Plaintiff's employment after learning of Plaintiff's substance abuse problem. [1] Id. P 3. After receiving professional help for her "alcohol issues," Defendant refused to reemploy Plaintiff in her original job or offer her a substantially similar position. Id. P 5.

> [1] Plaintiff's Complaint alleges that upon learning of Plaintiff's substance abuse problem, Defendant terminated her employment. However, Plaintiff further alleges it was not until after Plaintiff received counseling for her addiction did Defendant decide to "terminate[] her permanently." The Court is unable to ascertain whether Plaintiff's initial termination was merely a suspension.

Plaintiff initiated this action in the Superior Court of New Jersey, Middlesex County Vicinage on July 7, 2008. On August 29, 2008, Defendant sought to remove this matter to the United States District Court for the District of New Jersey pursuant to *28 U.S.C. §1441,* asserting that jurisdiction is proper in this Court pursuant to *28 U.S.C. §1332(a).* Specifically, Defendant avers that (1) it is a Delaware corporation maintaining its principal place of business in Georgia and (2) in her [*3] Complaint, Plaintiff seeks damages in excess of $ 75,000. Def.'s Notice of Removal. On September 22, 2008, Defendant brought this Motion to Dismiss Plaintiff's Complaint pursuant to *Fed. R. Civ. P. 12(b)(6).* However, on October 15, 2008, this Court ordered that Defendant's Motion be adjourned until November 17, 2008. Notwithstanding this adjournment, Plaintiff has not filed a response to Defendant's Motion. Accordingly, the Court

shall consider the Motion unopposed. For the following reasons, Defendant's Motion to Dismiss is granted.

## II. DISCUSSION

### A. Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). Recently, in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), that "a complaint [*4] should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id. at 1968* (quoting *Conley*, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id. at 1965*. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 127 S.Ct. at 1965).

When a plaintiff fails to oppose a motion to dismiss for failure to state a claim, a court is still obligated to address the motion on its merits; thus, this Court must determine whether Plaintiff's Complaint fails to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)(6)*. [*5] *West v. American Honda Motor Co.*, No. 08-0700, 2008 U.S. Dist. LEXIS 72343, 2008 WL 4104683, at *2 (D.N.J. Aug. 28, 2008) (citing *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir.1991)).

### B. Covenant of Good Faith and Fair Dealing

Plaintiff alleges Defendant "failed to act in good faith and fair dealing by refusing to offer the Plaintiff her original position or a substantially similar one or even requiring her to seek professional help and/or the completion of an alcohol program." Compl. P 6. In response, Defendant argues that the covenant of good faith and fair dealing is inapplicable in the case at bar. Specifically,

Defendant contends no contract, either implied or explicit, existed between the parties, and as such, the implied covenant of good faith and fair dealing does not govern the parties' relationship. This Court agrees.

"The covenant of good faith and fair dealing is implied in every contract in New Jersey; thus, it is axiomatic that a contract must exist between two parties before a court will infer this covenant." *J.M. ex rel. A.M. v. East Greenwich Tp. Bd. of Educ.*, No. 07-2861, 2008 U.S. Dist. LEXIS 23463, 2008 WL 819968, at *9 (D.N.J. March 25, 2008) (citing *Space v. BRPM Towing Service, Inc.*, No. 07-947, 2007 U.S. Dist. LEXIS 93724, 2007 WL 4570157, at *6 (D.N.J. 2007)). [*6] This implicit duty ensures "neither party to a contract shall injure the right of the other to receive the fruits of the agreement." *Onderdonk v. Presbyterian Homes of New Jersey*, 85 N.J. 171, 425 A.2d 1057, 1062 (N.J. 1981). A defendant who acts with improper purpose or ill motive may be found liable for breaching the implied covenant if the breach upsets the plaintiff's reasonable expectations under the agreement. *Intarome Fragrance & Flavor Corp. v. Zarkades*, No. 07-873, 2008 U.S. Dist. LEXIS 97631, 2008 WL 5109501, at *6 (D.N.J. Dec. 2, 2008) (quoting *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 267 (3d Cir.2008)).

Although the covenant of good faith and fair dealing applies to "those aspects of an at will employment relationship which are governed by some contractual terms," see *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 390 (D.N.J. 1999), "[i]t is well settled that the implied term of fair dealing will not work to constrain an employer's discretion to terminate an at-will employee." *Scudder v. Media General*, No. 95-1073, 1995 U.S. Dist. LEXIS 11817, 1995 WL 495945, at *6 (D.N.J. Aug. 15, 1995); *Pepe*, 85 F. Supp. 2d at 390 (citations omitted); see also *DeJoy v. Comcast Cable Communications, Inc.*, 968 F.Supp. 963, 989 (D.N.J. 1997). In other words, a cause [*7] of action arising out of the covenant of fair dealing must fail in the absence of a cognizable contract claim. *ABD Monroe Inc. v. Monroe Twp.*, No. 04-1412, 2008 U.S. Dist. LEXIS 242, 2008 WL 58876, at *12-13 (D.N.J. Jan. 3, 2008) (citing *Pepe*, 85 F. Supp. 2d at 390); *Wade v. Kessler Institute*, 172 N.J. 327, 798 A.2d 1251, 1258 (N.J. 2002).

Here, Plaintiff's Complaint does not allege the existence of a contract, either oral or written, that governs the terms of her employment. Moreover, the fact that Defendant employed Plaintiff for over twenty-three years does not convert her at-will employment into the type that requires an employer to exercise a duty of good faith and fair dealing. *Barone v. Leukemia Society of America*, 42 F. Supp. 2d 452, 457-58 (D.N.J. 1998) (declining to extend the implied covenant of good faith and fair dealing to the at-will employment of a plaintiff employed for

2009 U.S. Dist. LEXIS 6756, *

over twenty-five years before she was discharged by the defendant). Regardless of the length of Plaintiff's tenure, without the existence of a contract, Plaintiff's covenant of good faith and fair dealing claim fails as a matter of law. *Daly v. Woodshire Apartments, No. 07-2526, 2008 U.S. Dist. LEXIS 23987, 2008 WL 820117, at \*6 (D.N.J. March 26, 2008)* (finding the plaintiff's [\*8] "at-will employment status impedes his ability to successfully raise a claim for breach of the covenant of good faith and fair dealing."). Accordingly, Defendant's Motion to Dismiss is granted.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is granted.

Dated: January 30, 2009

/s/ Freda L. Wolfson

**Freda L. Wolfson, U.S.D.J.**

# Exhibit C



J.M. and M.M., on behalf of A.M., and J.M. and M.M., individually, Plaintiffs, v. EAST GREENWICH TOWNSHIP BOARD OF EDUCATION, et al., Defendants.

Civil Action No. 07-2861(NLH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2008 U.S. Dist. LEXIS 23463*

March 25, 2008, Decided
March 25, 2008, Filed

**SUBSEQUENT HISTORY:** Reconsideration denied by J.M. v. E. Greenwich Twp. Bd. of Educ., 2008 U.S. Dist. LEXIS 72704 (D.N.J., Aug. 27, 2008)

**COUNSEL:** [*1] Alan A. Reuter, Esquire, Nash Law Firm LLC, Blackwood, NJ, *Attorney for Plaintiffs.*

William S. Donio, Esquire, Cooper Levenson April Niedelman & Wagenheim, P.A., Atlantic City, NJ, *Attorney for Defendants.*

**JUDGES:** NOEL L. HILLMAN, U.S.D.J.

**OPINION BY:** NOEL L. HILLMAN

**OPINION**

**HILLMAN,** District Judge

This matter has come before the Court on defendants' motion to dismiss certain claims in plaintiffs' complaint. For the reasons expressed below, defendants' motion will be granted in part and denied in part.

**BACKGROUND**

Plaintiffs, J.M. and M.M., are parents to their son, A.M., who at the time of the filing of their complaint was seven years old and a student in the East Greenwich School District. When A.M. was born, he was diagnosed with Noonan Syndrome, which is a genetic disorder. A.M. takes medication for a heart condition and he suffers from bilateral severe sensorineural hearing loss. Plaintiffs state in their complaint that it is "paramount" to them that A.M. is not limited, and they desire that A.M. not be taken out or precluded from a mainstream educational environment.

This lawsuit concerns an Individualized Educational Plan ("IEP") which was developed for A.M. for the 2006-2007 school year. Plaintiffs claim that [*2] defendants violated the Individuals with Disabilities Education Act (IDEA), *20 U.S.C. § 1400 et seq.,* by implementing A.M.'s IEP without a proper IEP meeting, and by not considering the parents' wishes for their son. Plaintiffs claim that the Child Study Team Supervisor, Mary Heade, improperly and unilaterally determined prior to the IEP meeting that A.M. was to be placed either in a self-contained classroom or beginner's kindergarten, without even considering A.M.'s placement in developmental kindergarten, a class in which A.M. was currently enrolled during the afternoon. Plaintiffs contend that Heade refused to even discuss the option of developmental kindergarten, even though M.M. had raised the issue numerous times.

It appears from the complaint that because plaintiffs objected to the IEP developed for their son, they filed a due process complaint pursuant to the procedures in the IDEA. It also appears that A.M. did not resume attendance at the Greenwich Township schools, but was instead home schooled. While being home schooled, plaintiffs requested additional services, such as speech therapy, occupational therapy, and physical therapy from the school district, but plaintiffs claim [*3] that these requests were denied.

Based on the foregoing, plaintiffs claim that defendants violated the IDEA (Count I), the Americans with Disabilities Act ("ADA") (Count II), Rehabilitation Act (Count IV), and New Jersey's Law Against Discrimination ("NJLAD") (Count V). Plaintiffs have brought these claims for direct violations of those laws, as well as pursuant to *42 U.S.C. § 1983* (Count III). Plaintiffs also

claim that defendants created a hostile educational environment (Count VI), breached the duty of good faith and fair dealing (Count VII), participated in a civil conspiracy (Count VIII), and committed the torts of intentional infliction of emotional distress (Count IX) and fraud (Count X).

Defendants have moved to dismiss all of plaintiffs' claims except for their IDEA claim. Defendants argue that this case is simply about the dispute over the IEP developed for A.M., and all the other claims either have no basis in law or plaintiffs have failed to state any basis for relief. Furthermore, defendants argue that because this case is essentially an appeal of an Administrative Law Judge's ruling on plaintiffs' due process petition brought pursuant to the IDEA's appeal procedures, this [*4] Court lacks subject matter jurisdiction over plaintiffs' other claims. Plaintiffs have opposed defendants' motion.

## DISCUSSION

### A. Jurisdiction

Plaintiffs have alleged this Court's jurisdiction over their claims based on federal law pursuant to *28 U.S.C. § 1331*, and supplemental jurisdiction over plaintiffs' state law claims pursuant to *28 U.S.C. § 1367*. Defendants have challenged the jurisdictional basis for plaintiffs' claims other then their IDEA claim.

### B. Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)*. It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. *Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977)*. [*5] However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3, 104 S. Ct. 1723, 80 L. Ed. 2d 196 (1984)* (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" *Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1969 n.8, 167 L. Ed. 2d 929 (2007)* (quoting *Scheuer v. Rhoades, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974))*. A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997)*. The defendant bears the burden of showing that no claim has been presented. *Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005)* (citing *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991))*.

Finally, a court in reviewing a *Rule 12(b)(6)* motion must only consider the facts alleged [*6] in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Group Ltd., 181 F.3d 410, 426 (3d Cir. 1999)*. A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)*. If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a *Rule 12(b)(6)* motion will be treated as a summary judgment motion pursuant to *Rule 56. Fed. R. Civ. P. 12(b)*.

### C. Analysis

Plaintiffs have advanced claims that can be separated into two categories: 1) the appeal of the ALJ's decision on their due process complaint concerning the IEP developed for A.M. for the 2006-2007 school year; and 2) all other claims arising from the events concerning and arising out of the development of the IEP. Defendants claim that the second category of plaintiffs' claims fall outside the scope of the primary issue, which is whether A.M. has received a free appropriate public [*7] education (FAPE). They also argue that those claims, if considered, constitute an impermissible end-run around the limited damages afforded by the IDEA.

Under the IDEA, any aggrieved party may "present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *20 U.S.C. § 1415(b)(6)*. The party may elect to have the complaint investigated by the state educational agency, see *34 C.F.R. § 300.661*, or avail itself of an "impartial due process hearing," *20 U.S.C. § 1415(f)*. Any party aggrieved by the outcome of the due process hearing "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States, without regard to the

amount in controversy." Id. *§ 1415(i)(2)(A).* This action must be initiated within 90 days from the date of the hearing officer's decision. Id. *§ 1415(i)(2)(B).* The district court is authorized to grant "such relief as the court determines is appropriate," including attorneys' fees, reimbursement for a private educational placement, and compensatory education. See id. [*8] *§ 1415(i)(3)(B)(i).*

In reviewing an administrative law judge's decision, a district court must employ a modified version of *de novo* review. *S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 269-70 (3d Cir. 2003).* Under this standard, the court "must make its own findings by a preponderance of the evidence," but "must also afford due weight to the ALJ's determination." *Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004).* The Third Circuit has explained that due weight means that the "factual findings from the administrative proceedings are to be considered *prima facie* correct," so that "if a reviewing court fails to adhere to them, it is obliged to explain why." *S.H., 336 F.3d at 271.*

A district court is not confined to hearing only those issues ruled upon by the ALJ, however. See *Rancocas Valley Reg'l High School, 380 F. Supp. 2d 490, 493 (D.N.J. 2005)* (noting that "the language creating subject matter jurisdiction is both explicit and broad"). Even though failure to raise an issue at the administrative level will result in a waiver of the issue in a civil action before a federal district court, "IDEA plaintiffs may raise claims not presented [*9] in the state due process hearing if it would have been impossible or futile for them to have done so." *S.C. v. Deptford Twp. Bd. of Educ., 213 F. Supp. 2d 452, 456-57 (D.N.J. 2002).* Examples of when it would be impossible or futile to bring a claim before the ALJ include,

[1] where the question presented is purely a legal question (*Lester H. by Octavia P. v. Gilhool, 916 F.2d 865, 869-70 (3d Cir. 1990)),* [2] where the administrative agency cannot grant relief (*Komninos by Komninos v. Upper Saddle River Bd. of Educ., 13 F.3d 775 (3d Cir. 1994)),* [3] where 'an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law,'" (*Association for Community Living in Colorado v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993)* (quoting H.R. Rep. No. 296, 99th Cong., 1st Sess. 7 (1985))[and] . . . [4] "where plaintiffs allege structural or systemic failure and seek system wide reforms[,]" *Romer, 992 F.2d at 1044;* see

also *Beth V. by Yvonne V. v. Carroll, 87 F.3d 80, 89 (3d Cir. 1996).*

*Grieco v. New Jersey Dept. of Educ., 2007 U.S. Dist. LEXIS 46463, 2007 WL 1876498, *6 (D.N.J. June 27, 2007).*

Thus, to determine whether plaintiffs' non-IDEA claims can survive defendants' motion for failure [*10] to state a claim, it must also be determined whether they should have been, and could have been, brought before the ALJ. To do so, each claim must be analyzed. [1]

1    Defendants attach a copy of the ALJ's opinion to their brief, and restate a portion of the ALJ's decision in their brief. Plaintiffs object to defendants' submission and use of the ALJ's opinion, arguing that it is irrelevant to defendants' motion to dismiss, which must only be based on the face of plaintiffs' complaint.

The Third Circuit has held that although "a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion." *Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004)* (citation omitted). "'[A] court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment.'" Id. (citing *Southern Cross, 181 F.3d at 427 n.7* (explaining that "[i]t has been suggested that the appropriate analogy is the hearsay rule, which allows an out-of-court statement to be admitted into evidence for purposes [*11] other than establishing the truth of the statement")).

The Court finds it premature to convert defendants' motion to one for summary judgment, and as such, aside from acknowledging that an ALJ issued a decision on plaintiffs' IDEA due process claim, the Court is constrained from otherwise considering the ALJ's findings at this time.

**1. Plaintiffs' ADA and Rehabilitation Act claims**

Plaintiffs claim that the school district and two individuals--Mary Heade, the Child Study Team Supervisor, and Barbara Harris, a Child Study Team member and case manager--violated the ADA by discriminating against A.M., M.M., and J.M. "under the guise of acting under the IDEA and applicable laws." (Compl. P 220.) Plaintiffs claim that defendants discriminated against them "because of, by virtue of and on the basis of the

disabilities of A.M. and thereby violated their rights under Title II" of the ADA by "denying Plaintiffs the benefits of receiving full and equal access to the public education programs and activities offered within the school district, when such access could have been achieved with reasonable accommodations." (*Id. P 221*.)

In addition to their ADA claims, plaintiffs allege that defendants collectively   [*12] violated *§ 504* of the Rehabilitation Act by denying "Plaintiff the benefits of receiving full and equal access to the public education programs and activities offered within the school district, when such access could have been achieved with reasonable accommodations, and by improperly restricting the rights of A.M. and the choices of M.M. and J.M. with respect to the education of A.M." (*Id. P 237*.)

Section 12132 of Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *42 U.S.C. § 12132*. This statement constitutes a general prohibition against discrimination by public entities. *New Directions Treatment Services v. City of Reading, 490 F.3d 293, 301-02 (3d Cir. 2007)*. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be   [*13] subjected to discrimination under any program or activity receiving Federal financial assistance." *29 U.S.C. § 794(a)*.

The Third Circuit has noted that "[a]s the ADA simply expands the Rehabilitation Act's prohibitions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized." *New Directions, 490 F.3d at 302* (citation omitted). The Third Circuit has also noted, however, that the ADA and the Rehabilitation Act are not exactly the same, and that the language of these two statutory provisions "regarding the causative link between discrimination and adverse action is significantly dissimilar." *Id. at 301 n.4* (citations omitted).

The Third Circuit has also found that although a party may use the same conduct as the basis for claims under both the IDEA and the Rehabilitation Act, a violation of the IDEA is not *per se* violation of the Rehabilitation Act, regardless of whether it meets the independent requirements for an ADA violation. *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation, 490 F.3d 337, 349 (3d Cir. 2007)* (stating that even in cases also brought under the

IDEA a   [*14] plaintiff must still prove that there was a violation of the Rehabilitation Act).

Thus, based on these principles, even though the ADA and Rehabilitation Act are very similar, and even though the same conduct may be used to support an ADA and/or Rehabilitation Act claim as used to support an IDEA claim, claims for violations of the ADA, Rehabilitation Act, and IDEA are distinct. As discussed below, the elements to prove an IDEA claim are different than those to prove an ADA and Rehabilitation Act claim, and the damages available for these claims are also different. [2] Additionally, plaintiffs were not able to bring these claims pursuant to the due process procedures of the IDEA when they challenged the development of A.M.'s IEP. Consequently, even though defendants may ultimately prove that plaintiffs have not been able to establish these claims, plaintiffs' ADA and Rehabilitation Act claims are not precluded by virtue of plaintiffs' availment of the IDEA due process procedure. [3]

2   Damages available under the Rehabilitation Act and ADA include compensatory damages, injunctive relief, and other forms of relief traditionally available in suits for breach of contract. See *A.W. v. Jersey City Public Schools, 486 F.3d 791, 804 (3d Cir. 2007)*.   [*15] Punitive damages are not available. *Bowers v. National Collegiate Athletic Ass'n, 346 F.3d 402, 429 (3d Cir. 2003)* (citing *Barnes v. Gorman, 536 U.S. 181, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002))*.

3   At least one court has found "where the ADA and Rehab Act claims are premised upon violations of the IDEA, the claims are merely derivative and suffer the same fate as the IDEA claim." *Emily Z. v. Mt Lebanon School Dist., 2007 U.S. Dist. LEXIS 79890, 2007 WL 3174027, *4 (W.D. Pa. 2007)* (citing *Melissa S v. School District of Pittsburgh, 183 Fed. Appx. 184, 188 (3d Cir. 2006)* (affirming grant of summary judgment where summary judgment was appropriately entered on IDEA claim and where "the allegations underlying the Rehabilitation Act claim do not differ substantively from those underlying the IDEA claim"), quoting *Matula, 67 F.3d at 492-93* ("there appears to be few differences, if any, between IDEA's affirmative duty and *§ 504*'s negative prohibition"); *Falzett v. Pocono Mountain School District, 152 Fed. Appx. 117, 120-21 (3d Cir. 2005)* (stating that, "[b]ecause Pocono provided Tiber with a FAPE, the District Court correctly granted Pocono summary judgment on Tiber's claims under the ADA, the Rehabilitation Act, and *42 U.S.C. § 1983*");   [*16] *Derek B. ex rel. Lester B. v. Donegal School District, Civ. No. 6-2402, 2007 U.S. Dist. LEXIS 2983, 2007 WL*

*136670 at * 13 (E.D. Pa. Jan.12, 2007) (holding that, because the court denied relief under the IDEA, it must also deny relief under *§ 504); P.G. ex rel. C.B. v. Southern York County School District, 2006 U.S. Dist. LEXIS 77197 , 2006 WL 3042966 (M.D. Pa. Oct.24, 2006)* (stating that where § 504 and ADA claims are premised upon the same core of operative facts as an IDEA claim, the Commonwealth Court's entry of judgment in favor of the school district on the IDEA claim mandated, on the basis of collateral estoppel, the entry of judgment in favor of the school district on the ADA and Rehab Act claims) and *Colon ex rel. Disen-Colon v. Colonial Intermediate Unit 20, 443 F. Supp. 2d 659, 677 (M.D. Pa. 2006)).* That case was decided at the summary judgment stage, however, and is inopposite here.

Even though the Third Circuit has not specifically addressed the issue, it appears that damages available under the IDEA are limited to compensatory education. *Brandon V. v. Chichester School Dist., 2007 U.S. Dist. LEXIS 53852, 2007 WL 2155722, *3(E.D. Pa. July 25, 2007)* (reviewing decisions from other circuits and holding, "The Court agrees with the overwhelming weight of authority that compensatory [*17] damages are generally inconsistent with the purpose and statutory scheme of the IDEA, and until the Third Circuit holds otherwise, will not recognize damages as an available form of relief in IDEA actions").

This finding, however, does not address whether these claims can survive defendants' motion to dismiss. In order to make out a *prima facie* case of disability discrimination under the ADA, a plaintiff must establish that he (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse action because of that disability. *Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006)* (citation omitted). A plaintiff can prove his Rehabilitation Act claim where "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007)* (quoting *Ridgewood Board of Education v. N.E., 172 F.3d 238, 253 (3d Cir. 1997)).* [*18] [4] Reviewing plaintiffs' allegations against these standards, plaintiffs have adequately pleaded their ADA and Rehabilitation Act claims for the purposes of *Rule 12(b)(6).*

4   Even though the Third Circuit has not specifically addressed the issue, it appears that to prove a Rehabilitation Act claim, a plaintiff must show that the defendant acted with deliberate indifference. See *L.T. v. Mansfield Tp. School Dist., 2007 U.S. Dist. LEXIS 58924, 2007 WL 2332308, *5 (D.N.J. Aug. 10, 2007).*

Despite this, there are several problems with these claims as pleaded by plaintiffs. First, plaintiffs seeks punitive damages for defendants' alleged ADA and Rehabilitation Act claims. Punitive damages are not available for these claims. See *Doe v. County of Centre, PA, 242 F.3d 437, 455-58 (3d Cir. 2001)* (concluding punitive damages are not available under *§ 504* of the Rehabilitation Act or Title II of the ADA).

Second, claims against the individual defendants are unavailable for these claims. With regard to the ADA, the Third Circuit has followed other circuit courts of appeals in holding that individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively. *Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002)* [*19] (citations omitted).

With regard to the Rehabilitation Act, the Third Circuit has held that if an individual defendant does not receive federal aid, a plaintiff cannot state a claim against him or her under the Rehabilitation Act. See *Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002).* Here, because plaintiffs have not alleged that any of the teachers or administrators receive federal aid, following *Emerson,* the individual defendants cannot be held liable under *Section 504* of the Rehabilitation Act.

Thus, plaintiffs' ADA and Rehabilitation Act claims may proceed past the motion to dismiss stage, except that punitive damages are unavailable and these claims can only be maintained against the Board of Education.

## 2. Plaintiffs' claims brought pursuant to *42 U.S.C. § 1983*

Plaintiffs have asserted a separate cause of action against defendants pursuant to *42 U.S.C. § 1983.* As a primary matter, *§ 1983* does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere. *Doe v. Delie, 257 F.3d 309, 314 (3d Cir. 2001)* (citing *Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)).* To the extent that plaintiffs [*20] are bringing their IDEA, ADA, and Rehabilitation Act claims pursuant to *§ 1983,* the Third Circuit has recently clarified that this is improper. In *A.W. v. Jersey City Public Schools, 486 F.3d 791, 803, 805 (3d Cir. 2007),* the Third Circuit held that *§ 1983* is not available to provide a remedy for defendants' alleged

violations under the IDEA or *Section 504*. Even though the A.W. court did not address whether the prohibition applies to ADA claims brought pursuant to *§ 1983*, because the ADA, as noted above, is the public analogue of the Rehabilitation Act, it is clear that this prohibition with regard to the IDEA and the Rehabilitation Act is applicable to the ADA as well. See *Woodruff v. Hamilton Tp. Public Schools, 2007 U.S. Dist. LEXIS 46468, 2007 WL 1876491, *4 (D.N.J. June 26, 2007)*.

To the extent that plaintiffs have attempted to bring any of their other claims under *§ 1983*, plaintiffs cannot do so. "*Section 1983* imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges or immunities secured by the Constitution or laws of the United States." *42 U.S.C. § 1983*. Plaintiffs have not alleged any constitutional violation claims, or claims [*21] arising under any other federal law. [5] Consequently, even though claims brought pursuant to *§ 1983* may not be deemed waived because they did not bring them before the ALJ during the IDEA due process hearing, these claims must be dismissed pursuant to *Rule 12(b)(6)*.

> 5   Even if plaintiffs did assert additional valid claims pursuant to *§ 1983*, those claims would be dismissed against the individual defendants, because although plaintiffs have sued the individual plaintiffs in their official capacities, claims against school administrators or teachers in their official capacities is duplicative of claims against the school. See *Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)*.

**3. Plaintiffs' NJLAD and Hostile Educational Environment claims**

Plaintiffs claim that "Defendants, including Heade and Harris, . . . fraudulently and with actual malice and through willful misconduct violated the LAD by discriminating against plaintiffs." (Compl. P 243.) Plaintiffs also claim that "Defendants, including Heade and Harris, have maliciously, fraudulently and through willful misconduct and malicious intent subjected A.M., M.M. and J.M. to unwelcome, unjustified and illegal harassment." (Id. P 250.) With regard to their [*22] harassment claim, plaintiffs claim that defendants used their "authority and obligations" under the IDEA to create a hostile, abusive and inflexible environment for them, and that this harassment has been so pervasive, it has altered the conditions of A.M.'s education. (Id. § 257.)

First it must then be determined whether these claims are of the type that could have, and should have, been brought before the ALJ in plaintiffs' due process hearing. If not, it must then be determined whether plain-

tiffs have asserted valid claims under the NJLAD and for hostile educational environment.

**1) *Whether plaintiffs' NJLAD and hostile environment claims could have or should have been brought before the ALJ***

As a primary matter, there is no independent cause of action for hostile educational environment. To the extent that such a claim may exist, it has been interpreted as a claim arising under the NJLAD. See, e.g., *Woodruff v. Hamilton Tp. Public Schools, 2007 U.S. Dist. LEXIS 46468, 2007 WL 1876491, *4 (D.N.J. June 26, 2007)* (recognizing that plaintiffs pleaded a novel theory of law for hostile educational environment claim under the NJLAD). Thus, the Court's analysis of plaintiffs' hostile environment claim must be considered [*23] as part of the analysis of plaintiffs' NJLAD claim.

The NJLAD provides,

> All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

*N.J. Stat. Ann. 10:5-4*. Damages available under the NJLAD include compensatory and punitive relief. See *N.J. Stat. Ann. 10:5-13* ("All remedies available in common law tort actions shall be available to prevailing plaintiffs."); *Lehmann v. Toys R Us, Inc., 32 132 N.J. 587, 626 A.2d 445, 461 (N.J. 1993)* (recognizing right to both compensatory and punitive damages under NJLAD). "[I]n adjudicating cases brought under the ADA and NJLAD, courts apply the burden-shifting framework applicable [*24] to cases brought under Title VII," *Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 502 (3d Cir. 1996)*, and therefore, the ADA and NJLAD claims are governed by the same standards, *Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 70 (3d Cr. 1996)* (citing *Ensslin v. Township of North Bergen, 275 N.J. Super. 352, 646 A.2d 452, 458-59 (N.J. Super. Ct. App. Div.1994)*, cert. denied, 142

*N.J. 446, 663 A.2d 1354 (N.J. 1995))*; see also *Morales-Evans v. Administrative Office of the Courts of New Jersey, 102 F. Supp. 2d 577, 586 (D.N.J. 2000)* (noting that the NJLAD is the state version of the federal Title VII of the Civil Rights Act).

Based on these standards, plaintiffs' NJLAD claims could not have been brought before the ALJ: (1) the elements to prove an IDEA claim are different than those to prove an NJLAD claim, (2) the damages available for these claims are different, and (3) plaintiffs were not able to bring these claims pursuant to the due process procedures of the IDEA when they challenged the development of A.M.'s IEP.

### 2) Whether plaintiffs have stated viable NJLAD claims

With regard to defendants' motion to dismiss plaintiffs' general NJLAD claim for failure to state a claim, defendants argue that the   [*25] NJLAD claim could result in the potential recovery of the very type of damages that the federal courts have prohibited in the context of IDEA, ADA, and Rehabilitation Act claims brought pursuant to those statutes, as well as pursuant to *§ 1983*. In other words, defendants argue that because punitive damages are not available for claims under the ADA, Rehabilitation Act, or IDEA, plaintiffs's NJLAD claims must be dismissed because punitive damages are available under the NJLAD.

Defendants' argument is unavailing. First, the fact that there are no punitive damages available under the ADA, Rehabilitation Act, or IDEA does not mean that a plaintiff who has successfully proven an ADA, Rehabilitation Act, and/or IDEA claim as well as a NJALD claim is not entitled to all the damages available under each statute. Second, although it is true that a plaintiff cannot bring IDEA, ADA, and Rehabilitation Act claims pursuant to *§ 1983*, the reason for that prohibition cannot be automatically extended to plaintiffs' NJLAD claims. The Third Circuit prohibited the use of *§ 1983* to bring IDEA, ADA, and Rehabilitation Act claims because the court found that Congress intended those statues to supplant *§ 1983*.   [*26] See *A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007)*. In so finding, the Third Circuit did not say that bringing those claims pursuant to *§ 1983* was barred because *§ 1983* allows for punitive damages, while the IDEA, ADA, and Rehabilitation Act do not.

Even though by virtue of prohibiting a plaintiff from bringing IDEA, ADA, and Rehabilitation Act claims pursuant to *§ 1983*, the Third Circuit effectively eliminated the availability of punitive damages for violations of those statutes, streamlining damages was not the basis for the Third Circuit's decision. Indeed, as noted above, the ADA and Rehabilitation Act allow for money damages, while the IDEA has been interpreted to only allow

for compensatory education. Accordingly, this Court cannot deny plaintiffs the damages available under the NJLAD simply because the IDEA, ADA and Rehabilitation Act do not afford the same type of damages. [6]

> 6   The Court also notes that the *A.W.* court's interpretation of *§ 1983* law does not preclude this Court, when properly exercising supplemental jurisdiction, from granting remedies based on state law that exceed the scope of remedies available under similar federal laws.

With regard to plaintiffs'   [*27] hostile environment claim, most hostile environment claims arise in the employment context. Generally, to state a hostile environment claim under the NJLAD, a plaintiff must show that the complained-of conduct: (1) would not have occurred but for his race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity; and it was (2) severe or pervasive enough to make a (3) reasonable, similarly-situated person believe that (4) the conditions of employment are altered and the working environment is hostile or abusive. Id. (citation omitted).

Plaintiffs apparently wish to extend this standard to the education environment. As noted above, this Court in *Woodruff v. Hamilton Twp. Public Schools, 2007 U.S. Dist. LEXIS 46468, 2007 WL 1876491, *4 (D.N.J. June 26, 2007)* recognized in that case that the plaintiffs pleaded a novel theory of law for a hostile educational environment claim under the NJLAD, and consequently did not dismiss that claim pursuant to the defendants' *Rule 12(b)(6)* motion. Defendants argue that the facts as pleaded by the plaintiffs in Woodruff are completely dissimilar to the facts pleaded by plaintiffs   [*28] here, and as such, plaintiffs should not be permitted to assert such a cause of action. Plaintiffs argue that they have sufficiently pleaded a claim such that it should proceed past the motion to dismiss stage.

Defendants' argument is not persuasive at this time. Plaintiffs claim that defendants' alleged harassment of them was severe and pervasive, was motivated by A.M.'s disability, and created an abusive educational and learning environment. Plaintiffs allege a series of events, and if they are accepted as true, they set forth allegations sufficient to satisfy plaintiffs' requirement to give the defendants fair notice of what their claims are and the grounds upon which they rest. Even though plaintiffs may not ultimately be able to prove such a claim, the issue on a *Rule 12(b)(6)* motion is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1969 n.8, 167 L. Ed. 2d 929 (2007)* (citation omitted). Plaintiffs' pleading is sufficient to allow them to offer evidence to support this

claim. Consequently, plaintiffs's general NJLAD claim and hostile educational environment claim under the NJLAD [*29] survive defendants' motion to dismiss. [7]

> 7 Plaintiffs' NJLAD claims against the individual defendants may stand as well. The NJLAD prohibits unlawful employment practices by an "employer," as that term is defined under the law. *Tarr v. Ciasulli, 181 N.J. 70, 853 A.2d 921, 927-28 (N.J. 2004)*. Although a person in a supervisory capacity is not an "employer" under the NJLAD, an individual may nevertheless be liable under *N.J.S.A. 10:5-12(e)* if he "aids or abets" others (namely, an employer) in committing acts forbidden by the law. *Hurley v. Atlantic City Police Dept., 174 F.3d 95, 126 (3d Cir. 1999); Tarr, 853 A.2d at 928-29*. The Third Circuit has stated that "employee aids and abets a violation of the [NJ]LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer." *Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir.1998)*. Further, the Third Circuit has found that a supervisor "may be liable as an aider and abettor for active harassment or knowing and willful inaction" under the NJLAD. *Hurley, 174 F.3d at 128*. Thus, if the Court were to find that plaintiffs have proven a valid hostile educational environment claim, by analogy to the employment context, [*30] plaintiffs may maintain this claim against the individual defendants.

**4. Plaintiffs's Breach of the Duty of Good Faith and Fair Dealing Claim**

Plaintiffs claim that defendants "Heade and Harris, as educators responsible for the welfare of A.M., M.M. and J.M., and who are compensated with the tax dollars of M.M. and J.M., are charged with the obligation to and employed to educate A.M., owe a duty of good faith and fair dealing to A.M., M.M. and J.M." (Compl. P 262.) Plaintiffs also claim that the other defendants are liable for the actions of Heade and Harris under the principles of respondeat superior. (*Id. P 266*.)

This claim must be dismissed. The covenant of good faith and fair dealing is implied in every contract in New Jersey; thus, it is axiomatic that a contract must exist between two parties before a court will infer this covenant. *Space v. BRPM Towing Service, Inc., 2007 U.S. Dist. LEXIS 93724, 2007 WL 4570157, *6 (D.N.J. 2007)* (citing *Wade v. Kessler Inst., 343 N.J. Super. 338, 778 A.2d 580, 584 (N.J. Super. Ct. App. Div. 2001)* (stating that "[i]n the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing")) (other citations omitted). Any contention that

a breach of the implied covenant [*31] may arise absent an express or implied contract finds no support in New Jersey case law. *Id.*

Here, plaintiffs appear to assert that a contract exists between them and defendants Heade and Harris because plaintiffs pay taxes, and part of those taxes go toward paying their salaries. [8] This tenuous connection does not constitute a contract between plaintiffs and defendants. Consequently, because there is no contract between the parties, the duty of good faith and fair dealing does not apply.

> 8 If plaintiffs are trying to allege that defendants had a general duty to act in good faith while formulating and implementing A.M.'s IEP, that is a claim for a violation of the IDEA, and cannot stand alone as a separate cause of action.

**5. Plaintiffs' Intentional Infliction of Emotional Distress Claim**

Plaintiffs claim that defendants Heade and Harris intentionally inflicted upon them severe emotional distress during the development of A.M.'s IEP. (Compl. P 272-73.) This claim must be dismissed as well.

The New Jersey Supreme Court has explained the standard for an IIED claim.

> [T]o establish a claim for intentional infliction of emotional distress, a plaintiff must establish intentional and outrageous conduct [*32] by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.

> Second, the defendant's conduct must be extreme and outrageous. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be

expected to endure it." By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims while eliminating those that should not be compensable.

*Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 544 A.2d 857, 863 (N.J. 1988)* (internal [*33] citations and quotations omitted).

There are several problems with plaintiffs' IIED claim. One problem is that plaintiffs' allegations do not evidence that Heade or Harris acted "recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." This defect corresponds to the fact that none of the alleged conduct of Heade or Harris can be described as "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Plaintiffs' claims relate to the development of A.M.'s IEP, and the dispute over whether A.M. should be in a self-contained classroom and/or which level of kindergarten class. Even if Heade or Harris violated the IDEA with regard to their methods of determining A.M.'s IEP, none of that conduct as alleged by plaintiffs rises to the level of going "beyond the bounds of decency."

Another problem with plaintiffs' IIED claim is that plaintiffs have failed to specifically articulate the emotional distress they suffered, and any distress that they have articulated is not "so severe that no reasonable man could be expected to [*34] endure it." Plaintiffs make a conclusory statement that they suffered severe emotional distress, but they do not indicate how each of them has suffered. Plaintiffs' bald assertions are insufficient to survive a motion to dismiss. Accordingly, because of these defects in plaintiffs' IIED claim, it must be dismissed.

### 6. Fraud Claim

Plaintiffs claim that defendants "Heade and Harris, by their conduct, defrauded A.M., M.M. and J.M. in his educational rights, protection and benefits to which he was and is entitled." (Compl. P 275.) Plaintiffs further claim that Heade and Harris "acted maliciously and with fraudulent intent and their actions constitute willful misconduct." (*Id. P 276.*) As with plaintiffs' good faith and fair dealing and IIED claims, this claim must be dismissed as well.

The five elements of common law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its fal-

sity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors, 148 N.J. 582, 691 A.2d 350 (N.J. 1997).* Corollary to that standard, the Federal Rules of [*35] Civil Procedure provide, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(h).*

Plaintiffs have failed to meet both standards. Plaintiffs have not alleged how Heade or Harris knowingly misrepresented a fact, and intended either A.M., J.M. or M.M. to rely on that fact. Indeed, the opposite is true as alleged by plaintiffs. Plaintiffs claim that Heade made up her mind prior to the IEP meeting not to place A.M. in developmental kindergarten. Plaintiffs do not allege that Heade misrepresented her intentions for A.M.'s placement in order to induce the parents to sign the IEP. Instead, the parents were well aware of Heade's opinions, which Harris agreed with. They disputed those opinions, and they refused to sign the IEP. This difference of opinion as to A.M.'s placement, and the way the IEP was implemented, may state a claim under the IDEA, but it does not rise to the level of fraud.

### 7. Plaintiffs's Civil Conspiracy Claim

Plaintiffs claim that Heade and Harris "with malicious and fraudulent intent, and willfully, [*36] agreed between themselves to and did discriminate against A.M., M.M. and J.M. and violate and abuse the IDEA and applicable laws for their own benefit and to the detriment of A.M., M.M. and J.M. and with disregard for the rights and welfare of Plaintiffs." (Compl. P 269.) Plaintiffs claim that this harmed them, and constitutes an unlawful civil conspiracy. (*Id. P 270.*)

This claim must be dismissed because it is simply plaintiffs' IDEA claim recast as an alleged civil conspiracy. Plaintiffs' entire complaint centers around plaintiffs' claims that defendants did not properly prepare and implement an IEP for A.M. This alleged conduct may be enough to state a claim under the IDEA, as well as the ADA, Rehabilitation Act and NJLAD, but it cannot also form the basis for a civil conspiracy.

"A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to injure another, and an overt act that results in damage." *Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 633 A.2d 985 (N.J. Ct. App. Div. 1993)* (quotations and citations omitted). The primary [*37] requirement for a civil conspiracy is the existence

of a separate underlying tort. *In re Orthopedic Bone Screw Products Liability Litigation, 193 F.3d 781, 789 (3d Cir. 1999).* A plaintiff "cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant." *Id.* "Instead, actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." *Id.* (internal quotations and citations omitted)).

As a primary matter, this conspiracy claim must fail because plaintiffs have not alleged a viable tort claim against any of the defendants. Without an actionable tort committed by one defendant, none of the other defendants can be held to have conspired to commit that tort.

This claim must also fail because plaintiffs have not alleged that all the defendants, or even some of the defendants, had an agreement to injure A.M. or his parents. The fact that defendants collaborated in the development of A.M.'s educational plan, which the parents ultimately objected to, does not automatically create a conspiracy to harm plaintiffs. Rather, working collaboratively  [*38] is a requirement of the IDEA, and failure to do so constitutes a violation. Indeed, plaintiffs complain that the

IDEA requires the educational team to work collaboratively with the parents, and not just with each other.

Consequently, plaintiffs' civil conspiracy claim must be dismissed. To hold otherwise would open the door for every IDEA plaintiff to assert a civil conspiracy claim as well.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss must be granted as to plaintiffs' *§ 1983* claims, and their claims for the breach of the duty of good faith and fair dealing, intentional infliction of emotional distress, fraud and civil conspiracy. Plaintiffs' IDEA, ADA, Rehabilitation Act, and NJLAD claims may proceed, except that plaintiffs' ADA and Rehabilitation Act claims are dismissed as to the individual defendants. An appropriate Order will be entered.

Dated: March 25, 2008

At Camden, New Jersey

s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

# Exhibit D



**PASTOR, REV. GEORGE W. CARTHAN, JR., Plaintiff, v. ALLIANCE, DIVISION OF ROCK-TENN COMPANY; JOHN DOES 1-50 Fictitious persons or corporations, jointly, severally and/or in the alternative, Defendants.**

**CIVIL ACTION NO. 05-4470 (JEI)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2007 U.S. Dist. LEXIS 6465*

**January 29, 2007, Decided**

**COUNSEL:** [*1] For Pastor Rev. George W. Carthan, Plaintiff, Pro se.

For GEORGE W. CARTHAN, JR., PASTOR, REV., Plaintiff: MICHAEL H. BERG, BERG & PEARSON, PC, WOODBURY, NJ.

For ALLIANCE, DIVISION OF ROCK-TENN COMPANY, Defendant: ROBERT J. HAGERTY, LEAD ATTORNEY, CAPEHART & SCATCHARD, P.A., MOUNT LAUREL, NJ.

**JUDGES:** Joseph E. Irenas, S.U.S.D.J.

**OPINION BY:** Joseph E. Irenas

**OPINION**

IRENAS, Senior District Judge:

This is an employment discrimination and wrongful termination suit filed by Pastor George W. Carthan against his former employer, Alliance.[1] Carthan asserts that he was terminated on account of his race, age and religion, and was retaliated against for filing civil rights complaints, all in violation of the New Jersey Law Against Discrimination ("NJLAD"), *N.J.S.A. 10:5-1 et seq.* Additionally, he alleges tortious interference with his prospective economic advantage and promissory estoppel.[2] Alliance moves for summary judgment.

1    Alliance is a division of the Rock-Tenn Company.
2    This Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332*, as Plaintiff is a citizen of Delaware and Defendant is a Georgia corporation with its principal place of business in Georgia. The amount in controversy exceeds $ 75,000.00.

[*2] I.

Carthan, a fifty-two year old African American male, began his employment at Alliance in Pennsauken, New Jersey, on July 16, 2002. He was discharged less than one year later, on June 30, 2003. Carthan was employed as a "Clerk," a supervisory position, in Alliance's Pennsauken facility. This facility employs approximately 130 employees who primarily engage in product packaging and assembling point of purchase displays.

In the First Amended Complaint, Carthan alleges that, prior to his employment with Allaince, in a conversation with his soon-to-be supervisor, Lori Carter, Carter advised him that all employees are occasionally required to work overtime on Saturdays and Sundays. Carthan responded that because he was a Pastor, he would be unable to work on Sundays.

Once employed by Alliance, Carthan was trained by a Caucasian employee, James McNally, Chief Clerk of the Product Cage. Soon thereafter, McNally was transferred to an Alliance facility in Morrestown, New Jersey.

The first alleged incident of racial discrimination occurred two weeks after the commencement of Carthan's employment, when he walked into the "product cage" where three Caucasian employees were located. [*3] Upon his entrance, one of them stated, "it would be best for all of us if you would just leave." Carthan reported this remark to Carter, but did not specifically complain that the remark had racial implications. Carter

denies awareness of the fact that Carthan believed this was a race-based comment.

Also beginning soon after the commencement of his employment, Carthan complains that he was scheduled to work on Sundays on several occasions. It is undisputed that it was Carthan's responsibility to find replacements for his Sunday shifts, although on at least one occasion, Alliance bore the responsibility for him. It is also undisputed that Carthan fulfilled that responsibility when necessary.

The events leading up to and on the weekend of June 25-26, however, are disputed. Carthan asserts that on June 23, 2003, Carter told him that he was required to work the Sunday shift on the following weekend, or face reprimand. On Thursday, June 24, 2003, Carthan met with Carter and told her that he could not work on that Sunday, but could work on Saturday, to which Carter purportedly replied "something will have to be done about this." The next day, Carter again informed Carthan that he must [*4] work that Saturday and Sunday. When Carthan reminded her of his restrictions, Carter allegedly replied, in the presence of another employee, that "if he [Carthan] couldn't work on Sunday than he couldn't work on Saturday." Carthan purportedly replied "Ok that's fine with me."

Alliance nevertheless secured coverage for his Sunday shift and told Carter that he was required to either work that Saturday or to find someone to cover the shift for him. Carthan alleges that while he was able to find an employee to cover his Saturday shift, two Caucasian employees who were scheduled for shifts that weekend did not work and did not find coverage for their shifts, yet they were not reprimanded in any way. Carthan, however, was discharged from Alliance the following Monday when he returned to work.

The replacement Carthan found to cover his Saturday shift is the source of much contention and the alleged reason for Carthan's termination. Alliance disputes that Carthan found coverage for his shift. It acknowledges that while Carthan presented Duane Jones to Carter as a substitute for his shift, Carter expressly disapproved of Jones because he was not adequately trained for Carthan's position. [*5] Carthan maintains that Carter said nothing when he told her that Jones would be his substitute on Saturday, and therefore, he assumed Joens was a suitable substitute. Jones did, in fact, cover for Carthan that Saturday, and was unable to perform required tasks. Ultimately, at some point that Saturday after it became clear that Jones was inadequately trained, Frank Durst, Senior Clerk, asked another supervisory Clerk, Rob Marrero, to cover for Jones. As a result, Marrero worked a double-shift. Marrero sent an e-mail to Carter the following Monday, June 30, complaining that Carthan pro-

vided an unacceptable substitute for the Saturday shift and that he was not a "team player." Alliance contends that when Carter read this e-mail and became aware of Carthan's insubordinate conduct in failing to find a suitable replacement as Carter had allegedly ordered, Carthan was terminated.

Carthan's position was filled by McNally, who was transferred back to the Pennsauken facility a few weeks prior to Carthan's discharge. Alliance claims that after Carthan was terminated, Carter asked the two first shift clerks, Marrero, African American, and McNally, a younger Caucasian man, to devise a plan to [*6] cover Carthan's former shift until the position was filled. McNally volunteered to do so, and took over Carthan's position.

After his termination, Carthan filed a Charge of Discrimination with the New Jersey Division on Civil Rights and the Equal Employment Opportunity Commission (the "EEOC") on August 8, 2003, alleging wrongful discharge on the basis of race, age and religion. On February 11, 2004, the EEOC issued a Notice of Right to Sue under Title VII and the Age Discrimination in Employment Act. On June 24, 2005, Carthan filed a Complaint in the Superior Court of New Jersey, Burlington County. On August 1, 2005, Carthan filed a First Amended Complaint, which was subsequently removed to this Court.

**II.**

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (quoting *Fed. R. Civ. P. 56(c)*). In deciding a motion for summary judgment, the [*7] Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986)*. "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'- that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas, 364 F.3d 135, 145-46 (3d Cir. 2004)* (quoting *Celotex*). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

**III.**

2007 U.S. Dist. LEXIS 6465, *

## A. NJLAD Claims

Carthan asserts that he was discriminated against and wrongfully terminated due to his religion in violation of the NJLAD. Because courts generally apply a similar analysis to discrimination claims brought pursuant to Title VII and the NJLAD, we will look to cases applying both in analyzing Carthan's claims. *See Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 277 (3d Cir. 2001).* [*8]

A plaintiff can establish a *prima facie* case of discrimination on the basis of religion under the NJLAD by showing that he or she: "(1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person." *Viscik v. Fowler Equip. Co., 173 N.J. 1, 14, 800 A.2d 826 (2002).* [3] "Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent." *Id.*

> 3  Carthan, a *pro se* plaintiff, alleges religious discrimination. It is not clear whether the claim is for disparate treatment, or for failure to accommodate. Alliance treats it a simply a claim of failure to accommodate. Because the theory upon which Carthan relies is unclear, we will analyze it under both.

[*9]  Carthan sets forth sufficient evidence establishing a *prima facie* case. It in undisputed that he is a Christian Pastor, held the position of "clerk" for which he was objectively qualified, and was terminated. It is also undisputed that upon his termination, his position was filled, at least temporarily, by a similarly qualified individual.

Alliance's alleged non-discriminatory reason for firing Carthan was insubordination because Carthan did not work on a mandatory Saturday shift, as required by his supervisor, and failed to find an acceptable substitute for his shift. Carthan claims that this reason is pretextual. The evidence he adduces to support this contention is his claim that he did in fact find an acceptable substitute, and even if the substitute was not qualified, he was not made aware of this. Assuming Carthan's allegations are true, it does not show that Alliance's decision to terminate his

employment was based upon his religion. Carthan's obligations to his religious community conflicted with his ability to work on Sundays, not Saturdays. There is no evidence, beyond Carthan's bald assertions, that his inability to work Sundays was the motivation for his termination.

[*10]  A second theory of discrimination on the basis of religion is one of failure to accommodate. [4] In *Shelton v. U.M.D.N.J.,* the court noted that Title VII requires that employers "make reasonable accommodations for their employees' religious beliefs and practices, unless doing so would result in 'undue hardship' to the employer." *223 F. 3d 220, 224 (3d Cir. 2000)* (internal citations omitted).

> 4  It is not clear whether there is a cause of action for failure to accommodate a religious conflict under the NJLAD. When such cause of action is addressed, the analysis is done simultaneous with the analysis under Title VII. *See, e.g., Abramson v. William Paterson College, 260 F.3d 265, 282 (3d Cir. 2001)* (noting that "under the NJLAD and Title VII, the analysis [of religious discrimination] is essentially the same"). Because we conclude that even if there is such a cause of cation, Plaintiff's claim fails on the merits, we will assume without deciding that such a claim is available.

[*11]  A plaintiff can establish a *prima facie* case of failure to accommodate by showing through competent evidence that: (1) he holds a sincere religious belief that conflicts with a job requirement; (2) he informed his employer of the conflict; and (3) he was disciplined for failing to comply with that requirement. *Id.* If the employee establishes a *prima facie* case, the burden shifts to the employer to show that it made good faith efforts to accommodate, or that the requested accommodation would work an undue hardship. *See Shelton* at *223 F.3d 224 (3d Cir. 2000); United States v. Board of Educ., 911 F.2d 882, 886-87 (3d Cir. 1990).*

Alliance moves for summary judgment, asserting that as a matter of law, the alleged conduct is not actionable under the NJLAD because Carthan's conflict was not the cause for his termination. Specifically, it argues that Carthan did not establish prongs one and three of his *prima facie* case. We agree.

Alliance argues that Carthan cannot establish prong one or three. Because Carthan has not established prong three, the Court need not decide prong one. It is undisputed that the incident giving rise to Carthan's [*12] termination involved work on Saturday. Carthan alleged that his beliefs prevented him from working on Sundays. Thus, there can be no logical connection between Plain-

tiff's religious beliefs and his termination. No reasonable juror could conclude based on this record that Plaintiff's religious beliefs were connected to his termination.

Additionally, Carthan alleges that he was also discriminated against and wrongfully terminated on the bases of both race and age. To establish a *prima facie* case of wrongful termination under the NJLAD, a plaintiff must show that he: "(1) belongs to a protected class, (2) was performing in the position from which [he] was terminated, (3) nevertheless was fired, and (4) the employer sought someone to perform the same work after [he] left." *Zive v. Stanley Roberts, Inc., 182 N.J. 436, 457-58, 867 A.2d 1133 (2005).* In an age discrimination claim, however, the last prong requires a showing that the plaintiff was replaced by a candidate sufficiently younger than he to permit an inference of age discrimination. *See Young v. Hobart West Group, 385 N.J. Super. 448, 458, 897 A.2d 1063 (App. Div. 2005).* "The defendant then bears the burden of rebutting [*13] that presumption by articulating a legitimate and non-discriminatory reason for the termination, and the plaintiff is entitled to show that the reasons advanced by the defendant are a pretext for discrimination." *Zive, 182 N.J. at 457-458.*

Alliance contests that Carthan was performing his job because he did not obtain appropriate coverage for his missed Saturday shift, or approval for his coverage. Assuming, however, that Carthan made a *prima facie* case for race, age, and religious discrimination, he must show that Alliance's purported reason for termination was pretextual "by persuading the court . . . that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Bergen Commer. Bank v. Sisler, 157 N.J. 188, 211, 723 A.2d 944 (1999).* He does not.

The basis of Carthan's claim of racial discrimination is that McNally, a Caucasian man, filled his position upon his termination, and that a Caucasian employee made a racist comment upon his entrance into the product cage when he said "it would be best for all of us if you would just leave." This comment, however, is ambiguous, [*14] was made by a subordinate employee, and though he believed it was made because of his race, he never told his supervisor about this belief.

Carthan also asserts that two other, Caucasian employees were scheduled on a weekend shift and did not obtain coverage or show up, yet neither was fired. Alliance denies this allegation. These proofs, together, cannot sustain charges of discrimination and wrongful termination on the basis of race. *Warner v. Fed. Express Corp., 174 F. Supp. 2d 215, 223 (D.N.J. 2001)* (finding

mere allegations of discrimination insufficient to withstand summary judgment).

Carthan's claim for age discrimination rests solely upon the fact that he was replaced by a younger man. Because Carthan was hired and fired while a member of a protected age group, by the same individual, [5] he cannot withstand Alliance's motion for summary judgment. *See Young v. Hobart West Group, 385 N.J. Super. 448, 461, 897 A.2d 1063 (App. Div. 2005)* (the fact that the same person hired and fired an employee who was a member of the protected age group when hired "strongly counters against an inference of age discrimination."). Moreover, there is no evidence in the record supporting [*15] an inference that Alliance's stated reason for filing his position with a younger employee was pretextual. Accordingly, his claim for age discrimination fails.

> 5   The record reflects that Carter both hired and fired Carthan.

Carthan also claims that he was retaliated against for filing civil rights complaints with the New Jersey Division on Civil Rights and the Equal Employment Opportunity Commission on August 8, 2003. Carthan, however, was terminated on June 30, 2003. Accordingly, he could not have been subjected to an adverse employment action, as is required to make a *prima facie* case of retaliation under the NJLAD, because he was not employed by Alliance at the time of the alleged retaliation. *See Kluczyk v. Tropicana Prods., 368 N.J. Super. 479, 493, 847 A.2d 23 (App. Div. 2004)* (a *prima facie* case of retaliation under the NJLAD requires a showing that plaintiff was engaged in a protected activity known to the defendant, was subjected to an adverse employment decision by defendant thereafter, [*16] and there is a causal link between the two).

### B. Promissory Estoppel

Carthan claims that Alliance promised him that he could serve as its in-house common carrier and then breached that promise when it denied him that position. Promissory estoppel requires a showing of a "(1) clear and definite promise; (2) made with the expectation that the promisee will rely upon it, (3) reasonable reliance upon the promise, (4) which results in definite and substantial detriment." *Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499, 815 A.2d 1013 (App. Div. 2003);* Swider v. Ha-Lo Indus., 134 F. Supp. 2d 607 (D.N.J. 2001) . Carthan cannot defeat Alliance's motion for summary judgment on this claim.

Carthan alleges that he discussed serving as an "in-house" common carrier with Bill Atcheson, an employee of Alliance, in March, 2003. Purportedly in reliance upon that conversation, he purchased a tractor,

trailer, and cargo insurance, which Atcheson told him were required for the position. Alliance, however, refused to permit him to serve as the in-house carrier.

Alliance disputes that Carthan can meet the first and third elements of the *prima facie* case, a clear and definite [*17] promise upon which Carthan reasonably relied. We agree. Carthan has not produced sufficient evidence to show a clear and definite promise. Carthan concedes that Atchenson did not promise Carthan a specific amount of work, did not tell him that he would begin on any particular date, and did not discuss providing for load deliveries with him. Carthan, however, purchased the items and returned to Atchenson so that Atchenson could get consent for Carthan to provide such services. Any reliance that Carthan made upon these representations was not reasonable as a matter of law.

## C. Intentional Interference with Prospective Economic Advantage

Last, Carthan does not state a claim for tortious interference with his prospective economic advantage. He claims that Alliance interfered with his prospective economic advantage when it prohibited him from entering its property, and thus prevented him from fulfilling his delivery obligations under a contract with a third-party.

In order to establish a *prima facie* case, a plaintiff must demonstrate that: "(1) [he] had some reasonable expectation of economic advantage; (2) the defendants' actions were malicious in the sense that the harm [*18] was inflicted intentionally and without justification or excuse; (3) the interference caused the loss of the prospective gain or there was a reasonable probability that the plaintiff would have obtained the anticipated economic benefit, and (4) the injury caused the plaintiff damage." *Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 79-80, 860 A.2d 945 (App. Div. 2004)*.

Prior to his employment with Alliance, Carthan owned and operated a small tucking company, Carthan Transportation, Inc. ("CTI"), from 1987 to 1991, when it discontinued operations. CTI reinstated its common carrier license on June 9, 2003, and, at that time, contracted with Pioneeer. The contract allegedly provided that CTI

would pick up deliveries from Alliance, but did not guarantee any specific number of deliveries in any given time period.

On August 19, 2003, the EEOC generated its Notice of Charge of Discrimination as to Carthan's claims. On August 20 2003, Carter prohibited Carthan from entering the property, allegedly in accordance with its policy of prohibiting former, discharged employee from entering its property. It was not until August 22, 2003, however, that Alliance received the Notice of Charge [*19] of Discrimination. [6] Richard Kitchell, the President of Pioneer, testified that after Carthan was prohibited from going to Alliance, CTI was simply assigned other routes.

> 6   Carthan disputes the alleged date of receipt by Alliance, based only upon the number of days between the time that the EEOC generated the letter and the alleged date of receipt by Alliance.

Carthan does not present evidence to demonstrate Alliance's actions were malicious, meaning, "the intentional doing of wrongful act without justification or excuse." *Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 756, 563 A.2d 31 (1989)*. Even if he could show that his termination was discriminatory, he does not allege and it does not follow that the motivation for the discrimination was to interfere with his contract with Pioneer. Furthermore, he has not put forth any evidence that the interference caused him damage. The President of Pioneer himself testified that when Carthan was barred from making pick-ups from Alliance, he [*20] was simply given another route. Carthan does not set forth sufficient evidence to establish a *prima facie* case of tortious interference with his prospective economic advantage.

## IV.

For the foregoing reasons, the Court will grant Alliance's Motion for Summary Judgment on all counts. An appropriate order will be issued.

Dated:   January   29,   2007**Joseph   E.   Irenas, S.U.S.D.J.**