## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IDEAVILLAGE PRODUCTS CORP., a New Jersey corporation,<br><br>      Plaintiff,<br><br>    vs.<br><br>BRETT SAEVITZON; ALL THE J'S LLC; SPOT ON DIRECT RESPONSE, LLC; D R PRODUCT GROUP, LLC; PAUL VON MOHR; INTERACTIVE GROUP LLC; PREXIO TOYS LTD. and INFOMERCIALS, INC.;<br><br>      Defendants. | Civil Action No.: 11-7548(WJM)(MF)<br><br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>*(Document Electronically Filed)*<br><br>*(Motion Returnable: February 21, 2012)* |

---

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

---

**HARTMANN DOHERTY**
**ROSA BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, New Jersey 07661
(201) 441-9056

**BESHADA FARNESE LLP**
108 Wanaque Avenue
Pompton Lakes, New Jersey 07442
(973) 831-9910

*Attorneys for Plaintiff*
*IdeaVillage Products Corp.*

*Of Counsel and on the Brief:*
  Michael G. Langan, Esq.
  Donald A. Beshada, Esq.

*On the Brief:*
  Kelly A. Zampino, Esq.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . 1
PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . 2
FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 3
LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 10
POINT I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    IDEAVILLAGE'S COMPLAINT DOES NOT PLEAD A FEDERAL
    CAUSE OF ACTION AND THERE IS NO ALTERNATIVE BASIS
    FOR FEDERAL SUBJECT MATTER JURISDICTION . . . . . . . . 10
POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    CONTRARY TO DEFENDANTS' ARGUMENTS, RULE 8 AND
    TWOMBLY-IQBAL DO NOT REQUIRE A PLAINTIFF TO PROVE
    EACH ELEMENT OF ITS CASE AT THE PLEADING STATE . . . . . 10
        A. IDEAVILLAGE HAD ADEQUATELY PLED A CAUSE
    OF ACTION UNDER NEW JERSEY LAW FOR BREACH OF
    CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . 13
        B. IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE
    OF ACTION UNDER NEW JERSEY LAW FOR BREACH OF THE IMPLIED
    COVENANT OF GOOD FAITH AND FAIR DEALING . . . . . . . . 21
        C. IDEAVILLAGE HAD ADEQUATELY PLED A CAUSE
    OF ACTION UNDER NEW JERSEY LAW FOR PROMISSORY
    ESTOPPEL . . . . . . . . . . . . . . . . . . . . . . . . 23
        D. IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE
    OF ACTION FOR TORTIOUS INTERFERENCE UNDER NEW
    JERSEY LAW . . . . . . . . . . . . . . . . . . . . . . . 26
        E. IDEAVILLAGE HAD ADEQUATELY PLED A CAUSE
    OF ACTION FOR UNFAIR COMPETITION UNDER NEW
    JERSEY LAW . . . . . . . . . . . . . . . . . . . . . . . 27
POINT III
    IDEAVILLAGE HAS ADEQUATELY PLED CLAIMS AGAINST
    INTERACTIVE GROUP, LLC, WHICH IS A PROPER PARTY/
    DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . 32
POINT IV
    PLAINTIFF SHOULD BE PERMITTED DISCOVERY REGARDING
    THE "ALTER EGO" CLAIMS AGAINST DEFENDANT SAEVITZON
    AND, IN LIGHT OF THE FACTS THAT HAVE RECENTLY COME
    TO LIGHT, LEAVE TO AMEND SHOULD BE GRANTED . . . . . . 35
POINT V
    IN THE EVENT THIS COURT FINDS THAT PLAINTIFF'S
    COMPLAINT FAILS TO SATISFY THE FEDERAL PLEADING
    STANDARDS, LEAVE TO AMEND SHOULD BE GRANTED . . . . . . 39
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

### CASES

Aamaco Transmissions, Inc. v. Smith
    756 F.Supp. 225 (E.D.Pa. 1991) . . . . . . . . . . . . 28

Aircraft Inventory Corp. v. Falcon Jet Corp.
    18 F.Supp.2d 409 (D.N.J. 1998) . . . . . . . . . . . . 23

American Shops v. American Fashion Shops of Journal Square
    13 N.J. Super. 416 (App. Div. 1951) . . . . . . . . . .30

Ashcroft v. Iqbal,
    129 S.Ct. 1937 (2009) . . . . . . . . . . . . . . passim

Bak-A-Lum Corp. v. Alcoa Building Products, Inc.
    69 N.J. 123 (1976) . . . . . . . . . . . . . . . . . 22

Bd. of Trs. v. Foodtown, Inc.
    296 F.3d 164 (3d Cir.2002) . . . . . . . . . . . . . .35

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . .passim

Carthan v. Alliance, Div. of Rock-Tenn Co.
    2007 WL 316464 (D.N.J. January 29, 2007) . . . . . . .26

Commerce Bankcorp. v. BK Int'l. Ins. Brokers
    490 F. Supp. 2d 556 (D.N.J. 2007) . . . . . . . . . . 23

Craig v. Lake Asbestos of Quebec, Ltd.
    843 F.2d 145 (3d Cir.1988) . . . . . . . . . . . . . 39

Fowler v. UPMC Shadyside
    578 F.3d 203 (3d Cir. 2009) . . . . . . . . . . . . . 12

Gruen Marketing Corp. v. Benrus Watch Co., Inc.
    955 F.Supp.979 (N.D.Ill. 1997) . . . . . . . . . . 28, 29

In re Blatstein
    192 F.3d 88 (3d Cir.1999) . . . . . . . . . . . . . .35

Lamorte Burns & Co., Inc. v. Walters
    167 N.J. 285 (2001) . . . . . . . . . . . . . . . . .31

Luden's Inc v. Local Union No. 6
      28 F.3d 347 (3d Cir. 1994) . . . . . . . . . . . . . . 20

Martin v. Campanaro
      156 F.2d 127 (2d Cir. 1946). . . . . . . . . . . . . . 21

Moog Controls, Inc. v. Moog, Inc.
      923 F.Supp. 427 (W.D.N.Y. 1996) . . . . . . . . . 28, 29

Palisades Properties Inc. v. Brunetti
      44 N.J. 117 (1965). . . . . . . . . . . . . . . . . . 22

Phillips v. County of Allegheny
      515 F.3d 224 (3d. Cir. 2008) . . . . . . . . . .11, 13

Platinum Management, Inc. v. Dahms
      285 N.J. Super. 274 (Law Div. 1995). . . . . . . . . .31

Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc.
      307 N.J. Super 461 (App. Div. 1998). . . . . . . . 22, 23

Printing Mart-Morristown v. Sharp Elecs. Corp.
      116 N.J. 739 (1989). . . . . . . . . . . . . . . . . 27

Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co.
      722 F.Supp. 184 (D.N.J. 1989). . . . . . . . . . . . 14

Red Devil Tools v. Tip Top Brush Co.
      50 N.J. 563 (1967). . . . . . . . . . . . . . . . . .30

Ryan v. Carmona Bolen Home for Funerals
      341 N.J. Super 87 (App. Div. 2001) . . . . . . . . . . 30

Sean Wood, LLC v. Hegarty Group, Inc.
      422 N.J. Super. 500 (App. Div. 2011). . . . . . . . 35, 37

Shane v. Fauver
      213 F.3d 113 (3d Cir. 2000). . . . . . . . . . . . . 39

Shoney's Inc. v. Schoenbaum
      686 F.Supp. 554 (E.D.Va. 1988). . . . . . . . . . 28, 29

Silverstar Enterprises, Inc. v. Aday
      537 F.Supp. 236 (S.D.N.Y. 1982). . . . . . . . . . 28, 29

Sons of Thunder, Inc. v. Borden, Inc.
      148 N.J. 396 (1997) . . . . . . . . . . . . . . . 21, 22

Squeezit Corp. v. Plastic Dispensers
      31 N.J. Super 217, 222-223 (App. Div. 1954). . . . . . . 30

Staff Builders of Philadelphia, Inc. v. Koschitzki
      1989 WL 974707 (E.D.Pa. August 18, 1989) . . . . . . 28, 29

Sun Dial Corp. v. Rideout
      16 N.J. 252 (1954) . . . . . . . . . . . . . . . . . . 31

Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.
      925 F.Supp. 212 (S.D.N.Y. 1996) . . . . . . . . . .28, 29

T.B. Harms Co. v. Eliscu
      339 F.2d 823 (2d Cir. 1964), *cert. denied,* 381 U.S. 915, 85
S.Ct. 1534, 14 L.Ed.2d 435 (1965) . . . . . . . . . . . .  28

Tsai v. Buildings by Jamie, Inc. (In re Buildings by Jamie)
      230 B.R. 36 (Bankr. D.N.J. 1998)). . . . . . . . . . . 35

Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.
      210 F.Supp.2d 552 (D.N.J. 2002) . . . . . . . . . . . 14

Zerand-Bernal Group, Inc. v. Cox
      23 F.3d 159 (7th Cir.1994). . . . . . . . . . . . 28, 29

**RULES**

FED. R. CIV. P. 8 . . . . . . . . . . . . . . . . . . passim
FED. R. CIV. P. 12(b)(6). . . . . . . . . . . . . . . passim
FED R. CIV. P. 15 . . . . . . . . . . . . . . . . . . . 13

## PRELIMINARY STATEMENT

This brief is submitted by Plaintiff IdeaVillage Products Corp. in opposition to the motion to dismiss pursuant to Rule 12(b)(6) filed by Defendants Saevitzon and Spot On; the motion to dismiss pursuant to Rule 12(b)(6) filed by Defendant All the J's, LLC and the motion to dismiss pursuant to Rule 12(b)(6) filed by Defendant Interactive Group, LLC.

As set forth below, there is no basis for federal subject matter jurisdiction. Nevertheless, the Verified Complaint contains detailed factual allegations which, if accepted as true, support each of the separate claims alleged against Defendants. Further, Defendant Interactive Group, LLC, is a proper party and Plaintiff's allegations in that regard must be accepted as true and the motion to dismiss denied. Accordingly, in the event the Court denies Plaintiff's motion to remand, the defense motions should be denied. In the alternative, Plaintiff requests the opportunity to amend, in order to conform its state court pleadings to federal pleading standards relied on by Defendants.

## PROCEDURAL HISTORY

On December 7, 2011, Plaintiff IdeaVillage Products Corp. ("Plaintiff" or "IdeaVillage") filed an Order to Show Cause in the Superior Court of New Jersey, Chancery Division, Passaic County, seeking an injunction and other equitable relief against Defendants under New Jersey law.[1] (See Docket Entry Nos. 1-1, 1-2) The Order to Show Cause was entered by the Superior Court (Hon. Margaret Mary McVeigh, P.J.Ch.) and an initial hearing was scheduled for December 16, 2011. The return date of the Order to Show Cause was adjourned to January 6, 2012, based upon a purported scheduling conflict on the part of Defendant Saevitzon. On December 28, 2011 -- the day prior to the due date of Defendants' opposition papers -- Defendant Paul von Mohr, Defendant Saevitzon's business partner in Defendant Spot On Direct Response, LLC ("Spot On"), removed the case to this Court, with Saevitzon and Spot On joining in the removal petition (See Docket Entry No. 1). Just two days later, Defendants Spot On and Saevitzon filed a motion to dismiss the Verified Complaint based on federal pleading standards (i.e., Twombly-Iqbal and their progeny).

---

[1] Each of the claims set forth in the Verified Complaint are predicated on New Jersey law and, contrary to Defendants' assertions, no federal claims were pled or intended. This is confirmed by Plaintiff's Brief submitted to the New Jersey Superior Court in Support of the Order to Show Cause. See Beshada Declaration in Opposition to Motions to Dismiss, Ex. B.

Pending before this Court is Plaintiff's motion to remand the action due to the absence of federal subject matter jurisdiction. (See Docket Entry No. 8). Given the jurisdictional issue, it is IdeaVillage's position that the remand motion must be decided before the various defense motions can proceed. As noted above, on December 30, 2011, Defendants Saevitzon and Spot On filed a motion to dismiss the Verified Complaint, which is predicated entirely on New Jersey law. Similarly, Defendant All the J's LLC ("AJ") filed a motion to dismiss on January 13, 2012 (Saevitzon, Spot On and AJ will hereinafter collectively be referred to as the "Saevitzon Defendants")[2] and Defendant Interactive Group, LLC ("Interactive Group") filed a motion to dismiss on January 27, 2012. Each of the defense motions are predicated on federal pleading standards.

## FACTUAL BACKGROUND

IdeaVillage relies upon and incorporates the factual allegations set forth in its Verified Complaint (sometimes

---

[2] For the sake of appearance, AJ has retained separate counsel and has filed a separate motion to dismiss, albeit relying on and incorporating by reference the arguments of Saevitzon and Spot On. As discussed below, AJ is, in fact, a sham corporation controlled by Defendant Saevitzon, which has no assets, which was utilized solely for Saevitzon's exclusive dealings with IDV, and which, like the other Saevitzon entities, utilizes Saevitzon's home in Sherman Oaks, CA as its business address. Further, Saevitzon has affirmatively assumed the obligations of AJ, going so far as to agree to the entry of a consent judgment against him personally for the one-half of the payments made to AJ by IDV under the contract at issue in this litigation. See Declaration of Donald Beshada, Esq., at Exhibit A.

referred to as the "Compl."), filed in New Jersey Superior Court, Chancery Division, Passaic County, as well as the other pleadings of record in the state and federal court, including the Certification of Anand ("Andy") Khubani, President, CEO and founder of IdeaVillage (hereinafter the "Khubani Cert."), submitted in support of IdeaVillage's Order to Show Cause and request for preliminary injunction. In addition, IdeaVillage submits herewith a Declaration of Ronald J. Boger, the company's Chief Operating Officer, which directly responds to the erroneous factual statements contained in Defendants' motion papers and, specifically, the Declaration of Alan J. Sutton, submitted on behalf of Sutton's New Jersey business entity, Interactive Group, LLC.[3]  A summary of the basic facts of the case follows.

Through its Order to Show Cause filed in New Jersey Superior Court, IdeaVillage seeks preliminary injunctive relief under New Jersey common law against its former "exclusive" product development consultant, Defendant Saevitzon, and the Co-Defendants, which include various corporate entities (limited liability companies) owned and/or controlled by Saevitzon, including AJ and Spot On, as well as his agents and business

---

[3] The Sutton Declaration is not appropriate for a motion under Rule 12(b)(6). Nevertheless, if the Declaration of Mr. Sutton is to be considered, it is only fair and appropriate that the Court also consider the responding Declaration of Mr. Boger.

affiliates, including von Mohr and Interactive Group. (Compl., ¶ 1)   As set forth in the Verified Complaint, Defendant Saevitzon and his cohorts have hijacked a lucrative product campaign ("Stompeez") from IdeaVillage and have compounded matters by failing to deliver the product to consumers in violation of consumer protection statutes and by refusing to supply product to IdeaVillage, so that it can fulfill a commitment to Walmart, IdeaVillage's largest retail customer. (Id. at ¶¶ 1, 3) Further, Defendant Saevitzon has perpetrated this scheme through fraudulent misrepresentations and misuse of the corporate form, utilizing at least three different LLCs in an attempt to cover his tracks. (Id. at ¶¶ 10-12)

As set forth in the Verified Complaint, IdeaVillage develops, markets, sells and distributes a variety of consumer products, both through direct response marketing and advertising (TV and internet infomercials) and more traditional retail channels, including big box retailers, such as Walmart, Kmart, Target and Walgreens. (Id. at ¶¶ 8, 16) In or about February 2010, IdeaVillage entered into an "exclusive worldwide consulting agreement" with Defendant Saevitzon, through his business, AJ, (the "Agreement"), whereby Saevitzon agreed to act as a product finder for IdeaVillage on an **exclusive** basis. (See Compl., ¶¶ 19-24; ¶¶ 51-56 & Ex. A; see also Khubani Cert., Ex. A)   Under the exclusive Agreement, which Saevitzon executed as

"Managing Member" "[b]y and on behalf of All the J's LLC and all of its subsidiaries and affiliates[,]" (emphasis added) IdeaVillage was to receive **all rights** to **any products** developed by AJ (or its subsidiaries or affiliates), during the term of the Agreement, which took effect on November 1, 2009, and continued through August 2011. (See Consulting Agreement, ¶ 1.3; Compl., ¶¶ 19-24; ¶¶ 51-56 & Ex. A). The Agreement further provides:

> **AJ shall provide their services to IV** and **AJ shall not provide services to any other entity during the term of this Agreement.** The rights granted to IV hereunder shall be **exclusive to IV**. Without limiting the generality of the foregoing sentence, so long as the rights granted hereunder are held exclusively by IV, **AJ shall not**, without IV's prior written consent: (i) **directly or indirectly, either by itself or in participation with any other person or entity, engage or otherwise assist in marketing, advertising, distribution and or sale of the Product, or any Competing Product, via means or media within the Territory,** (ii) sub-license the patent or trademark or otherwise grant the right to any other person or entity to engage in the marketing, advertising, distribution or sale of the Product or any Competing Product in any consumer channel of distribution via any means or media within the Territory, and/or (iii) sell the Product or any Competing Product to any person or entity for distribution or sale or resale in any consumer channel of distribution via any means or media, within the Territory. The term "Competing Products", for purposes of this Agreement, shall mean a product that is similar to or identical to the Product.[4]

---

[4] "Product" is defined under section 1.2 of the Agreement as "any product or item that AJ provides services to IV under this Agreement." Compl., Ex. A.

Agreement, ¶ 2 (emphasis added), Compl., Ex. A.

Under the Agreement, Saevitzon gained access to IdeaVillage's confidential business information, including financial reports, product development information and marketing plans and strategies, as well as access to IdeaVillage's network of industry contacts, including the producer of its television commercials, Defendant Infomercials, Inc. ("Infomercials").[5] (Compl., ¶¶ 22-26) In return for his **exclusive** services under the Agreement -- which includes a confidentiality provision and the aforementioned prohibitions on competition -- Defendant Saevitzon received substantial compensation and family healthcare benefits from IdeaVillage, as well as reimbursement of his business expenses (in aggregate, more than **$370,000,** between **November 2009 and August 2011**). (Compl., ¶¶ 21-24)

On August 29, 2011, Saevitzon notified IdeaVillage that he had decided that he was going to start developing products on his own. (Compl., ¶ 28; Khubani Cert., Ex. B) Just a few weeks later, Saevitzon, through his entity, Spot On, approached IdeaVillage with two "new" product ideas: (1) **Stompeez,** a

---

[5]   Defendant Infomercials, Inc., a Utah-based corporation, is an existing business partner of IdeaVillage and Infomercials has been named in this action for purposes of discovery, declaratory judgment and injunctive relief. Infomercials has represented that it will abide by any Orders issued by the Court in this matter.  Without prejudice to Plaintiff's rights, IdeaVillage has not asserted any causes of action against Infomercials in the Verified Complaint.

children's slipper/plush toy and (2) **Turbopak**, a children's backpack that converts to a scooter. (Compl., ¶¶ 29-30) Negotiations ensued and IdeaVillage and Saevitzon reached an interim agreement regarding retail distribution rights for Stompeez. (Compl. at ¶¶ 31-24) With Saevitzon's full knowledge, support and encouragement, and in reliance on Saevitzon's representations that IdeaVillage would have retail distribution rights, IdeaVillage pitched Stompeez to Walmart, with whom IdeaVillage has an established business relationship.[6] (Id. at ¶¶ 34-35; ¶¶ 67-68)

Thereafter, IdeaVillage discovered that, in violation of the Agreement, and contrary to his representations, Defendant Saevitzon developed, tested, advertised and marketed Stompeez during the term of the Agreement. (Compl., ¶¶ 38-39; Ex., Khubani Cert., Ex. E) To add insult to injury, Saevitzon developed the Stompeez product utilizing IdeaVillage's business contacts, goodwill, and other resources, including its confidential business information, and while he was still receiving substantial monthly consulting fees and other compensation and expense reimbursement from IdeaVillage.

---

[6] As a direct result of its meeting with Walmart in mid-October, IdeaVillage succeeded in securing placement for Stompeez in Walmart stores beginning February 2012, only to have Saevitzon subsequently attempt to limit IdeaVillage's retail distribution rights and to control all direct response TV marketing. (Id. at ¶¶ 35-37)

(Compl., ¶¶ 38-50)      More specifically, Saevitzon developed the commercial for Stompeez during the term of the Agreement with the assistance and financial support of Infomercials. (Compl., ¶ 44)  In fact, it is believed, and discovery will confirm, that the test infomercial for Stompeez initially aired prior to Saevitzon's termination of the Agreement. (Id.)  In further violation of his Agreement, Saevitzon has also entered into an agreement with Interactive Group, LLC and/or its affiliate, Prexio Toys, Ltd., concerning the distribution and sale of Stompeez. (Compl., ¶¶ 45-46)  Due to Saevitzon's material breach of the Agreement and subsequent and continuing violation of IdeaVillage's **exclusive rights** to Stompeez, with which the other Defendants have tortiously interfered, IdeaVillage has been, and will continue to, be irreparably damaged by Saevitzon and his business associates. (Compl., ¶ 50) Therefore, IdeaVillage seeks a preliminary injunction against Defendants to prevent any further irreparable harm to IdeaVillage, as well as related equitable relief and monetary damages.

## LEGAL ARGUMENT

### POINT I

**IDEAVILLAGE'S COMPLAINT DOES NOT PLEAD A FEDERAL CAUSE OF ACTION AND THERE IS NO ALTERNATIVE BASIS FOR FEDERAL SUBJECT MATTER JURISDICTION**

As discussed more fully below, contrary to Defendants' assertions, the operative Complaint does <u>not</u> plead a cause of action under the Lanham Act. (<u>See</u> Point II, <u>infra</u>)  In fact, there is no reference to the Lanham Act in the Verified Complaint.  IdeaVillage only alleges claims under New Jersey common law.  Further, as set forth in Point III, IG, a New Jersey entity, is a proper Defendant, and its sole member, Alan J. Sutton, is a resident of New Jersey.

Defendants' self-serving characterizations of Plaintiff's Complaint are without merit and their arguments based on federal pleading standards should be disregarded and the entire action remanded to state court, as requested by Plaintiff.

### POINT II

**CONTRARY TO DEFENDANTS' ARGUMENTS, RULE 8 AND *TWOMBLY-IQBAL* DO <u>NOT</u> REQUIRE A PLAINTIFF TO PROVE EACH ELEMENT OF ITS CASE AT THE PLEADING STAGE**

The pleading standard delineated by the Supreme Court of the United States in <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007) provides that a plaintiff must state a claim to relief that is <u>plausible</u> on its face; critically, however, the

Supreme Court "did not require heightened fact pleading of specifics[,]" nor did the Court impose a <u>probability</u> requirement. <u>See also</u> <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009) (applying the <u>Twombly</u> pleading requirement to all civil suits in federal courts). Thus, a claim that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" is sufficient to satisfy the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. <u>Iqbal</u>, 129 S.Ct. at 1949. Stated another way, a plaintiff's complaint must contain enough facts to "raise a reasonable expectation that discovery will reveal evidence" of the necessary element. <u>Twombly</u> 550 U.S. at 556. <u>See also</u> <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234-35 (3d. Cir. 2008) ("The notice pleading standard of Rule 8(a)(2) remains intact[;]" "[Federal Rule of Civil Procedure 8(a)(2)] mandates a statement showing that the pleader is entitled to relief. That is to say, there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." (internal citations omitted)). Thus, a complaint should survive a motion to dismiss "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." <u>Twombly</u>, 550 U.S. at 556 (internal citations omitted).

When presented with a motion to dismiss for failure to state a claim, the District Court must conduct a two-part analysis: (1) the factual and legal elements of a claim should be separated -- the District Court must accept all the complaint's well-pleaded facts as true, but may disregard any legal conclusions; and (2) the District Court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim" for relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009) (internal citations omitted). Where a complaint permits the court to "infer more than the mere possibility of misconduct," a plaintiff has shown entitlement to relief and the motion to dismiss should be denied. Iqbal, 129 S.Ct. at 1950.

Although the state court pleading at issue was not subject to the requirements of the Federal Rules of Civil Procedure and federal common law at the time of filing, IdeaVillage's Complaint contains detailed factual allegations which, if properly accepted as true, show not only plausibility, but IdeaVillage's entitlement to the requested relief and, therefore, the Verified Complaint provides the necessary factual content to satisfy the requirements of Rule 8 of the Federal Rules of Civil Procedure.

As discussed more fully below, Defendants' motions incorrectly argue that IdeaVillage has not pled facts sufficient

to satisfy each and every element of each cause of action against them; however, Defendants fail to recognize that, even under Twombly-Iqbal, "standards of pleading are not the same as standards of proof." Phillips, 515 F.3d at 246. Moreover, Defendants counter-arguments regarding the intent and meaning of the Agreement are not appropriate on a motion to dismiss, before there has been any discovery. Id.

IdeaVillage has alleged sufficient facts, which, if proven, would demonstrate that the Defendants have engaged in conduct in contravention of IdeaVillage's contractual and common law rights. Accordingly, the Verified Complaint as constituted is more than sufficient to withstand Defendants' motions to dismiss predicated on Twombly-Iqbal. Nevertheless, if this Court determines that more specificity is required, Plaintiff requests the opportunity to amend and supplement its pleading in accordance with F.R.C.P. 15, particularly in light of the additional facts that have come to light since the initial filing of this action in state court approximately two months ago.

## A. IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE OF ACTION UNDER NEW JERSEY LAW FOR BREACH OF CONTRACT

A party alleging a breach of contract under New Jersey law satisfies the pleading requirement if it alleges: (1) the existence of a contract; (2) a breach of that contract; (3)

damages flowing therefrom; and (4) that the party performed its own contractual duties. Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F.Supp.2d 552, 561 (D.N.J. 2002)(citing Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co., 722 F.Supp. 184, 219 (D.N.J. 1989)).  IdeaVillage's Complaint satisfies all four (4) requirements and, therefore, Plaintiff has stated a claim for breach of contract.

IdeaVillage alleges that it retained Saevitzon and his entity, AJ, to assist the Company with new product development. The retention was memorialized by an Exclusive Agreement, executed on or about February 5, 2010 between IdeaVillage and AJ and all its subsidiaries and affiliates; the Agreement was effective November 1, 2009 and continued through August 2011. Thus, the first element, a contract, is satisfied.

The Agreement provides that AJ will provide its services to IdeaVillage on an "exclusive worldwide" basis (i.e., Saevitzon was precluded from becoming a member of any other entity that performed similar services) and that IdeaVillage was to receive the **exclusive rights** to any product found or developed by AJ on a worldwide basis.  The Agreement further provides:

> **AJ shall provide their services to IV** and **AJ shall not provide services to any other entity during the term of this Agreement.  The rights granted to IV hereunder shall be exclusive to IV.** Without limiting the generality of the foregoing sentence, so long as the rights granted hereunder are held exclusively by IV, **AJ shall not**, without

> IV's prior written consent: (i) **directly or indirectly, either by itself or in participation with any other person or entity, engage or otherwise assist in marketing, advertising, distribution and or sale of the Product, or any Competing Product, via means or media within the Territory . . . .**

Agreement, ¶ 2 (emphasis added), Compl., Ex. A.

IdeaVillage alleges that Defendant Saevitzon, by and through the entities under his control, not only secretly developed Stompeez during the term of the "exclusive" Agreement and while he was being paid significant compensation by IdeaVillage pursuant to the terms of the Agreement, but also improperly licensed the rights to Stompeez to other entities, including his co-defendants, during the term of the Agreement. This allegation satisfies element two, breach of contract.

Defendants attempt to parse the Agreement to "create" an interpretation that could somehow justify the blatant violation of the Agreement with respect to Stompeez. Notably, nowhere in their briefs do Defendants cite or even acknowledge the express prohibitions on competition and the clear and unambiguous language set forth in section 2 of the Agreement. In any event, Defendants' competing interpretations of the Agreement are unavailing and their contentions cannot possibly be resolved at the pleading stage, before discovery.[7]

---

[7] Defendants' assertion that the Agreement did not create an obligation to present each and every product to IdeaVillage is similarly

15

While they simply ignore the clear and unambiguous language of section 2 of the Agreement, Defendants also argue that the Complaint fails to state a claim for breach of contract because the Agreement in question had an initial term of one year. Defendants erroneously argue that IdeaVillage concedes that any breach could only have occurred *after* the Agreement had expired. In this regard, Defendants argue that the Complaint contains an admission that the earliest possible date that a breach could have occurred is November 2010 -- outside the initial year of the Agreement. No such allegation is actually found in the Complaint.

To the contrary, the Complaint alleges that the lawsuit filed by Eyes Wide Open Corporation ("EWO") against Defendants Saevitzon and his affiliates (Defendants Spot On, AJ, von Mohr, and D.R. Product Group) in the Superior Court of California, County of Los Angeles, alleges that Saevitzon first discussed the Stompeez product concept with EWO in **"early Fall of 2010."** (Compl., ¶ 39 (emphasis added); see also Khubani Cert., Ex. E) The Complaint further alleges that Defendant Saevitzon, through his California counsel, has asserted that he pitched the Stompeez product concept to EWO as early as November 2010.

---

disingenuous. The Agreement clearly states, right at the outset, that IdeaVillage and AJ "desire to enter into an exclusive worldwide consulting agreement" and, as noted above, AJ was prohibited from developing products without the written consent of IdeaVillage, which naturally requires notice of its actions to IdeaVillage.

(Compl., ¶ 39; Khubani Cert., Ex. F)   However, the Complaint does <u>not</u> allege that Defendant Saevitzon's counsel's self-serving contention is correct[8] or, for that matter, that EWO's claim that the product concept was discussed in "early Fall 2010" is somehow inaccurate in terms of the timing of events.

The face of the Complaint does not allege the exact date that the breach occurred (nor is such a precise allegation required under the New Jersey rules of pleading or Rule 8) for good reason -- that information is in the hands of the Saevitzon Defendants and certain non-parties, including EWO and its representatives, and thus will be uncovered through the discovery process.   Nevertheless, there is reasonable cause to believe that the breach of contract initially occurred **prior to November 2010**, as that is precisely what Saevitzon's counsel's letter implies. (Khubani Cert., Ex. F). IdeaVillage's business records, specifically **expense reports submitted by Defendant Saevitzon to IdeaVillage**, reference multiple meetings between Defendant Saevitzon and Nancy Duitch, President and owner of EWO, in **September and October of 2010** (notably, Defendant Saevitzon submitted all expense reports in his name, rather than

---

[8]   Defendants' argument that the contract no longer existed is disingenuous.   Discovery will show that the initial breach occurred prior to November 2010, and that Defendant Saevitzon's contention of discussions in November 2010 is a fabrication on his part, in an effort to create the appearance that his misdeeds occurred outside the initial term of the Agreement.

in the name of AJ).  (See Boger Decl., Ex. A.).   There are no
such meetings referenced by Defendant Saevitzon in November.
(Id.) Thus, the reports are entirely consistent with Ms. Duitch
and EWO's claim that the product concept was discussed in "early
Fall 2010," which would fall within the initial year of the
exclusive Agreement with Defendant Saevitzon.

At the very least, there is a factual dispute as to when
the breach of the Agreement first occurred and, therefore,
Plaintiff is entitled to discovery on the issue.[9] The matter
cannot possibly be resolved in Defendants' favor at the pleading
stage, particularly in light of any denial on the part of
Defendant Saevitzon.

While the documentary evidence shows that the meetings
between Defendant Saevitzon and EWO occurred prior to November
2010 (consistent with EWO's allegations), IdeaVillage does not
concede that the Agreement expired on the one-year anniversary
of the effective date.  Although Defendants argue that, by its
terms, the Agreement expired on October 31, 2010, the limited
record shows that IdeaVillage and Defendant Saevitzon continued

---

[9] According to Saevitzon, he brought Stompeez to EWO in "early November
2010."  This claim -- self-serving as it may be -- strongly suggests
that Defendant Saevitzon had already made contact with the product
inventor, was brainstorming the product concept with EWO (and perhaps
others) and thus product development was already in the initial
stages.  Defendant Saevitzon, who continued to submit invoices to
IdeaVillage and collect his monthly retainer payment and reimbursement
of health benefits through August of the following year, does not
claim otherwise.

18

to conduct themselves as if the Agreement was still in effect. Specifically, Defendant Saevitzon continued to submit invoices for his monthly retainer and reimbursement of his business expenses and family healthcare expenses pursuant to the Agreement. Saevitzon's submission of those invoices, and the monthly payments themselves, continued until August 29, 2011, at which time Saevitzon informed IdeaVillage in an email to the senior executives that he did not wish to continue his exclusive consulting relationship with the company, but that he would be working independently on product development and would continue to bring new products to IdeaVillage for consideration. (Compl., Ex. D; Khubani Cert., Ex. B)  Of course, as IdeaVillage has now come to learn, August was when Defendant Saevitzon realized he had a "winning" product on his hands, and that is when he sought to cut IdeaVillage out, notwithstanding the two-years of compensation that IdeaVillage paid to Defendant Saevitzon while developed the product behind the back of IdeaVillage.

If the exclusive Agreement did, in fact, expire on October 31, 2010, as claimed by Saevitzon, then why did he feel it was necessary, almost a year later, to advise IdeaVillage that he would no longer be working on an exclusive basis?  Furthermore, the language used by Saevitzon, specifically that he was "very proud of what we [he and IdeaVillage] have accomplished over the

19

last 2 years," indicates that the Agreement was still in place, or at the very least, demonstrates that Saevitzon believed that to be the case. (Id.) In either event, Saevitzon's very words provide the factual predicate necessary to move this matter forward into discovery.

As alleged in the Complaint, IdeaVillage and Saevitzon continued to perform according to the same materials terms of the Agreement after the initial one-year period. In fact, as late as June 1, 2011, IdeaVillage confirmed that **his** consulting agreement remained "exclusive" and Saevitzon accepted that proposition by continuing to invoice IdeaVillage and accept payments:

> Brett,
>
> This email confirms our meeting of May 25th regarding your monthly draw. As discussed, effective July 1st 2011, the monthly draw will revert back to $10k per month plus the medical benefits. **The reduction in the monthly retainer does not in any way change the exclusive agreement that you have with Ideavillage.**
>
> It is our desire that we immediately achieve another winner from your product submissions and be able to again increase the monthly retainer.
>
> See Khubani Cert., Ex. G. (emphasis added).

Accordingly, under black letter contract principles, the material terms and obligations of the Agreement survived, notwithstanding any lapse of the initial contract term. See Luden's Inc v. Local Union No. 6, 28 F.3d 347, 355-56 (3d Cir.

1994) (decided under federal common law). Accord Martin v. Campanaro, 156 F.2d 127, 129 (2d Cir. 1946).

At a minimum, there are unsettled issues of fact as to when the Agreement expired, although the record strongly favors a finding that the Agreement continued after the initial year, and through August 2011. It is a question of fact whether or not the parties' conduct resulted in an implied contract, which cannot be resolved at the pleading stage.

IdeaVillage has satisfied elements three (damages) and four (performance of its contractual duties). Under the terms of the Agreement, IdeaVillage paid Saevitzon consulting fees, medical insurance payments, and expense reimbursements totaling more than $370,000.00. As such, Plaintiff has sufficiently alleged a breached of the Agreement and, therefore, the motions to dismiss should be denied.

**B. IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE OF ACTION UNDER NEW JERSEY LAW FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

The Agreement contains a New Jersey choice of law provision. It is well settled that every contract governed by New Jersey law contains an implied covenant of good faith and fair dealing. See Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396 (1997). The covenant dictates that "'neither party shall do anything which will have the effect of destroying or

21

injuring the right of the other party to receive fruits of the contract . . . .'". Id. (quoting Palisades Properties Inc. v. Brunetti, 44 N.J. 117, 130 (1965)); see also Bak-A-Lum Corp. v. Alcoa Building Products, Inc., 69 N.J. 123 (1976) (finding breach of the implied covenant of good faith and fair dealing arising from manufacturer's termination of exclusive distributorship agreement with the plaintiff).

As set forth above, Plaintiff has adequately pled a cause of action for breach of contract. Defendants' argument in regard to breach of the implied covenant of good faith and fair dealing -- that the contract was no longer in effect -- is unavailing. Similarly, Defendant Saevitzon's argument that Spot On (one of his various LLCs), and not AJ (the contracting party), is controlling Stompeez is likewise unavailing. The implied covenant of good faith and fair dealing dictates that Saevitzon cannot simply form a new corporate entity in order to avoid his preexisting obligations and divert an opportunity that would otherwise belong to IdeaVillage under the Agreement. See Sons of Thunder, 148 N.J. at 396; Palisades Properties, 44 N.J. at 130; and Bak-A-Lum Corp., 69 N.J. 123.

Accordingly, the separate count for breach of the implied covenant should survive the defense motions.

## C. IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE OF ACTION UNDER NEW JERSEY LAW FOR PROMISSORY ESTOPPEL

IdeaVillage has adequately pled the elements of promissory estoppel. Under New Jersey law, a promissory estoppel claim is generally established if four elements are satisfied:

1. a promise by the promisor, which is sufficiently clear and definite;
2. the promise must be made with the expectation that the promisee will rely on thereon;
3. the promisee must in fact reasonably rely on the promise; and
4. detriment of a definite and substantial nature must be incurred in reliance on the promise.

Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc., 307 N.J. Super 461, 469 (App. Div. 1998). See also Aircraft Inventory Corp. v. Falcon Jet Corp., 18 F.Supp.2d 409, 416 (D.N.J. 1998). However, depending upon the factual circumstances, a plaintiff need not ultimately demonstrate proof of a "clear and definite" promise in order to prevail on its claim. See Pop's Cones, 307 N.J. Super. at 469-472. Rather, the "clear and definite" requirement may be relaxed where it is necessary to avoid gross injustice. Id. Accordingly, promissory estoppel requires a fact-sensitive analysis, and thus does not lend itself to disposition on the pleadings. Id.; see also Commerce Bankcorp. v. BK Int'l. Ins. Brokers, 490 F. Supp. 2d 556, 562 (D.N.J. 2007) (Irenas, J.) (denying motion to dismiss: "The Court cannot hold that under no set of facts could [plaintiff] establish that the assurances

were clear and definite or that its reliance on those statements was reasonable. Both factors require highly fact and context specific inquiries.").

Here, IdeaVillage has alleged that in or about mid-September 2011, Saevitzon presented IdeaVillage with two "new" products -- one being Stompeez -- under a Confidentiality Agreement wherein Saevitzon used a "new" LLC, Spot On. (Compl., ¶ 29-31) As set forth in the Complaint, negotiations ensued between Spot On and IdeaVillage regarding a new distribution agreement; several drafts were exchanged between IdeaVillage and Defendant Saevitzon on behalf of Spot On (Id. at ¶ 32-33; see also Khubani Cert., ¶ 19, Ex. D) and IdeaVillage was led to believe that an interim agreement had been reached on the essential business terms for retail distribution. (Compl., ¶ 34)

In reliance on Spot On's promise of retail distribution rights, and with the understanding that the parties had reached an acceptable interim agreement on the "split" for retail, IdeaVillage presented the product to Walmart. (Id.) IdeaVillage proceeded with the full knowledge and encouragement of Defendants Saevitzon and Spot On. (Id.) In fact, Defendant Saevitzon provided IdeaVillage with samples of Stompeez for the meeting with Walmart and even wished IdeaVillage luck with the presentation to Walmart, which occurred in mid-October 2011. (Id.)

Plaintiff's Complaint alleges that Defendants Saevitzon, Spot On and von Mohr promised IdeaVillage that it would license the Stompeez rights to IdeaVillage if it could secure placement for Stompeez with Walmart. As set forth in the Complaint, after IdeaVillage presented the product to Walmart, Defendants changed course and attempted to renegotiate the basic business terms. Notably, these facts are not disputed. Rather, Defendants argue that the allegations are not specific enough under Twombly-Iqbal.

Contrary to Defendants' argument, Twombly-Iqbal, supra, do not require that a plaintiff plead the specific or "essential" terms of the promise, such as the quantity, purchase price or delivery. To the contrary, the requirement is a matter of New Jersey substantive law, not Rule 8. Further, Defendants' reliance on Carthan v. Alliance, Div. of Rock-Tenn Co., 2007 WL 316464 (D.N.J. January 29, 2007) as standing for the proposition that the reasonableness of a party's reliance can only be determined by reference to the specificity of the promise (thus implying a heightened pleading standard) is misplaced. Indeed, the case was not even decided on Rule 8 pleading standards (Carthan was decided under Rule 56) and New Jersey substantive law controls.

In Carthan, an employment discrimination and wrongful termination case, plaintiff alleged that the defendant promised

25

that he would serve as in-house common carrier.  However, the plaintiff conceded that the defendant "did not promise [plaintiff] a specific amount of work, did not tell him that he would begin on any particular date, and did not discuss providing for load deliveries with him." Id. at * 6.  On a motion for summary judgment (not at the pleading stage), the court ruled that any reliance on those representations was not reasonable as a matter of law. Id.

Here, Defendants' promise to IdeaVillage of retail distribution rights was clear.  Indeed, without it, IdeaVillage would not have presented the product to Walmart.  In any event, Defendants again attempt to argue fact issues in a motion to dismiss.  Plaintiff's pleadings sufficiently allege a plausible claim for relief and the motion to dismiss the promissory estoppel claim should, therefore, be denied.

**D.  IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE UNDER NEW JERSEY LAW**

IdeaVillage has asserted claims for tortious interference with contract (Fourth Count) and tortious interference with economic advantage (Sixth Count).  As Plaintiff has adequately pled a cause of action for breach of contract, supra, Defendants' primary argument (i.e., that there was no contract to interfere with) is moot.  Nevertheless, the claims are adequately pled.

26

To establish a cause of action for tortious interference under New Jersey law, a plaintiff must demonstrate: (1) a protectable right or interest (i.e., a prospective economic or contractual relationship); (2) defendants' actions were intentional and malicious; (3) the interference caused the loss of the prospective gain; and (4) the injury caused damage. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989). IdeaVillage paid a substantial sum of money for the rights and privileges in the Exclusive Agreement with Saevitzon and AJ (which included the Stompeez Rights) and, therefore, IdeaVillage had a reasonable expectation that the Agreement would be honored by Saevitzon and third parties. IdeaVillage's Complaint sufficiently alleges that Defendants are aware of IdeaVillage's exclusive rights to Stompeez, but nevertheless, have marketed and sold Stompeez to the detriment of IdeaVillage.

**E. IDEAVILLAGE HAS ADEQUATELY PLED A CAUSE OF ACTION FOR UNFAIR COMPETITION UNDER NEW JERSEY LAW**

Plaintiff's claim of unfair competition is based on the exclusive agreement between IdeaVillage and AJ/Saevitzon -- which Saevitzon breached by developing and licensing the Stompeez product utilizing IdeaVillage's business contacts, goodwill, and other resources. Defendants place undue reliance on the Stompeez trademark to characterize IdeaVillage's unfair

27

competition claim as a claim of trademark infringement and false advertising.  Defendants do so in an obvious effort to morph Plaintiff's allegations into a federal cause of action to support their removal of the action. However, IdeaVillage has not now, nor has it ever, asserted any claims under the Lanham Act.  To the contrary, the claim is one under New Jersey law. An unfair competition claim may be grounded in state law or federal law and Plaintiff is not required to assert a claim under the Lanham Act.

State law claims do not invoke the Lanham Act, where, as here, a party is simply seeking to assert its rights under a contract, irrespective of whether or not the contract deals with intellectual property. Silverstar Enterprises, Inc. v. Aday, 537 F.Supp. 236, 242 (S.D.N.Y. 1982). Accord T.B. Harms Co. v. Eliscu, 339 F.2d 823, 826 (2d Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); Aamaco Transmissions, Inc. v. Smith, 756 F.Supp. 225, 227 (E.D.Pa. 1991); Staff Builders of Philadelphia, Inc. v. Koschitzki, 1989 WL 974707 at * 2 (E.D.Pa. August 18, 1989); Shoney's Inc. v. Schoenbaum, 686 F.Supp. 554, 563-64 (E.D.Va. 1988); Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc., 925 F.Supp. 212, 217 (S.D.N.Y. 1996); Moog Controls, Inc. v. Moog, Inc., 923 F.Supp. 427, 430 (W.D.N.Y. 1996); Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 162 (7th Cir.1994); Gruen Marketing Corp. v. Benrus

Watch Co., Inc., 955 F.Supp.979, 983 (N.D.Ill. 1997). Thus, the mere existence of a trademark does not confer federal jurisdiction over a contract dispute nor does it require a federal cause of action.

Indeed, Silverstar Enterprises, Inc. v. Aday, supra, 537 F.Supp. at 242, is directly on point on this issue, holding that a contract dispute between an exclusive licensee and a licensor over the right to use a trademark is determined by principles of state contract law (as it is the contract that defines the parties' relationship), and not the Lanham Act (which, in contrast, establishes marketplace rules governing the conduct of third parties) and several other district courts, including courts within the Third Circuit, have adopted and followed that same reasoning. See T.B. Harms Co. v. Eliscu, supra, 339 F.2d at 826; Aamaco Transmissions, Inc. v. Smith, supra, 756 F.Supp. at 2270; Staff Builders of Philadelphia, Inc. v. Koschitzki, supra, at * 2; Shoney's Inc. v. Schoenbaum, supra, 686 F.Supp. at 563-64; Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc., supra, 925 F.Supp. at 217; Moog Controls, Inc. v. Moog, Inc., supra, 923 F.Supp. at 430; Zerand-Bernal Group, Inc. v. Cox, supra, 23 F.3d at 162; Gruen Marketing Corp. v. Benrus Watch Co., Inc., supra, 955 F.Supp. at 983.

It is equally settled that Plaintiff may assert a claim under New Jersey common law when a business identity is unfairly

used by another. See e.g., Red Devil Tools v. Tip Top Brush Co., 50 N.J. 563, 572-575 (1967); American Shops v. American Fashion Shops of Journal Square, 13 N.J. Super. 416, 422, 427 (App. Div. 1951); and Squeezit Corp. v. Plastic Dispensers, 31 N.J. Super 217, 222-223 (App. Div. 1954). Further, there are no strict elements that a plaintiff must assert to adequately plead a cause of action for unfair competition under New Jersey common law, as the marketplace is constantly evolving:

> No catalogue exists of all acts which constitute unfair competition. No phophet has undertaken to foretell what acts will be held to constitute unfair competition in the future, because equity broadly concerns itself with the suppression of injurious deception and fraud whatever the means by which they are wrongfully accomplished. It must be realized that injunctive relief is not confined to the protection of those having trade-marks and trade-names. It reaches beyond to encompass all cases in which it is evident that fraud and deception are practiced by one in disparaging or capturing the trade of a competitor. The ingenuity of the unfair competitor thus eludes classification but not always the restraint of a court of equity.

American Shops, 13 N.J. Super. at 421. See also Squeezit Corp. v. Plastic Dispensers, 31 N.J. Super at 221 (stating that "[t]he concept and theory of unfair competition is unclear and may change from one decade to the next."); and Ryan v. Carmona Bolen Home for Funerals, 341 N.J. Super 87, 92 (App. Div. 2001) (stating that "the purpose of the law regarding unfair competition is to promote higher ethical standards in the

business world. Accordingly, the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand.  The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently flexible to accommodate those goals.") (internal citations omitted)).

Plaintiff's Complaint alleges that the Saevitzon Defendants, IG and Prexio have acted in concert to usurp and misappropriate the rights and interests of IdeaVillage under the exclusive worldwide Agreement and, therefore, have violated the "rules of the game."  Plaintiff further alleges that Saevitzon has engaged in deceptive practices -- hiding behind his various corporate entities and his agents and business affiliates -- in order to deprive IdeaVillage of its rights under the Exclusive Agreement.  Further, under New Jersey law, IdeaVillage has a protectable interest with respect to its product development, intellectual property, confidential business information, customer relationships and goodwill.  See Sun Dial Corp. v. Rideout, 16 N.J. 252, 259 (1954); Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 299 (2001); Platinum Management, Inc. v. Dahms, 285 N.J. Super. 274, 295 (Law Div. 1995). Defendants have violated the rules of the marketplace by using this information to their advantage (and to the detriment of IdeaVillage).

Accordingly, Plaintiff has adequately pled a cause of action for unfair competition under New Jersey common law.

### POINT III

**IDEAVILLAGE HAS ADEQUATELY PLED CLAIMS AGAINST INTERACTIVE GROUP, LLC, WHICH IS A PROPER PARTY/DEFENDANT**

In support of its motion to dismiss under Rule 12(b)(6), Defendant IG argues, via a Declaration of its sole member, Alan J. Sutton, that it does not currently have, **and has never had**, a business relationship with **any** of the parties to this action. IG further argues that it does not have a business relationship with Interactive Group Limited and Prexio Toys Ltd. of Hong Kong, entities which are directly involved with the procurement and distribution of Stompeez.

Specifically, Sutton avers that "Interactive Group, LLC . . . . has never engaged in any business whatsoever . . . ." and that "Interactive Group, LLC does not currently have, nor has it ever had, any business relationship with any party to the above-captioned case." Sutton Decl., ¶¶ 3-4. Sutton further avers that "[m]ore specifically, **Interactive Group, LLC does not have any business relationship with the Interactive Group Limited headquartered in Hong Kong, or Defendant Prexio Toys, Ltd.**, as has been suggested in Plaintiff's Verified Complaint." (Emphasis

added).   Sutton's   statements   are   materially   and   demonstrably false.

Specifically, a review of IdeaVillage's business records, as well as publicly available information regarding Sutton and IG, reveals that Sutton and IG are, in fact, direct affiliates of -- if not one and the same with -- the aforementioned Hong Kong entities.[10]

In or about June 2011, Defendant Saevitzon introduced Sutton to IdeaVillage as someone who, through his company, IG, could potentially handle international distribution of one of IdeaVillage's other toy products, *Wuggle Pets*.™ (Boger Decl., ¶ 9) In an email to IdeaVillage (on which Defendant Saevitzon was copied), Sutton provided the following contact information for his company:

> Interactive Group, 701 Cooper Road, Suite 11
> Voorhees, NJ 08043
> Attn: Michael Yeung/Kathleen Peterson[11]

---

[10] IG asks that the Court disregard the allegations contained in the Verified Complaint and accept the Sutton Declaration as true. In this regard, the motion to dismiss is improper.   Nevertheless, if Sutton's Declaration is to be considered by the Court, IdeaVillage requests that the Court also consider the emails and other documentary evidence submitted in opposition to the motion and that the Court order Sutton to appear and submit to an examination regarding the obvious discrepancies between his sworn statement and the documentary evidence.

[11] IG claims that it has never transacted any business, has never had any employees, has not paid any taxes and is not current on its New Jersey business registration. See Sutton Declaration; see also Beshada Decl., at Ex. D. Yet, the publicly available LinkedIn page for Kathleen Peterson indicates that from May 2010 – June 2011, she was an employee of IG. See Boger Decl., Ex. E.   In any event, even if it is

Boger Decl., ¶ 10, Ex. B. This is the exact same address for IG as is registered with the New Jersey Department of Treasury. Boger Decl., Ex. D.

Sutton utilized the following email address: **alan.sutton@interactive-group.com.** In another email to IdeaVillage, Sutton identified his company's website, www.interactive-group.com. See Boger Decl., Exs. B, F & G. In addition, Sutton provided IdeaVillage with a U.S. address in Cherry Hill, New Jersey and referenced yet another company, Cyber Clean, which is identified as a division of IG on Sutton's website. Boger Decl., Ex. B. Press releases issued by Sutton and IG state that the company is headquartered in Cherry Hill, New Jersey and also list the same website, www.interactive-group.com, which identifies Prexio as a division of the company and lists Stompeez as one of its products. (Boger Decl., Ex. F).

Clearly, Mr. Sutton's sworn Declaration is misleading, if not outright false. In any event, dismissal under Rule 12(b)(6) based on a Declaration and without the opportunity for discovery would be improper. IdeaVillage has made more than an ample showing at the pleading stage and, at a minimum, it is entitled

---

true that IG had no employees on the books and that it failed to pay appropriate taxes, those facts are hardly dispositive of the issue whether IG is a proper defendant in the case. Of course, these factual contentions, if true, may dictate that Mr. Sutton, a New Jersey resident, should be joined individually as a co-defendant.

to discovery regarding the corporate structure of IG and its (and Sutton's) relationship to the other Defendants in this matter. [12]

### POINT IV

**PLAINTIFF SHOULD BE PERMITTED DISCOVERY REGARDING THE "ALTER EGO" CLAIMS AGAINST DEFENDANT SAEVITZON AND, IN LIGHT OF THE FACTS THAT HAVE RECENTLY COME TO LIGHT, LEAVE TO AMEND SHOULD BE GRANTED**

An individual may be liable for corporate obligations where he has used the corporation as his *alter ego* and abused the corporate form in order to advance his personal interests. See Sean Wood, LLC v. Hegarty Group, Inc., 422 N.J. Super. 500, 517-18 (App. Div. 2011) (citing Tsai v. Buildings by Jamie, Inc. (In re Buildings by Jamie), 230 B.R. 36, 42 (Bankr. D.N.J. 1998)). The doctrine of piercing the corporate veil is employed when fraud or injustice has been perpetrated. Id. Piercing the corporate veil is an equitable remedy whereby the court disregards the corporate existence and holds the individual principals liable for the corporation's debts. See In re Blatstein, 192 F.3d 88, 100 (3d Cir.1999); Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir.2002). Consequently,

---

[12]  IdeaVillage anticipates that it may amend to name Sutton individually (particularly in light of his sworn statements regarding his New Jersey LLC, which he avers is nothing more than a shell) and, depending on discovery, the other IG/Prexio entities may be named as co-defendants.

the individual and the corporation are treated as one for liability purposes.

As set forth in the Verified Complaint, AJ is just one of several LLCs owned and/or controlled by Defendant Saevitzon and which Defendant Saevitzon has utilized in order to perpetrate a fraud on IdeaVillage and to hijack the Stompeez product campaign. Upon information and belief, AJ had no other business and it currently has no assets. In short, it is nothing more than a sham, created by Saevitzon to defraud IdeaVillage.[13]

Further, communications between IdeaVillage and Saevitzon confirm that it was the intent of the parties that Saevitzon be bound by the terms of the exclusive Agreement. As discussed supra, an email from Ronald Boger to Defendant Saevitzon in regard to the Agreement states:

> Brett,
>
> This email confirms our meeting of May 25th regarding **your** monthly draw. As discussed, effective July 1st 2011, the monthly draw will revert back to $10k per month plus the medical benefits. **The reduction in the monthly retainer does not in any way change the exclusive agreement that you have with Ideavillage.** (sic)
>
> It is our desire that we immediately achieve another winner from **your** product submissions and be able to again increase the monthly retainer.

---

[13] Notably, while he identifies Spot On and D.R. Product Group, Defendant Saevitzon does not even identify AJ as one of his current or former business ventures. See Saevitzon LinkedIn page, attached as Exhibit C to the Declaration of Donald Beshada.

(Khubani Cert., Ex. G) (emphasis added). See generally Sean Wood, LLC, supra, 422 N.J. Super. at 518-19 (agent of seller of industrial equipment was individually liable for the seller's breach of contract because agent used his personal funds to purchase equipment, referred to himself interchangeably as an agent and the seller in correspondence, and generated income for seller).

In fact, Defendant Saevitzon's abuse of the corporate form extends beyond IdeaVillage.   IdeaVillage has only recently learned the "truth" about AJ, through, among other things, investigation regarding other matters in which Defendant Saevitzon is alleged to have utilized the corporate form to defraud others, including EWO.  (See EWO Complaint, Khubani Cert., Ex. E).  (In other words, AJ may be just one large shell in a larger shell game being played by Defendant Saevitzon and his affiliates).

One such matter involves an individual by the name of John Linton, an associate of Saevitzon, who claims to be the founder and actual owner of D.R. Product Group, LLC, a company which Defendant Saevitzon claims to be a partner in.  See Saevitzon LinkedIn Page, attached as Ex. C to the Beshada Declaration; see also Saevitzon emails utilizing D R Product Group email address,

Boger Decl. Ex. B.   With respect to Linton, IdeaVillage anticipates that discovery will show the following:

Linton advanced Saevitzon $30,000 at or around the same time that Saevitzon executed the Agreement with IdeaVillage and Defendant Saevitzon promised Linton one-half of the proceeds of that Agreement. However, Saevitzon subsequently misrepresented to Linton that he had received no further compensation from IdeaVillage.

After the filing of the EWO lawsuit, Linton learned the truth -- that Saevitzon had been paid hundreds of thousands of dollars by IdeaVillage on three (3) product campaigns -- Uglue, Criss Angel Magic Kit, Wuggle Pets. In or about November 2011, Linton confronted Saevitzon with these facts, and Saevitzon almost immediately agreed to **personally** pay Linton one-half of the monies that Saevitzon received from IdeaVillage during the two-year term of the IdeaVillage-Saevitzon Agreement.   Ultimately, that agreement was reduced to writing, with Saevitzon agreeing to personally reimburse Linton for one-half of the payments, and agreeing to take a consent judgment against him, personally, for that debt. Beshada Decl., Ex. A.   The agreement refers to

Saevitzon's latest LLC -- Spot On -- as a Saevitzon "affiliate" (which is substantially the same language utilized in the IdeaVillage-Saevitzon exclusive consulting agreement. Id.

In this regard, Defendants Saevitzon and Spot On have assumed the obligations of AJ, which has no assets and is nothing more than a shell.

Here, there is ample basis for the allegations that Defendant Saevitzon has abused the corporate form.  IdeaVillage anticipates that further evidence supporting the claim will be revealed through discovery and, in such case, IdeaVillage will formally seek to pierce the corporate veil.[14]

## POINT V

**IN THE EVENT THIS COURT FINDS THAT PLAINTIFF'S COMPLAINT FAILS TO SATISFY THE FEDERAL PLEADING STANDARDS, LEAVE TO AMEND SHOULD BE GRANTED**

When faced with a motion to dismiss, particularly one that is based on technical pleading arguments, the Court should afford a plaintiff the opportunity to amend his or her

---

[14] The factors the Court must ultimately consider are: [1] gross undercapitalization; [2] failure to observe corporate formalities, non-payment of dividends; [3] the insolvency of the debtor corporation at the time; [4] siphoning of funds of the corporation by the dominant stockholder; [5] non-functioning of other officers or directors, absence of corporate records; and [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir.1988) (citations omitted).

complaint, unless it is clear that the amendment would be futile. Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000). In the event the Court finds that IdeaVillage's Complaint fails, in any respect, to satisfy the Rule 8 pleading standards under Twombly-Iqbal, leave to amend should be granted. Indeed, fairness dictates that IdeaVillage be afforded the opportunity to conform its state court pleadings to federal pleading standards and there will be no undue prejudice to Defendants, who elected to remove the action to federal court, if leave to amend is granted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss.

Respectfully submitted,

**BESHADA FARNESE LLP**

By:  /s/Donald A. Beshada
     DONALD A. BESHADA

**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**

*Attorneys for Plaintiff
IdeaVillage Products Corp.*

By:  /s/Michael G. Langan
     MICHAEL G. LANGAN

DATED:  February 7, 2012

40

## CERTIFICATION OF SERVICE

I hereby certify that on this date a true copy of the within Brief in Opposition and all supporting papers were served on Defendants via CM/ECF.

By: /s/Michael G. Langan
MICHAEL G. LANGAN

DATED: February 7, 2012