**HARTMANN DOHERTY**
**ROSA BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, New Jersey 07661
(201) 441-9056

**BESHADA FARNESE LLP**
108 Wanaque Avenue
Pompton Lakes, New Jersey 07442
(973) 831-9910

*Attorneys for Plaintiff*
*IdeaVillage Products Corp.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IDEAVILLAGE PRODUCTS CORP., a New Jersey corporation,<br><br>            Plaintiff,<br><br>       vs.<br><br>BRETT SAEVITZON; ALL THE J'S LLC; SPOT ON DIRECT RESPONSE, LLC; D R PRODUCT GROUP, LLC; PAUL VON MOHR; INTERACTIVE GROUP LLC; PREXIO TOYS LTD. and INFOMERCIALS, INC.;<br><br>            Defendants. | Civil Action No.: 11-7548(WJM)(MF)<br><br>**DECLARATION OF COUNSEL FOR PLAINTIFF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>*(Document Electronically Filed)* |

I, Donald A. Beshada, Esq., hereby declare, under penalty of perjury:

1.    I am a partner in the firm of Beshada Farnese LLP, co-counsel to IdeaVillage Products Corp. ("IDV"), the Plaintiff in the captioned matter.   In such capacity, I have personal

knowledge of the facts and circumstances set forth herein.   I submit this Declaration in opposition to Defendants' Motions to Dismiss.

2.   Annexed hereto as Exhibit "A" is a "Memorandum of Understanding" between Defendants Brett Saevitzon ("Saevitzon") and Spot On Group, LLC ("Spot On"), on the one hand, and John Linton.

3.   Annexed hereto as Exhibit "B" is Plaintiff's Brief filed with the New Jersey Superior Court in Support of Plaintiff's Order to Show Cause and served on counsel for Defendants Saevitzon and Spot On.

4.   Annexed hereto as Exhibit "C" is the publicly available LinkedIn page for Defendant Saevitzon.

5.   Annexed hereto as Exhibit "D" is a letter to the Court dated January 3, 2012 from Andrew Bronsnick, Esq., counsel to Paul von Mohr, in which Mr. Bronsnick relates his purported discussions concerning this matter with the "managing member" of Defendant Interactive Group, LLC.

I hereby declare that the foregoing statements made by me are true.  I am aware that if any of the statements are false, I am subject to punishment.

/s/Donald A. Beshada
DONALD A. BESHADA

Dated: February 7, 2011

# EXHIBIT A

## Memorandum of Understanding

This Memorandum of Understanding ("MOU") dated this __ day of November, 2011 is entered into by and between Brett Saevitzon ("Saevitzon"), an individual with a primary residence of 4244 Woodcliff rd, Sherman Oaks, Ca 91403, Spot on Group, LLC, a Delaware limited liability company, and or its subsidiaries or affiliates ("SpotOn" and collectively with Saevitzon "Marketers") with offices located 4244 Woodcliff Rd, Sherman Oaks, Ca 91403, and John Linton ("Linton") an individual with a primary residence of 2602 Winding View, San Antonio, Texas 78260.

## AGREEMENT

NOWTHEREFORE, intending to be legally bound, the parties agree as follows:

1.      Spot On and Saevitzon, jointly and severally, shall enter into an 17 month note in the principle amount of $148,868.00 payable to Linton in 18 amortized equal monthly installments. Said note shall bear interest at the rate of 7% per annum, the first installment of which is due on or before December 15, 2011, and each month thereafter until satisfied. Said note shall be secured against Saevitson's interest in SpotOn and shall be accompanied by a stipulated judgment against the Marketers in the event of default.

2.      Linton shall be paid 50% of all funds received by Saevitzon and or his affiliates, including SpotOn for all products sourced prior to the date hereof, except as provided for herein. Such products include, but are not limited to, Pawggles. UGLU, and Criss Angel.

3.      Linton shall be paid $0.10 per unit sold of Stompeez for all channels except direct response for which Linton shall be paid $.10 per unit; however said direct repose fee shall not exceed 10% direct response gross margin. Such unit fee shall apply to any derivative, similar, related products or

1

any other products that are sold to stopmeez customers. Such payment shall occur on a quarterly basis and shall be paid with 15 days of the end of each quarter.

4.     Linton shall be paid $0.20 per unit sold of TurboPak for all channels except direct response for which Linton shall be paid $.20 per unit; however said direct repose fee shall not exceed 10% direct response gross margin. Such unit fee shall apply to any derivative, similar, related products or any other products that are sold to TurboPak customers. Such payment shall occur on a quarterly basis and shall be paid with 15 days of the end of each quarter.

5.     Linton shall be paid $0.20 per unit sold of Blinq for all channels except direct response for which Linton shall be paid $.20 per unit; however said direct repose fee shall not exceed 10% direct response gross margin. Such unit fee shall apply to any derivative, similar, related products or any other products that are sold to Blinq customers. Such payment shall occur on a quarterly basis and shall be paid with 15 days of the end of each quarter.

6.     Linton shall be paid the greater of $0.10 per unit sold of Light Notes for all channels except direct response for which Linton shall be paid $.10 per unit; however said direct repose fee shall not exceed 10% direct response gross margin or $0.15 per unit sold of Lots of Hugs for all channels except direct response for which Linton shall be paid $.15 per unit; however said direct repose fee shall not exceed 10% direct response gross margin. Such unit fee shall apply to any derivative, similar, related products or any other products that are sold to Light Notes and/or Lots of Hugs customers. Such payment shall occur on a quarterly basis and shall be paid with 15 days of the end of each quarter.

7.     Linton shall be paid 50% of any revenue created through any products introduced to Marketers by Linton at any time.

2

8.   Linton agrees not to initiate any conversations with Idea Village, its agents and/or its principles, except those authorized by either Spot On or Saevitzon after the execution hereof.

9.   All obligations hereunder shall be guaranteed by the parties hereto.

10.   Marketers, jointly and severally, hereby agree to indemnify Linton and DR Products Group, LLC to the full extent allowable under the law, including paying for any legal fees incurred, as incurred, for any claims that are brought against Linton and or DR Products Group, LLC for any activities, whether known or unknown, caused in part or in whole, directly or indirectly by the actions of the Marketers at any point in time, whether prior to the execution of this agreement or any time hereafter.

11.   If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

12.   This Agreement shall be construed and enforced according to the laws of the State of Texas and any dispute under this Agreement must be brought in State District Court in Bexar County, Texas and no other.

13.   The terms and conditions set forth herein constitute the entire agreement between the parties and supersede any communications or previous agreements with respect to the subject matter of this Agreement. There are no written or oral understandings directly or indirectly related to this Agreement that are not set forth herein. No change can be made to this Agreement other than in writing and signed by both parties.

14.   The waiver or failure of any party hereto to exercise in any respect any right provided in this agreement shall not be deemed a waiver of any other right or remedy to which the party may be entitled.

15.    Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or a recognized overnight delivery service such as FedEx.

16.    Marketer waives presentment for payment, protest, and notice of protest and nonpayment of the note and other obligations set forth herein Note.

17.    Marketers agree to sign definitive agreements that reflect the content hereof and all other required documentation including, but not limited to the note, security agreement, collateral agreement and any other agreements as presented by Linton, provided they comply with the terms hereof.

18.    Marketers shall pay for the preparation of all definitive agreements necessary to create definitive documents as required by Linton. Such payments shall be made directly to the attorney of Linton's choice who will represent Linton in said document preparation.

[signature page follows]

4

**IN WITNESS WHEREOF**, the parties hereto have executed this Memorandum Of Understanding by their officer's thereunto duly authorized as of the date first written above.

**BRETT SAEVITZON**

_____

Brett Saevitzon


**SPOT ON GROUP, LLC**

By:

_____

Name:

Title:


**JOHN LINTON**

_____

John Linton

5

EXHIBIT B

IDEAVILLAGE PRODUCTS CORP., a
New Jersey corporation;

        Plaintiff,

v.

BRETT SAEVITZON; ALL THE J'S
LLC; SPOT ON DIRECT RESPONSE,
LLC; D R PRODUCT GROUP, LLC;
PAUL VON MOHR, INFOMERCIALS
INC.; INTERACTIVE GROUP LLC and
PREXIO TOYS LTD.,


        Defendants.

---

**SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION:
GENERAL EQUITY PART
PASSAIC COUNTY**

DOCKET NO.: C- 117-11

<u>Civil Action</u>

---

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS APPLICATION FOR PRELIMINARY
INJUNCTION**

---

**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, New Jersey 07661
(201) 441-9056

**BESHADA FARNESE LLP**
108 Wanaque Avenue
Pompton Lakes, New Jersey 07442
(973) 831-9910

*Attorneys for Plaintiff
IdeaVillage Products Corp.*

*Of Counsel and on the Brief*
Michael G. Langan, Esq.

*On the Brief*
Kelly A. Zampino, Esq.

## TABLE OF CONTENTS

Page

Preliminary Statement . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . .   6

Legal Argument . . . . . . . . . . . . . . . . . . . .   17

    A.    PLAINTIFF'S CLAIMS ARE PREDICATED UPON
        SETTLED LAW . . . . . . . . . . . . . . .   18

    B.    THE MATERIAL FACTS ARE UNCONTROVERTED AND THERE
        IS A REASONABLE PROBABILITY OF ULTIMATE SUCCESS
        ON THE MERITS . . . . . . . . . . . . . .   21

    C.    IDEA VILLAGE WILL SUFFER IRREPARABLE HARM IF
        DEFENDANTS ARE NOT ENJOINED FROM THE MARKETING
        AND SALE OF STOMPEEZ . . . . . . . . . . .   24

    D.    THE EQUITIES FAVOR THE GRANT OF INTERLOCUTORY
        INJUNCTIVE RELIEF . . . . . . . . . . . . .   26

    E.    PLAINTIFF IS ENTITLED TO EXPEDITED DISCOVERY .   29

Conclusion . . . . . . . . . . . . . . . . . . . . . .   31

## TABLE OF CITATIONS

Page

A. Hollander & Son v. Imperial Fur Blending Corp.,
  2 N.J. 235, 249 (1949) . . . . . . . . . . . . . . . . 26

Bak-A-Lum Corp. v. Alcoa Building Products, Inc.,
  69 N.J. 123 (1976) . . . . . . . . . . . . . . . 19, 22

Boardwalk Regency Corp. v. Attorney General of State of
  N.J., 188 N.J. Super. 372, 373 (Law Div. 1982) . . . . . . 29

Charles Gendler & Co., Inc. v. Telecom Equip. Corp.,
  102 N.J. 460, 483 (1986) . . . . . . . . . . . . . . . 29

Citizens Coach Co. v. Camden Horse R.R. Co., 29 N.J.
  Eq. 299, 303-04 (E. & A. 1978) . . . . . . . . . . . . . 17

Crowe v. DeGioia, 90 N.J. 126, 132 (1982) . . . . . .17, 21, 24,
                                                        26, 28

Dolon v. DeCapua, 16 N.J. 599, 614 (1954) . . . . . . . . . 17

Dominion Video Satellite, Inc. v. Echostar Satellite
  Corp., 356 F.3d 1256, 1262-65 (10th Cir. 2004) . . . . . . . 24

General Electric Co. v. Gem Vacuum Stores, Inc.,
  36 N.J. Super. 234, 236-37 (App. Div. 1955). . . . . . . . 18

General Host Corp. v. Triumph Am., Inc., 359 F. Supp.
  749, 751 (S.D.N.Y. 1973) . . . . . . . . . . . . . . . 30

Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea
  Co., Inc., 476 F.2d 687, 692 (2d Cir. 1973) . . . . . . . . 30

Ingersoll-Rand Company v. Ciavatta, 110 N.J. 609, 639
  (1988) . . . . . . . . . . . . . . . . . . . . . . 28

J.I. Kislak, Inc. v. Artof., 13 N.J. Misc. 129, 132
  (Ct. Ch. 1935) . . . . . . . . . . . . . . . . . . 25

Karl's Sale and Service, Inc.v. Gimbel Brothers, Inc.,
  249 N.J. Super. 487, 493 (App. Div. 1991) . . . . . . . . 18

Page

Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 299
(2001) . . . . . . . . . . . . . . . . . . . . . . . 20

Leighton v. Uniroyal, 484 U.S. 964 (1987) . . . . . . . . . 29

Lighting Lube, Inc. v. Witco, 4. F.3d 1153, 1167 (1933) . . . 23

Luden's Inc. v. Local Union No. 6, 28 F.3d 347, 355-56
(3d Cir. 1994) . . . . . . . . . . . . . . . . . . . 23

Lyons v. Premo Pharm. Labs. Inc., 170 N.J. Super. 183,
189 (App. Div.) . . . . . . . . . . . . . . . . . . . 29

Makopoulos v. Walt Disney World, Inc., 221 N.J. Super.
513, 519-20 (App. Div. 1987) . . . . . . . . . . . . . 29

Marselli-Warner Corp. v. Babens, 51 F. Supp. 2d 508,
533 (D. NJ 1999) . . . . . . . . . . . . . . . . . . 28

Martin v. Campanaro, 156 F.2d 127, 129 (2d Cir.
1946) . . . . . . . . . . . . . . . . . . . . . . . 23

Palisades Properties Inc. v. Brunetti, 44 N.J. 117, 130
(1965) . . . . . . . . . . . . . . . . . . . . . . . 19

Platinum Management, Inc. v. Dahms, 285 N.J. Super. 274,
295 (Law Div. 1995) . . . . . . . . . . . . . . . . . 20

Pogastin v. Leighton, 216 N.J. Super. 363, 366 (App.
Div.) . . . . . . . . . . . . . . . . . . . . . . . 29

Pop's Cones v. Resorts International Hotels, 307 N.J.
Super 461, 1325 (App. Div. 1998) . . . . . . . . . . . 27

Simon v. Oldsman Tvvn., 203 N.J. Super. 365, 377 (Ch.
Div. 1985) . . . . . . . . . . . . . . . . . . . . . 29

Sons of Thunder, Inc. v. Bordon, Inc., 148 N.J. 396 (1997). . 19

Sun Dial Corp. v. Rideout, 16 N.J. 252, 259 (1954)  . . . . . 20

                                                           Page

Toyrus.com, LLC v. Amazon.com Kids, Inc., 2005 WL
    846141 (App. Div. 2005) . . . . . . . . . . . . . . . . 24

Walgreen Co. v. Sara Creek Prop. Co., B.V. 966 F.2d
    273, 279 (7th Cir. 1992) . . . . . . . . . . . . . . . 25

Waste Management of NJ, Inc. v. Union County Utilities
    Authority, 399 N.J. Super. 508, 520 (App. Div.) . . . . . . 18

**RULES:**

Rule 4:14-1 . . . . . . . . . . . . . . . . . . . . . 30

Rule 4:14-9(a) . . . . . . . . . . . . . . . . . . . . 30

Rule 4:18-1(b) . . . . . . . . . . . . . . . . . . . . 30

(iii)

## PRELIMINARY STATEMENT

We respectfully submit this Brief to the Court in support of Plaintiff IdeaVillage Products Corp.'s ("IdeaVillage") Order to Show Cause, seeking preliminary injunctive relief against its former "exclusive" product development consultant, Defendant Brett Saevitzon ("Saevitzon"), and the Co-Defendants, which include various corporate entities owned and/or controlled by Saevitzon, as well as his agents and business affiliates.  As discussed more fully below, and as recently uncovered through investigation, Defendant Saevitzon and his cohorts have hijacked a potentially lucrative product development campaign ("Stompeez") from IdeaVillage and have compounded matters by failing to deliver the product to consumers in violation of consumer protection statutes and by refusing to supply product to IdeaVillage, so that it can fulfill a commitment to Walmart, IdeaVillage's largest retail customer.  Further, Saevitzon has perpetrated this scheme through fraudulent misrepresentations and misuse of the corporate form, utilizing at least three different LLCs in an attempt to cover his tracks.

As set forth in the Verified Complaint, IdeaVillage develops, markets, sells and distributes a variety of consumer products, both through direct response marketing and advertising (TV and internet infomercials) and more traditional retail channels, including big box retailers, such as Walmart.  In

February 2010, IdeaVillage entered into a Consulting Agreement with Defendant Saevitzon, through his business, All the J's, LLC (the "Agreement"), whereby Saevitzon agreed to act as a product finder for IdeaVillage on an **exclusive** basis.   Under the Agreement, IdeaVillage was to receive **all rights** to **any products** developed by Saevitzon or any of his **affiliates** during the term of the Agreement, which took effect on November 1, 2009, and continued through August 2011.

Under the Agreement, Saevitzon gained access to IdeaVillage's confidential business information, including financial reports, product development information and marketing plans and strategies, as well as access to IdeaVillage's network of industry contacts, including the producer of its television commercials, Defendant Infomercials, Inc. ("Infomercials").[1]   In return for his **exclusive** services under the Agreement, which includes a confidentiality provision and prohibitions on competition, Saevitzon received substantial compensation and family healthcare benefits from IdeaVillage, as well as reimbursement of his business expenses (in aggregate, more than **$370,000** between November 2009 and August 2011).

---

[1] As further discussed below, Defendant Infomercials, Inc., a Utah-based corporation, is an existing business partner of IdeaVillage and Infomercials has been named in this action for purposes of discovery, declaratory judgment and injunctive relief.   Infomercials has represented that it will abide by any Orders issued by the Court in this matter. Without prejudice to Plaintiff's rights, IdeaVillage has not asserted any causes of action against Infomercials in the Verified Complaint and, barring new evidence or information, it does not anticipate any such claims against Infomercials.

On August 29, 2011, Saevitzon notified IdeaVillage that he had decided to discontinue the relationship and was going to start developing products on his own. Just a few weeks later, Saevitzon approached IdeaVillage with two hot new product ideas: (1) **Stompeez**, a children's slipper/plush toy and (2) **Turbopak**, a children's backpack that converts to a scooter. Negotiations ensued and IdeaVillage and Saevitzon reached an interim agreement regarding retail distribution rights for Stompeez. With Saevitzon's full knowledge, support and encouragement, and in reliance on Saevitzon's representations that IdeaVillage would have retail distribution rights, IdeaVillage pitched Stompeez to Walmart, with whom IdeaVillage has an established business relationship. As a direct result of its meeting with Walmart in mid-October, IdeaVillage succeeded in securing placement for Stompeez in Walmart stores beginning February 2012, only to have Saevitzon subsequently attempt to limit IdeaVillage's retail distribution rights and to control all direct response TV marketing.

IdeaVillage recently discovered that, in violation of the Agreement, and contrary to his representations, Saevitzon developed, tested, advertised and marketed Stompeez during the term of the Agreement. To add insult to injury, Saevitzon developed the Stompeez product utilizing IdeaVillage's business

3

contacts, goodwill, and other resources, including its confidential business information, and while he was still receiving substantial monthly consulting fees and other compensation and expense reimbursement from IdeaVillage. More specifically, Saevitzon developed the commercial for Stompeez during the term of the Agreement with the assistance and financial support of Infomercials. In fact, it is believed, and discovery will confirm, that the test infomercial for Stompeez initially aired prior to Saevitzon's termination of the Agreement. Upon information and belief, Saevitzon has also entered into a business with Interactive Group, LLC and/or its affiliate, Prexio Toys, Ltd., concerning the distribution and sale of Stompeez.

In recent weeks, there have been numerous consumer complaints (more than 150 at one website) related to Stompeez on the internet. More specifically, numerous customers have complained that they placed an order for Stompeez and have not yet received the shipment and further, cannot get in contact with a customer service representative regarding their order. As explained in the Certification of Andy Khubani, IdeaVillage's founder and CEO, at this stage in a direct response campaign, any negative comments about a product, especially complaints of untimely delivery right before the holiday season, are extremely

4

detrimental to the product and the continued campaign. Thus, IdeaVillage has been, and will continue to be, irreparably damaged by defendants' actions.

Due to Saevitzon's material breach of the Agreement and subsequent and continuing violation of IdeaVillage's **exclusive rights** to Stompeez, with which the other Defendants have tortiously interfered, IdeaVillage has been, and will continue to, be irreparably damaged by Saevitzon and his business associates. Therefore, IdeaVillage respectfully requests that this Court issue the requested preliminary injunction to prevent any further irreparable harm to IdeaVillage. Moreover, IdeaVillage requests that the Court exercise its equitable powers and order the immediate release of the product and all intellectual property and business information relating to Stompeez, so that IdeaVillage may fulfill its commitment to Walmart and thereby preserve one of its most important retail business relationships.

## STATEMENT OF FACTS

IdeaVillage develops, markets, sells and distributes a variety of consumer goods, both through direct response marketing and TV/internet advertising (i.e., *As Seen on TV* infomercials) and retail channels. (Verified Complaint at ¶ 16; "Khubani Cert." at ¶ 2)  IdeaVillage has, over time, and at substantial expense, established a network of industry contacts, including with marketing and television production companies and others involved with the product development and production side of the business, and with major retailers, such as Walmart, K-Mart and Rite Aid, and other business entities involved with product distribution. (Verified Complaint at ¶ 16; Khubani Cert. ¶ 3)

From time to time, IdeaVillage engages outside consultants to identify and assist with the development of new products. (Verified Complaint at ¶ 18; Khubani Cert. ¶ 4)  These individuals or entities are commonly referred to as "product finders."  (Id.)  In or about November 2009, IdeaVillage retained Defendant Brett Saevitzon ("Saevitzon") and his company, All the Jays, LLC ("AJ"), to assist with new product development.  (Khubani Cert. ¶ 5)  The retention was memorialized in a Consulting Agreement executed by Defendant Saevitzon on or about February 5, 2010 (the "Agreement"). (Verified Complaint at Ex. 19; Khubani Cert., Ex. A)

6

Under the Agreement, Defendant Saevitzon was to work for IdeaVillage on an **exclusive basis** and IdeaVillage was to receive "**exclusive rights**" to the products on a worldwide basis, including the right to test the products through direct response television advertising (more commonly referred to as an "infomercial"). (Verified Complaint at ¶ 20; Khubani Cert. ¶ 7; Ex. A at ¶¶ 1.3, 2 and 5). In this regard, Saevitzon agreed to grant a license or, if not within his power, to assist IdeaVillage in obtaining the intellectual property rights to the product. (Verified Complaint at ¶ 20; Khubani Cert., Ex. A at ¶ 1.3) For any product that Saevitzon or his company did not own, Saevitzon agreed that he would "acquire or license all the necessary intellectual property rights necessary to test and launch a DRTV Test, national TV campaign and national retail campaign." (Id.) Saevitzon also agreed that he would introduce IdeaVillage to his manufacturing contacts and that he would allow IdeaVillage to assume all product production and distribution. (Verified Complaint at ¶ 20; Khubani Cert. ¶ 8; Ex. A at ¶ 1.3)

In return for his services, Saevitzon received a monthly consulting fee (a draw against future royalties) -- in excess of six figures in annual compensation), additional compensation to cover his family's healthcare benefits and full reimbursement of

travel and other business expenses. (Verified Complaint at ¶ 21; Khubani Cert. ¶ 10)

Over the course of a 20-month period, IdeaVillage paid Saevitzon more than $370,000, including: (a) consulting fees of more than $300,000; (b) medical insurance reimbursement of nearly $25,000; and (c) expense reimbursement in excess of $40,000 (including trips to IdeaVillage's headquarters in New Jersey, several meetings with representatives of Infomercials and meetings with Defendant von Mohr, as well as reimbursement of his cellular telephone charges). (Id.)

In return, and as an express condition of his retention, Saevitzon agreed that he would not engage in any competitive practices, nor provide competitive services to any other entity during the term of the Agreement. (Verified Complaint at ¶ 20; Khubani Cert. ¶ 9, Ex. A at ¶ 2)  Saevitzon also agreed that he and his company would hold all Confidential Information related to the products, including all information relating to the manufacture and sale of the product, in strict confidence and that he would not disclose Confidential Information, directly or indirectly, without the express written consent of IdeaVillage. (Verified Complaint at ¶ 22; Khubani Cert. ¶ 9, Ex. A at ¶ 2) Further, Saevitzon agreed to provide IdeaVillage with all confidential information related to the products, including all

8

"marketing strategy, customer testimonials, media reports and sales data." (Verified Complaint at ¶ 22; Khubani Cert. ¶ 9, Ex. A at ¶ 5)

Under the Agreement, Saevitzon was privy to IdeaVillage's confidential and most sensitive business information, including financial reports, product development strategies, marketing plans and industry contacts, including in the "As Seen on TV" category, which was new to Saevitzon at the time he began his consulting work for IdeaVillage. (Verified Complaint at ¶ 24; Khubani Cert. ¶ 11)

During the term of the Agreement, IdeaVillage successfully developed and launched a few different product concepts that Saevitzon brought to the company. (Verified Complaint at ¶ 25; Khubani Cert. ¶ 12). IdeaVillage utilized the services of Infomercials to produce the television spots for these products. (Id.) IdeaVillage had a prior business relationship with Infomercials and its CEO and owner, Douglas Fowkes, and IdeaVillage introduced Saevitzon to Infomercials and Fowkes. (Verified Complaint at ¶ 26; Khubani Cert. ¶ 12) In fact, Saevitzon was directed by IdeaVillage to bounce new product ideas for the company off of Infomercials and Fowkes. (Verified Complaint at ¶ 27; Khubani Cert. ¶ 12) Saevitzon's expense

9

reports to IdeaVillage reflect numerous meetings and calls with representatives of Infomercials.

Saevitzon's Agreement and compensation continued through the end of August 2011, at which time Saevitzon informed IdeaVillage that he did not wish to continue his consulting relationship with the company, but preferred to develop products on his own. (Verified Complaint at ¶ 28; Khubani Cert. ¶ 13; Ex. B)  Specifically, Saevitzon sent an email to IdeaVillage on August 29, 2011, stating that he was "very proud of what **we** have accomplished over the last 2 years," but that he wished to develop products on his own and that he believed that "doing [his] own shows, product development, etc will give us ALL a better shot of making money and achieving **mutual success.**" (Khubani Cert. Ex. B (emphasis added))

Just a few weeks after he terminated the Agreement, Saevitzon informed IdeaVillage that he had a couple of "winning shows" on his hands (i.e., industry lingo for a product that has been received favorably through an initial infomercial). (Verified Complaint at 29; Khubani Cert. ¶ 14)  Saevitzon presented two "new" products to IdeaVillage under a Confidentiality Agreement with a "new" company, Spot On Direct Response, LLC ("Spot On") (Verified Complaint at ¶ 31; Khubani Cert. ¶ 16; Ex. C)  One of the products was Stompeez, a

10

children's slipper that converts to a plush toy; the other was Turbopak, a children's back-pack that turns into a scooter. (Verified Complaint at ¶ 30; Khubani Cert. ¶ 15)

Saevitzon proposed a new business arrangement, whereby he would grant retail rights to the new products to IdeaVillage, but with his "new" company -- Spot On -- receiving a much higher percentage of the profits than under his prior Agreement with IdeaVillage.[2] (Verified Complaint at ¶ 32; Khubani Cert. ¶ 17) Negotiations ensued and an interim agreement was reached in or about the second week in October, just in time for a scheduled business meeting between IdeaVillage and representatives of Walmart. (Verified Complaint at ¶ 33) In fact, Saevitzon encouraged and supported IdeaVillage's sales pitch to Walmart, which is the largest retailer in this category and with whom IdeaVillage has a longstanding relationship. (Verified Complaint at ¶ 34; Khubani Cert. ¶ 18-19)

As a result of its meeting with Walmart in mid-October (Saevitzon was not a direct participant in the meeting), IdeaVillage succeeded in securing store placement for Stompeez with Walmart, to commence in February 2012. (Verified Complaint at ¶ 35; Khubani Cert. ¶ 18) However, Saevitzon continued to

---

[2] Upon information and belief, and as IdeaVillage has recently come to learn, Saevitzon actually formed Spot On in or about January 2011, while still under the Agreement with IdeaVillage. (Khubani Cert. ¶ 22)

11

"negotiate" with IdeaVillage, even after he agreed to allow IdeaVillage to make the pitch to Walmart, making additional demands – exclusive control of all DRTV and imposing further restrictions on retail distribution rights. (Verified Complaint at ¶ 34; Khubani Cert. ¶ 19; Ex. D)

IdeaVillage has since come to learn, through notice of a lawsuit filed by Eyes Wide Open Corporation ("EWO")[3] against Saevitzon and his affiliates, Spot On, DR Product Group and Paul von Mohr, in the Superior Court of the State of California, County of Los Angeles, that Saevitzon developed Stompeez during the term of his Agreement with IdeaVillage. (Verified Complaint at ¶ 38; Khubani Cert. ¶ 20)   It is also believed that Turbopak was conceived and developed by Saevitzon and his affiliates during the same time period. (Id.)   Saevitzon filed a U.S. federal trademark registration for Stompeez on **June 22, 2011**, which further serves to confirm that Saevitzon developed Stompeez during the term of the Agreement.   (Verified Complaint at ¶ 39; Khubani Cert., Ex. E at ¶ 30)

In its suit against Saevitzon, EWO asserts that it began discussions with Saevitzon and his business associate, von Mohr, regarding a concept similar to the Stompeez product in or about the **early Fall of 2010** and that it subsequently executed an

---

[3] Ironically, independent of Stompeez, IdeaVillage introduced Saevitzon to EWO.  (Khubani Cert. ¶ 21)

agreement with Saevitzon in April 2011.  (Verified Complaint at
¶ 39; Khubani Cert. ¶ 21, Ex. E, ¶¶ 14, 17)  Saevitzon, through
his counsel, asserts that he pitched the Stompeez product to EWO
as early as **November 2010**.  (Id., Ex. F)  Saevitzon was under an
**exclusive** contract with, and being compensated by, IdeaVillage
during that time period.  (Id.)

IdeaVillage does not recall Saevitzon having presented the
Stompeez product concept prior to his termination of the
Agreement.  (Verified Complaint at ¶ 41; Khubani Cert. ¶ 25)
Further, Saevitzon never advised IdeaVillage that he was
developing the product without IdeaVillage, and with the
assistance of Infomercials; nor did he ever provide IdeaVillage
the media test results as required under the Agreement.[4]  (Id.)
Had IdeaVillage been aware of the development of Stompeez and
the positive media results, it would have exercised its
"exclusive rights" to the product under the Agreement. (Verified
Complaint at ¶ 42; Khubani Cert. ¶ 26)  Further, IdeaVillage
never consented to Saevitzon's advertising, marketing or selling
Stompeez -- and IdeaVillage never would have agreed to allow

---

[4] When Saevitzon announced he had two winning shows just weeks after he had
terminated the consulting relationship, IdeaVillage was, naturally,
suspicious.  IdeaVillage made repeated requests for the media test results
for Stompeez, but to no avail.  In fact, it was only after IdeaVillage
received notice of the EWO lawsuit that Saevitzon finally provided test
results, and the information he provided was limited and incomplete.
IdeaVillage is confident that discovery will reveal that Saevitzon developed
and tested Stompeez before the termination of the relationship, while he was
continuing to invoice IdeaVillage and accept payment for his services under
the "exclusive" Agreement.

Saevitzon to pursue the product on his own had it known the truth. (Verified Complaint at ¶ 43; Khubani Cert. ¶ 32)

IdeaVillage has a longstanding relationship with Fowkes, who has an exceptional track record of picking winning products and producing television commercials. (Verified Complaint at ¶ 44; Khubani Cert. ¶ 27)   According to Fowkes, when questioned regarding his right to pursue Stompeez without IdeaVillage, Saevitzon misrepresented to Infomercials that he was a "free agent" (or words to that effect) and that he could proceed without the consent or participation of IdeaVillage. (Id.) Nevertheless, Fowkes has represented that, under an agreement with Saevitzon, Infomercials is in control of all commercial advertising and DTRV sales for Stompeez.[5] (Id.)  However, Folkes has indicated that he is not at liberty to provide that agreement to IdeaVillage in the absence of a court order. (Id.)

It has also come to IdeaVillage's attention that Interactive Group LLC, a/k/a Prexio Toys, Ltd (hereinafter "Prexio"), headquartered in Hong Kong, is controlling the procurement of the product from the factory in China, and has U.S.-based agents seeking to distribute and sell the product in retail in the U.S. and possibly elsewhere. (Verified Complaint

---

[5] It is noted that, over the term of the Agreement, Saevitzon expensed several meetings with representatives of Infomercials, Inc., as well as meetings with Paul von Mohr and EWO.

14

at ¶ 45; Khubani Cert. ¶ 28)   IdeaVillage, through counsel, has placed Fowkes and Prexio on notice of IdeaVillage's exclusive worldwide rights to Stompeez under the Agreement and of Saevtizon's breach of his obligations to IdeaVillage.  (Verified Complaint at ¶ 46; Khubani Cert. ¶¶ 27, 29; Exs. I and K) Rather than cease and desist, Prexio has continued to solicit Kmart.  (Khubani Cert. ¶ 29)   In addition, it has been reported to IdeaVillage that Prexio has agreed to "indemnify" Saevitzon and to help him shelter his ill-gotten gains overseas. (Id.)

IdeaVillage holds all rights to the Stompeez product under the Agreement.   Nevertheless, in the interests of mitigating damages and irreparable injury to its business relationships, IdeaVillage attempted to resolve the dispute through business negotiations with Saevitzon and Infomercials.   (Verified Complaint at ¶ 47; Khubani Cert. ¶ 23)   As of November 29, 2011, Fowkes has agreed to pull the television advertising and has indicated that Infomercials will abide by any Orders that may be issued by the Court in this matter concerning IdeaVillage's rights to Stompeez.  (Khubani Cert., Ex. J).   Accordingly, as noted above, Infomercials has been named in this litigation for purposes of discovery and injunctive relief -- to avoid any jurisdictional deficiencies with respect to the preliminary

injunction or any permanent injunctive relief that the Court may order in this matter.

Unfortunately, Saevitzon has not engaged in good faith negotiations and has even gone so far as to refuse to supply product to IdeaVillage for Walmart, which has already reserved placement in its stores for February 2012. (Verified Complaint at ¶ 47; Khubani Cert. ¶ 23) Further, it appears that Saevitzon has compounded matters by granting retail distribution rights -- which belong to IdeaVillage under the Agreement -- to Defendant Interactive Group, LLC and/or its affiliate, Prexio Toys, Ltd. (Verified Complaint at ¶ 48; Khubani Cert. ¶ 28) Nevertheless, as Defendants have been advised, if IdeaVillage is unable to deliver the product, its relationship with Walmart will be irreparably damaged. (Khubani Cert. ¶ 24)

Additionally, IdeaVillage is alarmed by the mounting customer complaints regarding Defendants' failure to deliver the product, as detailed on consumer internet blogs. (Verified Complaint at ¶ 49; Khubani Cert. ¶ 31, Ex. L) Such consumer complaints regarding failure to timely deliver product, especially right before the holidays, will result in irreparable harm to IdeaVillage and the product campaign. (Khubani Cert. ¶ 31)

## LEGAL ARGUMENT

New Jersey has long recognized the power of courts to "prevent some threatening, irreparable mischief, which should be averted until opportunity is afforded for a full and deliberate investigation of the case." Crowe v. De Gioia, 90 N.J. 126, 132 (1982) (citations omitted).

The right to injunctive relief is governed by the standards set forth in Crowe, supra.   Specifically, Plaintiff must demonstrate:

> (1)  Immediate and irreparable harm is likely unless the requested relief is granted;
> (2)  The applicable underlying law is well settled;
> (3)  The material facts are not substantially disputed and there exists a reasonably probability of ultimate success on the merits; and
> (4)  The balance of the hardship to parties (and the public interest) favors the issuance of the requested relief.

Crowe, 90 N.J. at 132-34.   See also Citizens Coach Co. v. Camden Horse R.R. Co., 29 N.J.Eq. 299, 303-04 (E. & A. 1878).

An interlocutory injunction is an extraordinary remedy, which should only be entered upon a showing of clear and convincing proof.  Dolon v. DeCapua, 16 N.J. 599, 614 (1954). Despite the heightened standard, New Jersey courts have also recognized that when a moving party merely seeks to preserve the status quo -- as IdeaVillage does here with regard to Walmart --

17

then the Court may take a less rigid view than it would after a
final hearing.  See Waste Management of NJ, Inc. v. Union County
Utilities Authority, 399 N.J. Super. 508, 520 (App. Div. 2008)
(citing General Electric Co. v. Gem Vacuum Stores, Inc., 36 N.J.
Super. 234, 236-37 (App. Div. 1955).  Nevertheless, even under
the more stringent "clear and convincing" standard, IdeaVillage
has met its burden and the grant of the requested relief would
represent "an appropriate exercise of sound judicial discretion"
by this Court. Id.

## A.   PLAINTIFF'S CLAIMS ARE PREDICATED UPON SETTLED LAW

The Agreement at issue is governed by New Jersey law.
(Khubani Cert., Ex. A, at ¶ 13).  Under New Jersey law, it is
well settled that "where the terms of a contract are clear and
unambiguous there is no room for interpretation or construction
and the courts must enforce those terms as written." Karl's Sale
and Service, Inc. v. Gimbel Brothers, Inc., 249 N.J. Super. 487,
493 (App. Div. 1991).

Here, the Agreement between IdeaVillage and Saevitzon
unambiguously establishes an **exclusive** right:

> AJ if possible shall grant to IV [IdeaVillage] or
> assist IV in obtaining **an exclusive license to
> market and distribute the Product.** AJ, if
> possible, shall grant to IV an **exclusive license
> for all intellectual property** around the United
> States and Worldwide, including but not limited
> to, all patents, copyrights and trademarks

18

associated with any t [sic] AJ product presented to IV under this Agreement.   AJ represents that for a Product that AJ does not own, it will acquire or license all the necessary intellectual property rights necessary to test and launch a DRTV Test, national TV campaign and national retail campaign. AJ, to the extent possible hereby grants IV an **exclusive license to any and all digital asserts and url's** that relate to any Product or AJ will assist IV in obtaining such rights.   If AJ does not own the rights to all the digital assets and url's, AJ shall assist IV in securing the rights.   AJ hereby grants IV an **exclusive license to test and/or use any existing DRTV Spot and existing direct response offers related to a Product.**   IV shall have the **exclusive right to purchase and/or manufacture, market and distribute the Product;** and the right to use trademarks in the United States and Worldwide (the "Territory") in all channels of trade including, but not limited to, television, internet, retail, mail order and catalog.

(emphasis added).

The contract between IdeaVillage and Saevitzon is unambiguous and, therefore, is enforceable as written.

It is equally settled that every contract in New Jersey contains an implied covenant of good faith and fair dealing. See Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396 (1997). The covenant dictates that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive fruits of the contract . . . .'". Id. (quoting Palisades Properties Inc. v. Brunetti, 44 N.J. 117, 130 (1965)); see also Bak-A-Lum Corp. v. Alcoa Building Products, Inc., 69 N.J. 123 (1976) (finding breach of the

implied covenant of good faith and fair dealing arising from manufacturer's termination of exclusive distributorship agreement with the plaintiff). As set forth in further detail below, Saevitzon's bad faith conduct constitutes a breach of the implied covenant.

The remainder of the claims against Saevitzon and the other Co-Defendants (aside from Infomercials) -- including claims against his Co-Defendants for tortious interference -- flow from Saevitzon's breach of the Agreement and fraudulent misrepresentations, and are similarly predicated on well settled legal doctrines and principles.[6]

Finally, it is well settled under New Jersey law that IdeaVillage has a protectable interest with respect to its product development, intellectual property, confidential business information, customer relationships and goodwill. See Sun Dial Corp. v. Rideout, 16 N.J. 252, 259 (1954); Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 299 (2001); Platinum Management, Inc. v. Dahms, 285 N.J. Super. 274, 295 (Law Div. 1995).

---

[6] Plaintiff's Verified Complaint alleges: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) promissory estoppel; (4) tortious interference with contract; (5) unfair competition; (6) tortious interference with prospective economic advantage; and (7) declaratory judgment.

**B.   THE MATERIAL FACTS ARE UNCONTROVERTED AND THERE IS A REASONABLE PROBABILITY OF ULTIMATE SUCCESS ON THE MERITS**

Under _Crowe_, _supra_, IdeaVillage must demonstrate a reasonable probability of ultimate success on the merits. However, "mere doubt as to the validity of the claim is not an adequate basis for [denial of the requested relief]." _Crowe_, 90 N.J. at 133 (citations omitted).

Here, the breach of the Agreement by Saevitzon is firmly established and the material facts are uncontroverted.  Indeed, by Saevitzon's own admission (through his counsel in the California litigation), he began developing Stompeez in **November 2010**, during the term of his **exclusive** Agreement with IdeaVillage and nearly a year before he finally disclosed to IdeaVillage that he had developed a DRTV campaign for the product.  (Khubani Cert. ¶ 21; Ex. F).  It is beyond dispute that Saevitzon developed Stompeez on the company's dime, and utilizing IdeaVillage's business contacts, goodwill, and other resources, including its confidential business information.

Saevitzon's conduct is in direct violation of the exclusivity clause of the Agreement, as well as Saevitzon's agreement to: (1) not engage in or provide any competitive services to any other entity during the term of the Agreement; (2) hold all Confidential Information related to the products in strict confidence; and (3) provide IdeaVillage with all

21

confidential information and intellectual property related to the products. (Khubani Cert. at 9; Ex. A ¶¶ 2, 5) Moreover, Saevitzon's wrongful conduct, including his concealment of the product development and termination of the Agreement after having received the initial media test results confirming that Stompeez was a hit, represents a fundamental breach of the implied covenant of good faith and fair dealing. See Bak-A-Lum, supra, 69 N.J. at 130 ("defendant's selfish withholding from plaintiff of its intention seriously to impair its [exclusive] distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of good faith . . . .").

To add insult to injury, IdeaVillage introduced Saevitzon to Fowkes and Infomercials -- and it was through this contact that Saevitzon was able to obtain television production and media test results for Stompeez. Saevitzon was required to share this information with IdeaVillage, but he did not. Instead, he concealed the information and engaged in fraudulent misrepresentations in an effort to cover his tracks.

During the term of the Agreement, Saevitzon also formed a competing business, Spot On, and engaged in fraudulent misrepresentations in an effort to induce IdeaVillage to enter into a new contractual relationship regarding the sale and

22

marketing of Stompeez. Upon information and belief, Saevitzon has also entered into an agreement with Interactive Group LLC and/or its affiliate, Prexio Toys Ltd. concerning the marketing and sale of Stompeez, and it appears Saevitzon has improperly granted those Defendants retail distribution rights, which belong exclusively to IdeaVillage under the Agreement.[7]

As the Co-Defendants have been advised prior to this litigation, IdeaVillage has the exclusive right under the Agreement to market and distribute Stompeez in retail, as well as through direct response marketing and, therefore, the Co-Defendants' conduct represents tortious interference, which, if unabated, will cause irreparable harm to IdeaVillage. See Lighting Lube, Inc. v. Witco, 4. F.3d 1153, 1167 (1993) ("Although businesses have the right to compete fairly with one another, that right does not extend to actions taken with the malicious purpose of harming a competitor's business.") (citing

---

[7] Saevitzon may attempt to argue that the Agreement expired after one year. However, it is beyond any genuine dispute that IdeaVillage and Saevitzon both continued to perform according to the same materials terms of the Agreement after the initial one-year period. In fact, as late as June 1, 2011, IdeaVillage confirmed that the consulting agreement remained "exclusive" and Saevitzon accepted that proposition. See Khubani Cert., Ex. G. Accordingly, under black letter contract principles, the material terms and obligations of the Agreement survived, notwithstanding any lapse of the initial contract term. See Luden's Inc v. Local Union No. 6, 28 F.3d 347, 355-56 (3d Cir. 1994) (decided under federal common law). Accord Martin v. Campanaro, 156 F.2d 127, 129 (2d Cir. 1946).

Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751 (1989))

C.   **IDEAVILLAGE WILL SUFFER IRREPARABLE HARM IF DEFENDANTS ARE NOT ENJOINED FROM THE MARKETING AND SALE OF STOMPEEZ**

Under New Jersey law, irreparable harm is defined as a type of harm that "cannot be redressed adequately by monetary damages[;]" such inadequacy depends on the "nature of the injury or of the right affected." Crowe, supra, at 133. Defendants have violated IdeaVillage's exclusive right to the Stompeez product and, thus, have caused IdeaVillage immediate, substantial, and irreparable harm. IdeaVillage will continue to be damaged unless Defendants are enjoined from engaging in the development, marketing and sale of Stompeez.

As discussed above, Saevitzon has breached the exclusivity provision in his Agreement with IdeaVillage. Courts have routinely held that an alleged breach of an exclusivity clause constitutes irreparable harm because of the difficulty in estimating damages due to the loss of competitive market position -- a proposition accepted by the New Jersey Appellate Division.[8] See e.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1262-65 (10th Cir. 2004) (discussing cases but finding no irreparable harm in that case -- however, the court "agree[d] with the generally accepted

---

[8] See Toyrus.com, LLC v. Amazon.com Kids, Inc., 2005 WL 846141 (App. Div. 2005).

position that breach of an exclusivity clause almost always warrants the award of injunctive relief;" see also Walgreen Co. v. Sara Creek Prop. Co., B.V., 966 F.2d 273, 279 (7th Cir. 1992) (noting that injunctions to enforce exclusivity clauses are likely to be justifiable due to the difficultly in calculating adequate damages).

IdeaVillage's competitive market position has been threatened. In recent weeks, there have been mounting customer complaints on consumer internet blogs regarding Defendants' failure to deliver the product. In fact, one website contains more than 150 complaints from customers who have failed to receive the product and/or have been unable to reach a customer service representative regarding their order.[9] Such consumer complaints are extremely detrimental to the current and future product campaign, especially in light of the fast approaching holiday season.

Further, the product placement deal with Walmart, slated for February 2012, is jeopardized not only by Saevitzon's prior development and marketing efforts, but also his ongoing refusal to supply IdeaVillage with the product and related information and Defendants' misappropriation of retail distribution that rightfully belongs to IdeaVillage. This similarly constitutes

---

[9] See e.g., http://www.asseenontvonsale.com/fun-and-toys/stompeez/

irreparable harm.   See J.I. Kislak, Inc. v. Artof., 13 N.J. Misc. 129, 132 (Ct. Ch. 1935) ("[t]he impairment of [a] business and the diversion of its clientele to other channels is of a much more serious nature.   That loss, or damage, is not calculable or readily ascertainable."); see also, A. Hollander & Son v. Imperial Fur Blending Corp., 2 N.J. 235, 249 (1949) ("when [an] employee through his employment has learned of the business practices and methods of his employer which if disclosed to a competitor may result in irreparable injury to the complainant, the court may presume irreparable injury will ensue from the breach of the [post-employment] covenant.").

There is no question that IdeaVillage's damages arising from Saevitzon's pirating of Stompeez will not be easily quantified and damages at law will not be adequate to compensate IdeaVillage for the loss of the product and competitive market position.

## D.   THE EQUITIES FAVOR THE GRANT OF INTERLOCUTORY INJUNCTIVE RELIEF

The final element of Crowe, requires the Court to consider "the relative hardship to the parties in granting or denying relief." Crow, supra, at 134.   A balancing of the equities in this case clearly favors IdeaVillage.

Despite fulfilling its obligations under the Agreement, IdeaVillage has been deprived of the exclusive right to market

26

and distribute the Stompeez product.  As discussed in further detail above, with Saevitzon's full knowledge, support and encouragement, IdeaVillage has secured placement for Stompeez with Walmart -- a deal which is now in jeopardy due to Saevitzon's misconduct.  Accordingly, the detriment to IdeaVillage is substantial -- it does not possess the Stompeez product or control the intellectual property (as it should under the Agreement) and, thus, its business relationship with Walmart (and general business reputation) hangs in the balance. Moreover, the loss of competitive market position will be irreversible.  Public perception of the product has been, and will continue to be, greatly diminished due to Defendants' actions and, more specifically, their failure to deliver the product to consumers.  IdeaVillage has already suffered irreparable harm -- this is evidenced by consumers opting to not purchase the Stompeez product after reading negative reviews on consumer internet blogs.  (See Khubani Cert. Ex. L).

There is no countervailing interest in Saevitzon's favor. To the contrary, and with respect to Walmart in particular, equity dictates that Saevitzon should be estopped from asserting any opposition to the restraints.  See Pop's Cones v. Resorts International Hotels, 307 N.J. Super. 461, 1325 (App. Div. 1998).  Prior to the meeting with Walmart in mid-October,

27

Saevitzon represented that IdeaVillage would have the retail rights with respect to Stompeez, and IdeaVillage reasonably relied on Saevitzon's representations in this regard.[10]  There is no countervailing legitimate or hardship, especially considering Saevitzon's fraudulent and bad faith conduct as detailed in the Verified Complaint.

Under Crowe, supra, the Court must also consider the public interest.  Clearly, the grant of equitable relief in this instance will further the public interest.  See Marselli-Warner Corp. v. Rabens, 51 F.Supp.2d 508, 533 (D. NJ 1999) ("[w]here a party demonstrates both the likelihood of success on the merits and irreparable injury, 'it almost always will be the case that the public interest will favor' the issuance of an injunction." (citations omitted)); see also Ingersoll-Rand Company v. Ciavatta, 110 N.J. 609, 639 (1988) (noting that "the public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more, generally, knowledge and technique in which the employer may be said to have a proprietary interest.").

---

[10] As set forth in Pop's Cones, supra, the fact that the "new deal" was never executed by Saevitzon does not relieve him of his obligations, especially given his prior breach of the Agreement and the implied covenant of good faith and fair dealing.  See Bak-A-Lum, supra, 69 N.J. at 130.

IdeaVillage will continue to suffer severe hardship and irreparable injury to its business in absence of preliminary injunctive relief.   In contrast, the effect of an injunction on Defendants would merely require Saevitzon to adhere to the terms of the Agreement he freely entered into in 2009 and require the other Defendants to refrain from further tortious interference with that contractual relationship and IdeaVillage's prospective economic advantage.

**E. PLAINTIFF IS ENTITLED TO EXPEDITED DISCOVERY**

It is well settled under New Jersey law that a court may, in its discretion, order expedited discovery. See e.g., Charles Gendler & Co., Inc. v. Telecom Equip. Corp., 102 N.J. 460, 483 (1986); Makopoulos v. Walt Disney World, Inc., 221 N.J. Super. 513, 519-20 (App. Div. 1987); Pogastin v. Leighton, 216 N.J. Super. 363, 366 (App. Div.), cert. denied sub nom. Leighton v. Uniroyal, 484 U.S. 964 (1987); Lyons v. Premo Pharm. Labs. Inc., 170 N.J. Super. 183, 189 (App. Div.), certif. denied, 82 N.J. 267 (1979); Simon v. Oldsman Tvvn., 203 N.J. Super 365, 377 (Ch. Div. 1985); Boardwalk Regency Corp. v. Attorney General of State of NJ, 188 N.J. Super. 372, 373 (Law Div. 1982).   The Rules Governing the Courts of the State of New Jersey expressly provide the courts with such broad discretionary power.   For example, R. 4:14-1 provides, with respect to depositions:

29

> Except as otherwise provided by R. 4:14-9(a), after
> commencement of the action, any party may take the
> testimony of any person, including a party, by
> deposition upon oral examination.   Leave of court,
> granted with or without notice, must be obtained only
> if the plaintiff seeks to take a deposition prior to
> the expiration of thirty (30) days after service of
> the summons and complaint upon the defendant by any
> manner . . . .

R. 4:14-1.  The Court may also shorten the 10-day notice period

for depositions, R. 4:14-1(a) and (b), and the 30-day response

time  for  requests  to  produce  documents.    R.  4:18-1(b) ("On

motion, the court may allow a shorter or longer time.")

Expedited   discovery   is   frequently   ordered   where   a

preliminary injunction hearing is to be held within a short

period after the commencement of an action. See e.g., Gulf &

Western Indus., Inc. v. Great Atl. & Pac. Tea Co. Inc., 476 F.2d

687, 692 (2d Cir. 1973); General Host Corp. v. Triumph Am.,

Inc., 359 F.Supp. 749, 751 (S.D.N.Y. 1973).   An expedited

discovery schedule in this case is necessary to more fully

develop, for the Court's consideration at the preliminary

injunction hearing, a factual record regarding the development

of Stompeez and the related dealings between the various

parties.

Initial discovery will be relatively limited and will not

unduly burden the Defendants.  Counsel for IdeaVillage will, of

30

course, cooperate with counsel for Defendants to reasonably accommodate any challenges presented by an expedited schedule.

### CONCLUSION

For the foregoing reasons, Plaintiff IdeaVillage respectfully submits that the Court should grant the injunctive requested relief as set forth in more detail in the proposed form of Order attached hereto.

Respectfully submitted,

**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
*Attorneys for Plaintiff
IdeaVillage Products Corp.*

By:_____
        Michael G. Langan

DATED:   December 6, 2011

EXHIBIT  C

You have reached the cached page for http://www.linkedin.com/pub/brett-saevitzon/17/59A/890

Below is a snapshot of the Web page as it appeared on 1/23/2012 (the last time our crawler visited it). This is the version of the page that was used for ranking your search results. The page may have changed since we last cached it. To see what might have changed (without the highlights), go to the current page.

You searched for: brett saevitzon We have highlighted matching words that appear in the page below.

Bing is not responsible for the content of this page.

**Brett Saevitzon**

Founder at Spot On Direct Response
Greater Los Angeles Area | Consumer Goods

Join LinkedIn and access Brett Saevitzon's full profile.

As a LinkedIn member, you'll join 135 million other professionals who are sharing connections, ideas, and opportunities. And it's free! You'll also be able to:

• See who you and Brett Saevitzon know in common
• Get introduced to Brett Saevitzon
• Contact Brett Saevitzon directly

**Brett Saevitzon's Overview**

| | |
|---|---|
| Current | Founder at Spot On Direct Response |
| | Partner at D.R. Product Group, LLC |
| | Founding Partner at Pinnacle Direct Marketing |
| Past | CEO and Founder at PureBeauty |
| | ceo at purebeauty |
| | CEO at Pure Beauty / Advanced Beauty |
| | see all |
| Education | University of Johannesburg |
| | Damelin |
| | king david victory park |
| Recommendations | 1 person has recommended Brett |
| Connections | 475 connections |
| Websites | Company Website |

**Brett Saevitzon's Summary**

I have built a career focusing on leading and developing teams and brands to achieve corporate objectives. I have subscribed to the policy of "building clocks as opposed to telling the time."

I am a co founder of Spot On Direct Response. Prior to joining Spot On, I spent the last 20 years as a successful CEO, President, and business owner, achieving exponential revenue, market share, and brand equity growth in the mass, retail, prestige, and direct response (DRTV) beauty and fashion industries. I has always had as a core belief that leadership is about stewardship, and not ownership, and due to this he has been adept at transforming corporate cultures to foster creativity and innovation.

led a $150 million skin care company to achieve 100% growth in domestic sales and expansion of international markets, with a 50% increase in EDITDA, executed a sale of the brand to a strategic acquirer.

As COO of Freeman Cosmetics, we built the company into a major national and international brand targeting the mass market, while growing EBITDA 20% per year, and sold the company to Dial corporation

With he Freeman Family founded a "pre-eminent" beauty company, PUREBEAUTY, and grew it to 65 stores in six states.

I has had a significant history in the direct response arena, having created his own shows, and later in conjunction with his, launched a beauty franchise on television.

Specialties
Here are an example of some of my shows.
Aminogenesis, Graciecombatives, AcneMD, Altrist, True Ceramic Pro, Body Solution, Striation, Shrinkware, etc

**Brett Saevitzon's Experience**

**Founder**
**Spot On Direct Response**
January 2011 – Present (1 year) | Greater Los Angeles Area
Spot On Direct Response is a leading direct response television and retail marketer. Spot On has created highly successful brands in such diverse categories as Toys, Crafts, housewares, and health & beauty.

Spot On offers a complete product development capability specializing in the development of products from concept to the ultimate consumer.

**Partner**
**D.R. Product Group, LLC**
August 2009 – Present (2 years 5 months)

Focused in direct response campaigns, with expertise in beauty, Fitness and intellectual property, with material drive to retail ability. Currently 3 shows on the air and 6 in development.

I would love to hear about your ideas, no matter how far out there....

**Founding Partner**
**Pinnacle Direct Marketing**
January 2008 – Present (4 years)

Product concept and evaluation. Production of the direct response commercial and fostering relations with applicable retailers

**CEO and Founder**
**PureBeauty**
January 1999 – May 2005 (6 years 5 months)

C-Creator and Founder of pre eminent beauty retailer. Built the chain into 65 stores, with focus on those unique hard to find items, along with her everyday beauty needs.

**ceo**
**purebeauty**
1999 – 2005 (6 years)

**CEO**
**Pure Beauty / Advanced Beauty**
1999 – 2005 (6 years)

**CEO**
**Pure Beauty**
1999 – 2005 (6 years)

**COO**
**Freeman Cosmetics**
1992 – 1999 (7 years)

---

Brett Saevitzon's Skills

Direct Response marketer

---

Brett Saevitzon's Education

**University of Johannesburg**
BCOMM, CA, Accountancy and business
1981 – 1985

**Damelin**
High School, Grades 10,11 and 12
1978 – 1980

**king david victory park**
High School, Grades 7,8 and 9
1975 – 1978

---

Brett Saevitzon's Additional Information

Websites:          • Company Website

Groups and
Associations:       DMA  Official Direct Marketing Association

---

Contact **Brett** for:

| | |
|---|---|
| career opportunities | consulting offers |
| new ventures | job inquiries |
| expertise requests | business deals |
| reference requests | getting back in touch |

View **Brett Saevitzon**'s full profile to...

• See who you and Brett Saevitzon know in common

- Get introduced to Brett Saevitzon
- Contact Brett Saevitzon directly

View Full Profile

LinkedIn member directory - Browse members by country   a b c d e f g h i j k l m n o p q r s t u v w x y z more

LinkedIn Corporation © 2011   |

EXHIBIT D

# MASSOOD & BRONSNICK, LLP

JOSEPH A. MASSOOD
ANDREW R. BRONSNICK *

_____

*NJ, NY, DC and MD Bars
^ NJ and NY Bars
+ NJ, NY, DC and WA Bars

COUNSELLORS AT LAW

50 PACKANACK LAKE ROAD EAST
Wayne, New Jersey 07470-6663
(973) 696-1900
Fax (973) 696-4211

Email: MAIL@MASSOODLAW.COM

KEVIN J. SAVAGE +
BRENDAN H. MORRIS ^
ALLISON T. KURTZ

PARALEGALS
ELIZABETH BABITSCH
DARA K. SIERRA

January 3, 2012

<u>VIA ECF & REGULAR MAIL</u>
Honorable William J. Martini, USDJ
Martin Luther King, Jr. Federal Bldg. & Courthouse
50 Walnut Street
Newark, NJ 07101

     Re:    IdeaVillage Products Corp. v. Saevitzon et al.
              Civil Action No.: 11-CV-7548

Dear Judge Martini:

     Our firm represents Paul von Mohr ("von Mohr"), a named Defendant in the above-referenced matter. Please accept this letter in response to the December 30, 2011 letter from Mr. Langan on behalf of Plaintiff, IdeaVillage Products Corporation ("IDV").

     Mr. von Mohr did not actually receive the Verified Complaint and Order to Show Cause from the State Court action until his return to Florida from Hong Kong on December 12, 2011. The Removal Petition was filed after due consideration of the various parties and facts contained within IDV's Verified Complaint.

     With respect to the issue of diversity, the only Defendant identified by IDV with any relationship to New Jersey is Interactive Group, LLC. However, according to the entity's managing member, Interactive Group, LLC does not have and has never had any commercial relationship with any party to this suit. Furthermore, Interactive Group, LLC does not engage and has never engaged in any business activity of any kind. To this point, Interactive Group, LLC has never filed tax returns, hired employees, maintained bank accounts or conducted business of any nature since its formation. In short, the entity was formed in 2009, but has not engaged in any business of any kind.

     The Verified Complaint, paragraph 14, alludes to another company, Interactive Group Limited, headquartered in Hong Kong. Therefore, IDV's pleadings and correspondence to Your Honor confirm the confusion and potentially self-serving aspect of IDV's allegations in an effort to demonstrate lack of diversity for jurisdictional purposes. In fact, the Removal Petition refers to "Interactive Group Hong Kong LTD,

**2** | P a g e
January 3, 2012

(improperly pled as Interactive Group, LLC)," which is a more accurate characterization
than the assertion by IDV.

Prior to filing the Removal Petition, I consulted with the significant Defendants
and obtained their consent for the removal. Any remaining Defendants, even if they were
properly served, are nominal parties to this action.

Finally, we take issue with IDV's position regarding the applicability of the
Lanham Act.  Since the Unfair Competition allegations in IDV's Verified Complaint
involve allegations against Defendants other than Mr. von Mohr, it would be more
prudent to await a formal motion, if any, on this point.

Based upon the foregoing, we respectfully request that Plaintiff's request to *sua
sponte* remand this matter be denied and a formal motion be submitted for proper
consideration before Your Honor.

We thank Your Honor for your time and attention.

Respectfully,

/s/ *Andrew R. Bronsnick*

ANDREW R. BRONSNICK

cc: All Counsel of Record (Via ECF Delivery)